## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FIONA PARNIGONI, DAVID PARNIGONI, and ANDREW PARNIGONI, | ) ) ) | |
| 4412 S. 34th St. Arlingon, VA 22206 | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | 1:08-cv-00613 (RBW) |
| v. | ) ) | |
| ST. COLUMBA'S NURSERY SCHOOL, ST. COLUMBA'S EPISCOPAL CHURCH, VESTRY OF ST. COLUMBA'S PARISH, REV. JANET VINCENT, and JULIA H. BERRY, | ) ) ) ) ) | |
| 4201 Albermarle Street, N.W. Washington, D.C. 20016 | ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

## DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT
## PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

Defendants St. Columba's Nursery School, St. Columba's Episcopal Church, Vestry of St. Columba's Parish, Rev. Janet Vincent, and Julia H. Berry respectfully request that Plaintiffs' Amended Complaint be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. The Motion is supported by the attached Statement of Points and Authorities.

Date: June 4, 2008                                    Respectfully Submitted,


                                                       /s/ David W. DeBruin
                                                      David W. DeBruin (D.C. Bar No. 337626)
                                                      Luke C. Platzer (D.C. Bar No. 501274)
                                                      JENNER & BLOCK LLP
                                                      1099 New York Avenue, NW
                                                      Suite 900
                                                      Washington, DC 20001-4412
                                                      (202) 639-6015 (tel)
                                                      (202) 637-6375 (fax)

                                                      *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 4th day of June 2008, I caused a copy of the foregoing

Motion to Dismiss to be served upon the following by First Class Mail and via the Court's ECF

system:

> Sundeep Hora
> Leslie David Alderman, III
> ALDERMAN, DEVORSETZ & HORA PLLC
> 1025 Connecticut Ave., N.W.
> Suite 615
> Washington, DC 20036
>
> *Counsel for Plaintiffs*

                                    _/s/ David W. DeBruin_____
                                    David W. DeBruin

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| FIONA PARNIGONI, DAVID PARNIGONI, and ANDREW PARNIGONI, | ) ) ) | |
| 4412 S. 34th St. Arlingon, VA 22206 | ) ) ) | |
| Plaintiffs, | ) ) ) | 1:08-cv-00613 (RBW) |
| v. | ) ) | |
| ST. COLUMBA'S NURSERY SCHOOL, ST. COLUMBA'S EPISCOPAL CHURCH, VESTRY OF ST. COLUMBA'S PARISH, REV. JANET VINCENT, and JULIA H. BERRY, | ) ) ) ) ) ) | |
| 4201 Albermarle Street, N.W. Washington, D.C. 20016 | ) ) ) ) | |
| Defendants. | ) ) ) | |

**DEFENDANTS' STATEMENT OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT**
**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

David W. DeBruin (D.C. Bar No. 337626)
Luke C. Platzer (D.C. Bar No. 501274)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
(202) 639-6015 (tel)
(202) 637-6375 (fax)

*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................1

BACKGROUND .............................................................................................2

    A.    David Parnigoni's Criminal Conviction and Other Public Disclosures................. 2

    B.    Reverend Vincent's Letter And Julia Berry's Letter. ............................................ 4

STANDARD....................................................................................................8

ARGUMENT ...................................................................................................9

I.    NEITHER LETTER CONTAINS FACTS DEFAMATORY TO FIONA OR
ANDREW PARNIGONI AS A MATTER OF LAW (COUNT I)....................................9

    A.    Neither Letter At Issue Contains A Single False Or Defamatory Fact Or Is
Defamatory By "Implication."..................................................................... 9

    B.    The October Letter's Statement That Parents Were Entitled To Know
About Mr. Parnigoni's Conviction Also Is Constitutionally Protected As
An Opinion Based On Disclosed Facts.............................................................. 16

II.    VIRGINIA DOES NOT RECOGNIZE CLAIMS FOR "FALSE LIGHT" OR
"PUBLICATION OF PRIVATE FACTS," AND PLAINTIFFS FAIL IN ANY
EVENT TO STATE CLAIMS UNDER EITHER THEORY (COUNTS II AND
III). ...............................................................................................................18

    A.    Virginia Law Governs And Rejects Both Theories of Liability Here. ................. 18

    B.    Plaintiffs' "False Light" Claim Would Also Fail Under D.C. Law for the
Same Reasons As Their Defamation Claim......................................................... 21

    C.    Plaintiffs' "Publication of Private Facts" Claim Would Also Fail Under
D.C. Law Because The Fact Allegedly Publicized Was Not Publicized,
Was Not Private, And Was Of Legitimate Public Concern To The Parish. ......... 22

III.    THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM
FAILS BECAUSE DEFENDANTS' ALLEGED CONDUCT WAS NOT AN
'OUTRAGE' AND PLAINTIFFS' ALLEGED INJURIES WERE NOT
'SEVERE' (COUNT IV). ....................................................................................25

IV.    MRS. PARNIGONI'S SUPPOSED RELIANCE ON DEFENDANT JULIA
BERRY'S PREDICTION ABOUT HOW THE CONTROVERSY WOULD
SUBSIDE DOES NOT CREATE A CLAIM FOR PROMISSORY ESTOPPEL
(COUNT V). ...................................................................................................28

V.    THE "LOSS OF CONSORTIUM" CLAIMS ARE DERIVATIVE (COUNTS VI,
VII, AND VIII). ...............................................................................................29

VI.    THE PROVISION OF TRUTHFUL INFORMATION ABOUT MR.
PARNIGONI WAS NOT WRONGFUL AND CANNOT STATE A CLAIM
FOR INTERFERENCE WITH MRS. PARNIGONI'S ECONOMIC
RELATIONS (COUNT IX)....................................................................................30

VII.    DEFENDANTS WERE UNDER NO DUTY TO ANTICIPATE AND
        DISCLOSE TO PLAINTIFFS THAT THEY WOULD NOTIFY THE PARISH
        OF MR. PARNIGONI'S CRIMINAL CONVICTION (COUNT X)...............................31

CONCLUSION AND RELIEF REQUESTED ...........................................................................33

## TABLE OF AUTHORITIES

CASES                                                                PAGE(S)

*Alexander v. Wash. Gas Light Co.*,
   481 F. Supp. 2d 16 (D.D.C. 2006) .......................................................................12

*Almy v. Grisham*,
   639 S.E.2d 182 (Va. 2007).............................................................................26

*Anderson v. Sharma*,
   No. 125374, 1992 WL 884771 (Va. Cir. Ct. June 30, 1992)...............................30

*Bell Atl. Corp. v. Twombly*,
   127 S. Ct. 1955 (2007)...............................................................................8, 26

*Bell ex rel. Albert R. Bell Living Trust v. Rotwein*,
   535 F. Supp. 2d 137 (D.D.C. 2008) ...............................................................32

*Benz v. Wash. Newspaper Pub. Co.*,
   No. 05-1760 (EGS), 2006 WL 2844896 (D.D.C. Sept. 29, 2006)...........................11

*Blodgett v. University Club*,
   930 A.2d 210 (D.C. 2007) ............................................................................26

*\*Coles v. Washington Free Weekly*,
   881 F. Supp. 26 (D.D.C. 1995)................................................................8, 11, 17

*Crowley v. North American Telecomm. Ass'n*,
   691 A.2d 1169 (D.C. 1997) ...........................................................................27

*Daisley v. Riggs Bank, N.A.*,
   372 F. Supp. 2d 61 (D.D.C. 2005) .................................................................29

*Foretich v. CBS*,
   619 A.2d 48 (D.C. 1993) ..............................................................................20

*\*Foretich v. Glamour*,
   741 F. Supp. 247 (D.D.C. 1990) ............................................................... 19, 20

*Government of Rwanda v. Rwanda Working Group*,
   227 F. Supp. 2d 45 (D.D.C. 2002)...................................................................3

*Granfield v. Catholic University of America*,
   530 F.2d 1035 (D.C. Cir. 1976)......................................................................29

*Guilford Transp. Indus. v. Wilner*,
   760 A.2d 580 (D.C. 2000) ............................................................................14

*Harris v. Kreutzer*,
    624 S.E.2d 24 (Va. 2006)..........................................................26, 27, 28

*Herbert v. District of Columbia*,
    808 A.2d 776 (D.C. 2002) .........................................................30

*Hill v. Medlantic Health Care Group*,
    933 A.2d 314 (D.C. 2007) .........................................................30

*Houlahan v. World Wide Association of Specialty Programs and Schools*,
    No. Civ. A. 04-01161 HHK, 2006 WL 785326 (D.D.C. Mar. 28, 2006)..............17

*Houlahan v. World Wide Association of Specialty Programs and Schools*,
    No. Civ. A. 04-01161 HHK, 2006 WL 2844190 (D.D.C. Sept. 29, 2006)........14, 16

*Howard v. Antilla*,
    294 F.3d 244 (1st Cir. 2002)......................................................22

*Howard University v. Best*,
    484 A.2d 958 (D.C. 1984) .........................................................13

*Hustler Magazine v. Falwell*,
    485 U.S. 46, 108 S. Ct. 876 (1988)...............................................25

*In re XM Satellite Radio Holdings Securities Litigation*,
    479 F. Supp. 2d 165 (D.D.C. 2007) ................................................5

*Int'l City Mgmt. Ass'n Retirement Corp. v. Watkins*,
    726 F. Supp. 1 (D.D.C. 1989)......................................................31

*Johnson v. Richmond Newspapers, Inc.*,
    No. LB-715-4, 1996 WL 1065656 (Va. Cir. Ct. Dec. 13, 1996)...........................19

*Klayman v. Segal*,
    783 A.2d 607 (D.C. 2001) ...............................................9, 10, 11, 21

*Kowal v. MCI Commc'n Corp.*,
    16 F.3d 1271 (D.C. Cir. 1994).....................................................8, 23

*Lindemuth v. Jefferson County Sch. Dist.*,
    765 P.2d 1057 (Colo. Ct. App. 1988) .............................................28

*Maniaci v. Georgetown University*,
    510 F. Supp. 2d 50 (D.D.C. 2007)..................................................2

*Marsh v. Hollander*,
    339 F. Supp. 2d 1 (D.D.C. 2004)...............................................11, 12

*Martin v. Arc of Dist. of Columbia*,
  541 F. Supp. 2d 77 (D.D.C. 2008) ....................................................................................26

*Metropolitan Life Ins. Co. v. Barbour*,
  No. 07-1665, 2008 WL 2096350 (D.D.C. May 19, 2008) .......................................26

*Miles v. National Enquirer, Inc.*,
  38 F. Supp. 2d 1226 (D. Colo. 1999) ...............................................................................28

*Moldea v. New York Times Co.*,
  15 F.3d 1137 (D.C. Cir. 1994) .............................................................................................22

*Ollman v. Evans*,
  750 F.2d 970 (D.C. Cir. 1984) .............................................................................................13

*Parker v. Martin*,
  905 A.2d 756 (D.C. 2006) ...................................................................................................30

*\*Parnigoni v. District of Columbia*,
  933 A.2d 823 (D.C. 2007) ...........................................................................................2, 3, 22

*\*Pearce v. E.F. Hutton Group, Inc.*,
  664 F. Supp. 1490 (D.D.C. 1987) ............................................................................... 19, 20

*Provencio v. Paradigm Media, Inc.*,
  44 S.W.3d 677 (Tex. App. 2001) ........................................................................................25

*Raymen v. United Senior Association, Inc.*,
  409 F. Supp. 2d 15 (D.D.C. 2006) .....................................................................................12

*Richards v. Duke University*,
  480 F. Supp. 2d 222 (D.D.C. 2007) ..................................................................................26

*Roe ex rel. Roe v. Heap*,
  No. 03AP-586, 2004 WL 1109849 (Ohio Ct. App. May 11, 2004) ......................27

*Ruf v. American Broadcasting Co, Inc.*,
  Civ. No. 97-1427, 1999 U.S. Dist. Lexis 1092 (D.D.C. Jan. 29, 1999) ................11

*Sibley v. Breyer*,
  456 F. Supp. 2d 43 (D.D.C. 2007) .......................................................................................2

*Standing Committee on Discipline of U.S. Dist. Ct. for Cent. Dist. of Cal. v. Yagman*,
  55 F.3d 1430 (9th Cir. 1994) ...............................................................................................16

*Tavoulareas v. Piro*,
  817 F.2d 762 (D.C. Cir. 1987) .............................................................................................16

*Turner v. Federal Express Corp.*,
  539 F. Supp. 2d 404 (D.D.C. 2008) ....................................................... 8

*U.S. v. BCCI*,
  961 F. Supp. 287 (D.D.C. 1997) ............................................................ 3

*Vassiliades v. Garfinckel's, Brooks Bros.*,
  492 A.2d 580 (D.C. 1985) ..................................................................... 23

*Villnow v. DeAngelis, Winfield*,
  No. L00-2406, 2001 WL 34037316 (Va. Cir. Ct. June 18, 2001) ........... 30

*Waschsman ex rel. Wachsman v. Islamic Republic of Iran*,
  537 F. Supp. 2d 85 (D.D.C. 2008) ......................................................... 19

*\*Washington v. Smith*,
  80 F.3d 555 (D.C. Cir. 1996) ............................................................ 16, 18

*Washington Post v. Robinson*,
  935 F.2d 282 (D.C. Cir. 1991) ................................................................ 3

*\*Weyrich v. New Republic, Inc.*,
  235 F.3d 617 (D.C. Cir. 2001) ...................................................... 12, 17, 21

*\*White v. Fraternal Order of Police*,
  909 F.2d 512 (D.C. Cir. 1990) ....................................................... passim

*WJLA-TV v. Levin*,
  564 S.E.2d 383 (Va. 2002) ..................................................................... 19

*Womack v. Eldridge*,
  210 S.E.2d 145 (Va. 1974) ..................................................................... 27

**RESTATEMENTS**

Restatement (Second) of Conflict of Laws § 153 ......................................... 20

Restatement (Second) of Torts § 530 .......................................................... 33

Restatement (Second) of Torts § 551(1) ...................................................... 33

Restatement (Second) of Torts § 566 ..................................................... 16, 17

Restatement (Second) of Torts § 614 .......................................................... 12

Restatement (Second) of Torts § 652B ........................................................ 22

Restatement (Second) of Torts § 772 .......................................................... 31

**INTRODUCTION**

This action arises from the efforts of St. Columba's Episcopal Church, a large church community with many families and children, to protect those children from the risk of sexual abuse. In carrying out that duty, St. Columba's advised members of the community that Plaintiff David Parnigoni, the husband of Plaintiff Fiona Parnigoni, then a teacher at St. Columba's Nursery School, was a registered sex offender in the state of Virginia as a result of his criminal conviction for indecent exposure to a minor. David Parnigoni, Fiona Parnigoni, and their three-year-old child Andrew Parnigoni have now sued the Church, seeking nineteen million dollars in damages, claiming that the Church "defamed" Fiona and Andrew, invaded the family's privacy, caused each of them a loss of consortium, and committed various other wrongs.[1]

These claims must be dismissed. Although the Amended Complaint runs through ten different legal theories in the hope that one of them will stick, it on its face fails to allege any set of facts on which the Church or the individual Defendants could be subject to liability. The two letters of which Plaintiffs complain, one sent to parishioners by the Reverend Janet Vincent and one sent to parents by Julia Berry, the Director of the Nursery School, neither say nor imply anything derogatory about Mr. Parnigoni's wife or their three-year-old child. The letters contain nothing more than truthful disclosures of publicly available facts arising from Mr. Parnigoni's own criminal conduct. Although Mr. and Mrs. Parnigoni apparently feel it was unnecessary for

---

[1] Plaintiffs sue St. Columba's Episcopal Church, St. Columba's Nursery School, and the Vestry of St. Columba's Parish, as well as the Rector of the Church (Rev. Janet Vincent) and the Director of the Nursery School (Julia Berry). There are substantial issues which of St. Columba's Episcopal Church, Nursery School and Vestry are legal entities capable of being sued. These issues need not be resolved at this time because the Amended Complaint fails to state a claim against any defendant, properly named or not. Defendants reserve the right to challenge Plaintiffs' designation of specific entities as defendants by responsive pleading if necessary. *See generally* Fed. R. Civ. P. 9(a). Also, as Plaintiffs appear to be suing the Rector and Director in their official rather than personal capacities, Defendants have listed their official rather than personal addresses on the cover of this motion. *See* L. Civ. R. 5.1(e)(1).

1

the Church to draw such attention to their family, the Church had every right to inform its parishioners of Mr. Parnigoni's criminal conviction and express its belief that parents were entitled to this truthful information. This lawsuit fails to state any claim upon which relief can be granted and should be dismissed.

## BACKGROUND

### A. David Parnigoni's Criminal Conviction and Other Public Disclosures.

On October 11, 2007 − one week before the letter at issue to the Church's parishioners − the District of Columbia Court of Appeals affirmed David Parnigoni's criminal conviction for indecent exposure to a minor (and a second count of indecent exposure to the child's father), in a published opinion. *See Parnigoni v. District of Columbia*, 933 A.2d 823 (D.C. 2007).[2] The court reported that Parnigoni had worked at Janney Elementary School, where he befriended a boy designated as "O.J." and his family, who "grew to trust him." *Id*. at 825.[3] On the day of the events at issue, then 33-year old Parnigoni spent the day with then 11-year old O.J., at the boy's house. *Id*. Parnigoni suggested they play a game of ping-pong with "an additional rule": whoever lost a game would have to play the next game naked. *Id*. O.J. agreed to play according to that rule, and Parnigoni lost. Parnigoni took off all his clothes and began to play the next match naked. *Id*. During this second game, O.J.'s father came home. The father walked down

---

[2] On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court may consider "any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record." *Maniaci v. Georgetown Univ.*, 510 F. Supp. 2d 50, 59 (D.D.C. 2006) (citing *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)). A court "may take judicial notice of public records from other proceedings." *Sibley v. Breyer*, 456 F. Supp. 2d 43, 45 (D.D.C. 2007) (citing *Covad Commc'ns. Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005)).

[3] The Court can take judicial notice that the school at which Mr. Parnigoni met and befriended the victim of his criminal offense is located one block from St. Columba's Episcopal Church and Nursery School. Janney Elementary School is located at 4130 Albermarle Street, N.W.; St. Columba's is located at 4201 Albermarle Street, N.W. *Cf*. Fed. R. Evid. 201.

to the basement and observed Parnigoni facing him, completely naked. *Id*. When Parnigoni noticed O.J.'s father, he acted surprised, covered his genitals, and ran into a bathroom. *Id*.

Parnigoni was arrested and charged with two counts of indecent exposure, one as to O.J. and one as to the boy's father. *Id*. A jury found Parnigoni guilty of both offenses. Parnigoni appealed, contending that his conduct with 11-year old O.J. was "private" and "consensual." *Id*. The D.C. Court of Appeals unanimously affirmed the convictions, rejecting "the idea that the consent of a child under the age of sixteen can provide a valid defense." *Id*. at 828. As a result of his conviction, Parnigoni was required to register as a sexual offender in Virginia, where he lives. *See* Virginia Sex Offender and Crimes Against Minors Registry, *available at* http://sex-offender.vsp.virginia.gov/sor/servlet/SOR?id=X000098054 (entry for David Parnigoni) (last visited June 3, 2008).

At the time of his arrest, Parnigoni had left Janney School, where had worked as a substitute teacher, and was working for the Metropolitan Police Department. His conduct attracted considerable public attention, the fact of which this Court again may take judicial notice.[4] On October 22, 2003, District of Columbia Public Schools issued a general news release. *See District of Columbia Public Schools News Release: District of Columbia Public Schools and Janney Elementary School Officials Respond to Allegations Involving a Former Employee*, *available at* http://www.k12.dc.us/DCPS/dcpsnews/newsrelease/Janney%20%20-Parnigoni%20release%2010.22.03.pdf (last visited June 3, 2008). The release reported that "School officials at Janney Elementary School have moved promptly to respond to allegations

---

[4] The Court can take judicial notice of newspaper articles and similar press accounts. *See, e.g., U.S. v. BCCI Holdings (Luxembourg), S.A.*, 961 F. Supp. 287, 290 n.2 (D.D.C. 1997); *Government of Rwanda v. Rwanda Working Group*, 227 F. Supp. 2d 45, 60 n.6 (D.D.C. 2002); *Washington Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991) (the "court may take judicial notice of newspaper articles in the Washington, D.C. area").

that a former employee at the school acted inappropriately with young children." *Id*. The release continued:

> On Wednesday, school principal Dr. Charlie Abelmann sent home a letter to parents explaining the details of the case and the school's response. Dr. Abelmann has also arranged for a crisis team to be available at the school beginning Thursday, October 23, 2003 to assist any students or staff who may need counseling or other guidance. In addition, a parent information forum is scheduled for tomorrow, Thursday, October 23, 2003 in the school's multipurpose room. The forum, which begins at 7 p.m., will allow school officials to discuss the situation in detail and listen and respond to questions and concerns from parents and guardians. Representatives from the Metropolitan Police Department will be present at the meeting.

*Id*. The release concluded: "The former employee, David Parnigoni was at one time employed at Janney Elementary School, and is being investigated by local law enforcement on recent charges relating to inappropriate interaction with minors. . . . Parnigoni resigned from Janney to work for the Metropolitan Police Department." *Id*. In addition, the Washington Post publicly reported that the ping-pong game at issue had not been an isolated incident, and that, according to Fairfax County Police, on at least two previous occasions Parnigoni, with "two other 11-year-old-boys who visited his home," had "played a betting game in which the loser was required to strip naked and run through the house," and that both "[Parnigoni] and the boys disrobed while playing." *Officer Faces 2nd Nudity Case, D.C. Charges Involving Boy Following Fairfax Arrest*, Washington Post, Oct. 23, 2003 at B01.

### B. Reverend Vincent's Letter And Julia Berry's Letter.

On October 18, 2007, the Rector of St. Columba's Episcopal Church, Rev. Janet Vincent, sent a letter to all "St. Columba Parishioners and Nursery School Parents." *See* Letter from Rev.

Janet Vincent, Rector (Oct. 18, 2007) (attached in full as Exhibit A).[5]  The letter began:  "St. Columba's loves children.  We love and nurture them in our varied parish programs and through our Nursery School.  We also take seriously our responsibility to provide them with the safest possible environment in which to thrive and grow."  *Id*. at 1.

The letter continued:  "One way of ensuring the protection of our children is to keep parents and all of our members informed about the ways in which we safeguard our youngest members and students.  This letter aims to do that in three ways."  *Id*.  First, the letter noted that installation had begun on automated security systems that would allow St. Columba's to control and monitor the many access points to its building.  *Id*.  Second, the letter enclosed a copy of St. Columba's *Standards, Policies and Procedures for Ministries Involving Children and Young People*.  *Id*.  And third, the letter noted:  "Over the past several months three situations, or renewed concern about situations, have led us to review our Standards, Policies and Procedures with legal counsel and to weigh carefully our obligation to provide disclosure to our parish and Nursery School community.  St. Columba's vestry and the Nursery School board have been fully informed about these situations and have actively encouraged our obtaining professional advice to recommend appropriate responses to the three situations and for the future."  *Id*.

Rev. Vincent then continued that, after meeting with Church and Nursery School officials, and consulting with attorneys Mark Biros and Meredith Bailey of Proskauer Rose LLP, "I write to give you information already in the public domain but perhaps not known to all parishioners and Nursery School parents."  *Id*. at 2.  One of the disclosures involved David Parnigoni, and it read in full as follows:

---

[5] The Court on a motion to dismiss may consider any "documents . . . incorporated into the complaint by reference."  *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 174 (D.D.C. 2007) (citing *Leonard F. v. Israel Discount Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999)).

> Mr. David Parnigoni, the husband of Fiona Parnigoni, a teacher at St. Columba's Nursery School since June 2001, is registered with the Virginia Sex Offender and Crimes Against Minors Registry as a result of a July 3, 2004, conviction for indecent exposure to a minor. Until recently their son attended the Nursery School. I want to assure you that steps have been taken to prevent Mr. Parnigoni from entering St. Columba's grounds or participating in St. Columba's Nursery School events. I am providing you this notice to enable you to make informed decisions as to whom you entrust the care and supervision of your child. This disclosure is in no way intended to harm the Parnigoni family. Given the seriousness of the issue and our inability to anticipate every possible future scenario we believe our best course of action is to give parents the information they need to protect their children. Mrs. Parnigoni has been informed of this decision to disclose. We did not ask the Parnigonis to remove their son from the school.

*Id*. The letter then continued to disclose two other situations: one involving a named parishioner who was listed on the National Sex Offender Public Website and who had been convicted twice of sexual offenses against children, and a third involving a parishioner who was not on a public registry (and therefore was not named) but who had shown persistent and inappropriate interest in working with the Church's young people. *Id*.

The letter concluded: "These are sad disclosures, but they are necessary for the sake of our children. In making them we trust the basic sense of decency and compassion of each member of the parish and each family with a child in our Nursery School. I also make them with complete confidence that you are entitled to information that may impact the safety of your children. It is important to note that I am not disclosing the attempted abuse or abuse of a child in our care." *Id*. at 3. After announcing a special meeting where all these issues could be discussed further, the letter ended: "We are blessed by the presence of so many children in our midst and we gladly accept the responsibility to protect them." *Id*.

On November 9, 2007, Julia Berry, the director of the Nursery School, sent a letter from the School to parents to "thank" those who had written letters for their "words and letters of support for the school and Mrs. Parnigoni," which Ms. Berry referred to as "uplifting and

6

reassuring" as the community "wrestled with the uncomfortable knowledge that the world can be a less-than safe place for our children." *See* Letter from Julia Berry (Nov. 9, 2007) (attached in full as Exhibit B). Using the discussion generated by the Rector's letter as a springboard, Ms. Berry's letter also announced two upcoming events to educate parents about child safety issues. *Id*. This second letter did not mention Mrs. Parnigoni at all, other than to thank the community for their letters of support for her; nor did it mention Plaintiffs' son. *Id*.

Although not referenced in the Amended Complaint, two days before Ms. Berry's letter, the Parnigonis had sent their own letter to the parents of the Nursery School, through Mr. Parnigoni's counsel Mark E. Schamel. *See* Letter from Mark E. Schamel (Nov. 7, 2007) (attached in full as Exhibit C).[6] The letter asserted that the incident involving Mr. Parnigoni "involved no allegation of sexual contact or conduct." *Id*. Even though the D.C. Court of Appeals had affirmed Mr. Parnigoni's criminal convictions on October 11, 2007, Mr. Schamel asserted that the incident involving Mr. Parnigoni was an "immature prank" that "remains under appeal." *Id*. Mr. Schamel's letter continued: "There have never been any questions or issues regarding this matter as it did not involve any sexual misconduct and that all involved were aware that the juvenile behavior at issue was not criminal. There has never been an allegation or belief by anyone that Mr. Parnigoni is in any way a risk to anyone." *Id*.

In this lawsuit, Plaintiffs continue to ignore the nature of David Parnigoni's criminal convictions and to maintain that various wrongs have been committed by St. Columba's Church and Nursery School against David, Fiona, and Andrew Parnigoni. Their claims have no basis or foundation in the law.

---

[6] Defendants do not rely on the Parnigoni's letter for purposes of this motion, as the sole question in this procedural posture is whether Plaintiffs' allegations state a claim. Defendants reference it only to assist the Court in understanding the context of Plaintiffs' allegations.

**STANDARD**

On a motion to dismiss under Rule 12(b)(6), "the plaintiff's factual allegations must be presumed true and should be liberally construed in his or her favor." *Turner v. Federal Express Corp.,* 539 F. Supp. 2d 404, 407 (D.D.C. 2008) (citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993)), and "[t]he plaintiff must be given every favorable inference that may be drawn from the allegations of fact." *Id*. at 408 (internal citations omitted). However, "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). The sufficiency of pleadings "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007).

Close scrutiny at this stage is particularly appropriate here because, with the exception of their Promissory Estoppel claim (Count V), Plaintiffs' theories of liability are all based exclusively on the publication of two letters, one written by Rev. Vincent and one by Ms. Berry, and thus implicate significant First Amendment interests. "Given the threat to the first amendment posed by nonmeritorious defamation actions, it is particularly appropriate for courts to scrutinize such actions at an early stage of the proceedings to determine whether dismissal is warranted," *Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26, 30 (D.D.C. 1995); for "[i]n the First Amendment area, summary procedures are . . . essential . . . [t]he threat of being put to the defense of a lawsuit . . . may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself." *Id*. (citing *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966)).

**ARGUMENT**

I.   **NEITHER LETTER CONTAINS FACTS DEFAMATORY TO FIONA OR ANDREW PARNIGONI AS A MATTER OF LAW (COUNT I).**

In Count I of their Amended Complaint, Plaintiffs Fiona and Andrew Parnigoni attempt to sue a church, its nursery school and responsible individuals because, in the context of a letter describing efforts taken by the church to safeguard the children entrusted to its care, the church truthfully disclosed that the husband of a teacher at the nursery school was a registered sex offender, following his criminal conviction for indecent exposure to a minor.  The plain text of the letters at issue refutes any claim of defamation.  Plaintiffs do not identify a single fact about Fiona or Andrew Parnigoni in any statement by St. Columba's that is either false or defamatory, and there is none.  Plaintiffs thus are forced to allege that Fiona and Andrew Parnigoni somehow were defamed by "inference."  Am. Compl. ¶ 49.  The sufficiency of that allegation must be evaluated as a matter of law, however, and no reasonable person could understand anything in either letter as implying any false, defamatory facts about Fiona or Andrew Parnigoni.  Count I should be dismissed.

   A.   **Neither Letter At Issue Contains A Single False Or Defamatory Fact Or Is Defamatory By "Implication."**

To state a claim for defamation, a plaintiff must allege "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm."  *Klayman v. Segal*, 783 A.2d 607, 613 n.4 (D.C. 2001) (citing *Beeton v. District of Columbia*, 779 A.2d 918, 923 (D.C. 2001)).  To qualify as "defamatory," a statement "must be more than unpleasant or offensive; the language must make the plaintiffs appear 'odious,

infamous, or ridiculous.'" *Id.* at 613 (quoting *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984)).[7]

Although Plaintiffs' defamation claim ultimately fails every element,[8] it fails the first requirement at the threshold as a matter of law. Fundamentally, a claim of defamation requires a "false . . . statement concerning the plaintiff." *Klayman*, 783 A.2d at 613 n.4. An action for defamation will lie only where the derogatory statement is one of *fact* that is both *false* and susceptible to being *proved* false. *See White v. Fraternal Order of Police*, 909 F.2d 512, 522 (D.C. Cir. 1990) ("[T]he question is whether the person has made an assertion that can reasonably be understood as implying *provable facts*.") (emphasis added). Plaintiffs fail to identify any false fact about Fiona or Andrew Parnigoni on the face of either letter, and there is none. Rev. Vincent's letter identifies Mr. Parnigoni as "the husband of Fiona Parnigoni, a teacher at St. Columba's School," and says that Mrs. Parnigoni has been "a teacher at St. Columba's Nursery School since June 2001." Ex. A at 2. With respect to Andrew Parnigoni, it states that he "[u]ntil recently . . . attended the Nursery School." *Id.* Ms. Berry's letter does not mention Andrew, and mentions Fiona only to state that "[y]our words and letters of support for the school and for Mrs. Parnigoni" were "uplifting" and "reassuring." Ex. B. None of these statements is false in any way.

---

[7] For certain of Plaintiffs' claims, it is important to consider whether the claim is governed by the law of the District of Columbia or Virginia, where plaintiffs reside. Defendants assume that District of Columbia law applies to the defamation count for purposes of this motion, as the law of the two jurisdictions does not meaningfully differ with respect to the sufficiency of the allegations at the pleadings stage.

[8] Other flaws in Plaintiffs' claim include the falsity of some of the underlying allegations and the obvious applicability of several common-law privileges that bar defamation claims, most notably the common interest privilege and the fair comment privilege. As these are affirmative defenses, however, Defendants in this procedural posture will address only the defects on the face of Plaintiffs' pleadings.

Nor are the statements defamatory.  A claim of defamation also requires, *inter alia*, that the false factual assertions concerning Plaintiffs make them appear "odious, infamous, or ridiculous," *Klayman,* 783 A.2d at 613, meaning "arousing or deserving hatred or loathing," "notorious in disgrace or dishonor," or "deserving ridicule." *Benz v. Wash. Newspaper Publ'g Co.*, No. 05-1760 (EGS), 2006 WL 2844896 at *3 n.9 (D.D.C. Sept. 29, 2006).  Although the identification of David Parnigoni as a sex offender may be embarrassing to Fiona and Andrew insofar as they are identified as his wife and son, it does not make them appear "odious, infamous, or ridiculous."  Stating that *David* Parnigoni had been convicted of a sex offense, moreover, does not give *Fiona* and *Andrew* Parnigoni a cause of action, as the statement is not "of and concerning" them.  *See Marsh v. Hollander*, 339 F. Supp. 2d 1, 9 n.10 (D.D.C. 2004) (dismissing claim where allegedly defamatory statement not "of and concerning" plaintiff); *Ruf v. American Broadcasting Co., Inc.*, Civ. No. 97-1427, 1999 U.S. Dist. Lexis 1092, *20-21 (D.D.C. Jan. 29, 1999) (same).  Finally, their relationship to David Parnigoni is in any event true and not actionable.  The law is clear:  "That the truth carries a negative implication does not give the Plaintiff a meritorious defamation cause of action." *Coles*, 881 F. Supp. at 31.

Because the letters plainly say nothing defamatory about them, Plaintiffs are forced to contend that defamatory facts are somehow "implied."  *See generally White*, 909 F.2d at 518-21.  The doctrine of defamation by "implication," however, requires that "the communications of which the plaintiff complains were reasonably susceptible of a defamatory meaning." *Klayman*, 783 A.2d at 612-13 (citing *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 623 (D.C. Cir. 2001)).  The D.C. Circuit has expressly cautioned that "[i]n entertaining claims for defamation by implication, courts must be vigilant not to allow an implied defamatory meaning to be

11

manufactured from words not reasonably capable of sustaining such meaning." *White*, 909 F.2d at 519.

"Whether a statement is capable of defamatory meaning is a question of law." *Weyrich*, 235 F.3d at 627; *see also* Restatement (Second) of Torts § 614 (1977). Where, as here, a "defamation by implication" claim rests on "materially true facts," the D.C. Circuit has added the additional requirement that defamation "is not established" merely by showing that "a defamatory inference *can* reasonably be drawn" from the communication. *White*, 909 F.2d at 520 (emphasis added). Rather, a plaintiff must also show that the "communication . . . supplies additional, affirmative evidence suggesting that the defendant intends or endorses the defamatory inference." *Id.* Courts in this District, accordingly, routinely dismiss claims pursuant to Fed. R. Civ. P. 12(b)(6) where the challenged communications are not reasonably capable of false defamatory meaning. *See, e.g.*, *Alexander v. Wash. Gas Light Co.*, 481 F. Supp. 2d 16, 35-36 (D.D.C. 2006) (dismissing defamation claim where plaintiff "cannot in good faith contest 'falsity'" of allegedly defamatory statement); *Raymen v. United Senior Ass'n, Inc.*, 409 F. Supp. 2d 15, 20-22 (D.D.C. 2006) (dismissing defamation claim where statement not reasonably susceptible to defamatory meaning); *Marsh v. Hollander*, 339 F. Supp. 2d 1, 9-11(D.D.C. 2004) (same).

Plaintiffs' unsupported accusation that the letters raise a "defamatory inference" that Fiona and Andrew Parnigoni were "a threat to the safety and well-being of students," and that "parents needed to take action to ensure that their children did not become victims of sexual abuse," Am. Compl. ¶ 48, fails this standard. There is nothing in either letter that could reasonably support such an inference, much less anything suggesting that Defendants were

intentionally endorsing the view that David Parnigoni's *wife and son*, as opposed to David Parnigoni *himself*, constituted a risk to children.

Plaintiffs fail to specify which statements they allege carry the defamatory implication.[9] They appear to challenge statements in Rev. Vincent's letter that the Church was "providing you this notice to enable you to make informed decisions as to whom you entrust the care and supervision of your child," and that "[g]iven the seriousness of the issue and our inability to anticipate every possible future scenario we believe our best course of action is to give parents the information they need to protect their children." Ex. A at 2. In addition, Plaintiffs appear to object to the statement in Ms. Berry's letter that the community had "wrestled with the uncomfortable knowledge that the world can be a less-than safe place for our children," and her announcement of upcoming child safety-themed events. Ex. B.

No reasonable person, viewing the statements in the context and setting in which they appear, could read these statements as implying that Fiona or Andrew Parnigoni were a threat to children. The "publication must be considered as a whole, in the sense in which would be understood by the readers to whom it was addressed." *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. Cir. 1984); *see also Ollman v. Evans*, 750 F.2d 970, 979 (D.C. Cir. 1984) (court looks to the "common usage or meaning of the specific language of the challenged statement," the "statement's verifiability," the "full context of the statement" and the "broader context or setting in which the statement appears.").[10] With respect to three-year-old Andrew Parnigoni, this claim

---

[9] Plaintiffs' lumping of separate communications by separate parties into a single count also violates Fed. R. Civ. P. 10(b) and further muddles their already-vague allegations about which statements in the letters convey a defamatory "implication."

[10] The D.C. Court of Appeals has reaffirmed that the *Ollman* factors remain good law for distinguishing opinions that imply defamatory facts from those that do not. "Although the Supreme Court has made it clear . . . that statements of 'opinion' are not constitutionally

13

is particularly stretched.  Ms. Berry's letter has nothing to do with him, and Rev. Vincent's letter only identifies him as a former student and states that the Church did not ask Plaintiffs to withdraw him from the School.  Nothing remotely suggests the far-fetched implication that he poses a threat to other children.  The point of the letter is obviously that parents whose children may interact with Andrew should be aware of his father's criminal conviction and may wish to exercise caution regarding *David* Parnigoni.  It might prove stigmatizing to be the son of a known sex offender, but the letters did not suggest anything about *Andrew* Parnigoni that made *him* appear "odious, infamous, or ridiculous."  The letter explicitly *disavows* any concern by the Church about Andrew's presence at the school, emphasizing that it "did *not* ask the Parnigonis to remove [Andrew] from the school."  Ex. A at 2 (emphasis added).

Nor are the letters susceptible of a defamatory implication involving Fiona Parnigoni.  Rev. Vincent's letter identifies David Parnigoni as her husband.  Ex. A at 2.  It makes clear that Fiona Parnigoni had been a teacher at the School for over six years, and she remained so at the time of the letter − thus disavowing any suggestion that the Church thought *she* in any way posed a risk to children.  The letter, moreover, asserts that parents are "entitled to information that may impact the safety of [their] children," Ex. A at 3, and identifies three persons about whom the Church had "concern," which did not include *her*.  *Id*.  Again, the point of the letter is that parents should be aware of *David* Parnigoni and not assume – if they knew him already or met him in the future – that he could be entrusted around their children simply because he is married to someone the Church *did* consider worthy of that trust.

---

protected if they assert provably false and defamatory facts, the constitutional principles that animate [] *Ollman* remain equally compelling and equally good law today."  *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 583 (D.C. 2000); *see also Houlahan v. World Wide Ass'n of Specialty Programs & Sch.*, No. Civ. A 04-1161 HHK, 2006 WL 2844190 at *4 n.9 (D.D.C. Sept. 29, 2006) (same).

Ms. Berry's letter also is not susceptible of any defamatory implication.  The statement that the community had "wrestled with the uncomfortable knowledge that the world can be a less-than safe place for our children," Am. Compl. ¶ 41, is clearly not a veiled reference to Fiona Parnigoni; no reasonable person could understand it as suggesting the world was "less-than safe" for children because of *Mrs.* Parnigoni.  And the announcement of two upcoming child safety-themed events is clearly not defamatory of anyone.  No reasonable person could think that the Nursery School, by showing an informative film to educate parents about child safety, was insinuating that "parents needed to take action to ensure that their children did not become victims of child abuse" caused by *Mrs.* Parnigoni.  *Compare* Am. Compl. ¶¶ 41, 48.  Ms. Berry's letter, moreover, describes the letters of support for Fiona Parnigoni as "uplifting" and as an endorsement of support for *her*, given the difficulties that her husband's circumstances must have caused her.  Ex. B.[11]

A communication is defamatory only if it is *reasonably* susceptible to defamatory meaning.  Where, as here, the communication conveys true facts, it must supply "affirmative evidence" that the speaker *intended* defamatory meaning.  *White*, 909 F.2d at 519-20.  Nothing in either letter supports such an accusation here, and the court "cannot accept . . . [a] tortured attempt to discern some dark, hidden meaning" in the letters "when the plain words of the

_____

[11] Plaintiffs try to introduce extrinsic evidence to support their argument that the letters expressed defamatory facts about Mrs. Parnigoni and their son by quoting from two letters in which members of the parish disagreed with the Church's justification to send the October letter. Am. Compl. ¶¶ 39-40.  Plaintiffs argue that these letters "evidence" that the letters are "reasonably capable of a defamatory interpretation."  Am. Compl. ¶ 51.  Neither letter supports this proposition.  Both are about whether it was necessary to name *Mr.* Parnigoni, not about whether naming him suggested anything untoward about *Mrs.* Parnigoni.  One letter opines that the disclosure was "unjustified" and says that the author was "saddened" by the attention drawn to Plaintiffs; the second expresses that the author was "disappointed" by the lack of "faith" the letter showed in David Parnigoni.  Am. Compl. ¶¶ 39-40.  These letters do nothing to alter the conclusion that no reasonable person could view Rev. Vincent's or Ms. Berry's letters as endorsing the view that Fiona and Andrew were threats to children.

[communications] explicitly rebut that meaning." *Tavoulareas v. Piro*, 817 F.2d 762, 781 (D.C. Cir. 1987) (en banc).

**B.    The October Letter's Statement That Parents Were Entitled To Know About Mr. Parnigoni's Conviction Also Is Constitutionally Protected As An Opinion Based On Disclosed Facts.**

Nor can Plaintiffs state a claim for defamation based on Rev. Vincent's explanation in her letter that the Church made the three disclosures because it believed that parents are "entitled to information that may impact the safety of [their] children" so they can "make informed decisions as to whom [they] entrust the care and supervision of [their] child." Ex. A at 2, 3. Even if this expression of opinion somehow were construed as defamatory to Plaintiffs, this is a constitutionally protected expression of opinion based on disclosed facts and cannot form the basis for a defamation claim.

A statement concerning a plaintiff, even if defamatory, is not actionable unless it "makes direct or implicit *factual* assertions." *Houlahan v. World Wide Ass'n of Specialty Programs & Sch.*, No. Civ. A. 04-01161 HHK, 2006 WL 2844190, at *4 (D.D.C. Sept. 29, 2006) (emphasis added); *White*, 909 F.2d at 522 ("[T]he question is whether the person has made an assertion that can reasonably be understood as implying *provable facts*.") (emphasis added); Restatement (Second) of Torts § 566 (1977). It is well established that a statement of opinion does not imply factual assertions concerning a plaintiff – and is thus not actionable – where the context makes clear that it is opining on disclosed facts. *See Washington v. Smith*, 80 F.3d 555, 557 (D.C. Cir. 1996) ("the writer is immune from defamation unless the plaintiff can show that the statement is 'so obviously false' that *'no reasonable person could find'*" that Defendant's statements "were 'supportable interpretations' of the underlying facts") (quoting *Moldea*, 22 F.3d at 315, 317)) (emphasis in original); *Standing Committee on Discipline of U.S. Dist. Ct. for Cent. Dist. of CA v. Yagman*, 55 F.3d 1430, 1439 (9th Cir. 1995) ("[w]hen the facts underlying a statement of

16

opinion are disclosed, readers will understand they are getting the author's interpretation of the facts presented"); Restatement (Second) of Torts § 566 cmt. c (1977).

"Whether a challenged statement is capable of being proven true or false is a question of law for the Court," *Coles*, 881 F. Supp. at 32 n.5 (citing *Moldea*, 15 F.3d at 1144)), and the verifiability of a challenged statement is "a critical threshold question" when deciding a motion to dismiss. *Weyrich*, 235 F.3d at 624. As a matter of law, the opinion expressed in the letter – that parents are "entitled to information" about David Parnigoni so that they could make informed decisions about "whom [they] entrust the care and supervision of [their] child" – implies no provably false factual assertions concerning Plaintiffs. At most, the letter expresses a constitutionally protected opinion regarding the importance that parents may place on the facts *already* disclosed in the letter, and not a suggestion of any *further* defamatory facts about Fiona or Andrew Parnigoni.

It is important what the letter does *not* say. It does not suggest incidents in which Fiona Parnigoni (or Andrew) have endangered children. It does not suggest that Fiona Parnigoni (or Andrew) had said or done anything to suggest that they would endanger children in the future. *Compare, e.g., Houlahan v. World Wide Ass'n of Specialty Programs & Schools*, No. Civ. A. 04-01161 HHK, 2006 WL 785326 (D.D.C. Mar. 28, 2006) (statement accusing reporter of "disregard for truth and honesty" implied defamatory facts because it "suggests that [defendant] is in a position where he is aware of facts unavailable to the public at large"). And it forecloses any suggestion that the Church was withholding from the community any potentially damaging facts "that may impact the safety of [their] children" because it openly trumpets the belief that the Church should always provide such information to parents. Am. Compl. ¶ 32.

Plaintiffs may disagree with the Church's belief that Mr. Parnigoni's circumstances were relevant to parents, but they cannot plausibly contend – as they must to overcome the protections of the First Amendment – that "no reasonable person could find" that view supportable by the fact and circumstances of his conviction. *Cf. Washington*, 80 F.3d at 557. In stating the opinion that parents were entitled to this information, Rev. Vincent's letter laid out all the facts on which that opinion was based. Readers were free to agree or disagree with the Church's explanation for why it felt the disclosures were relevant.[12] As such, it was a textbook opinion based on disclosed facts and is not actionable.

## II. VIRGINIA DOES NOT RECOGNIZE CLAIMS FOR "FALSE LIGHT" OR "PUBLICATION OF PRIVATE FACTS," AND PLAINTIFFS FAIL IN ANY EVENT TO STATE CLAIMS UNDER EITHER THEORY (COUNTS II AND III).

Plaintiffs next relabel their defamation claims as invasion of privacy, under the dual theories that Rev. Vincent's and Ms. Berry's letters placed them in a "false light" and that Rev. Vincent's letter revealed the "private" fact that they had withdrawn their son from the school to avert the disclosure. These claims are not recognized under Virginia law, which governs these claims. They fail under D.C. law as well: for the same reasons that the defamation claim fails and because the facts revealed in Rev. Vincent's letter were matters of public record. Counts II and III should be dismissed.

### A. Virginia Law Governs And Rejects Both Theories of Liability Here.

The choice of law is fatal to Counts II and III. Virginia, by statute, recognizes "one of the four common law torts of invasion of privacy," the "misappropriation of plaintiff's name or likeness for commercial purposes" and has "excluded the remaining three as actionable torts."

---

[12] Plaintiffs prove this point themselves by citing two letters in which parishioners – based on the facts provided in the October letter – expressed their opinion that there was insufficient reason to disclose Mr. Parnigoni's conviction. *See* Am. Compl. ¶¶ 39-40.

*WJLA-TV v. Levin*, 564 S.E.2d 383, 394 & n.5 (Va. 2002).[13]  Counts II and III must thus both be dismissed.

Virginia is the only jurisdiction with an interest in application of its law to Counts II and III.  A "false conflict" of law exists, as here, "when the policies of one state would be advanced by the application of its laws and the policies of the states whose laws are claimed to conflict would not be advanced by the application of their law."  *Wachsman ex rel. Wachsman v. Islamic Republic of Iran*, 537 F. Supp. 2d 85, 94 (D.D.C. 2008) (citing *Long v. Sears Roebuck & Co.*, 877 F. Supp. 8, 11 (D.D.C. 1995)).  Virginia's interest is directly implicated by Plaintiffs' residence there, and "Virginia has no interest in permitting its citizens to recover under a theory that Virginia itself chooses not to recognize."  *See Foretich*, 741 F. Supp. at 250.  Defendants' sending letters from the District, moreover, does not implicate D.C.'s policy in recognizing privacy torts, as the purpose of such policy is compensation of the victim and not regulation of the speaker.  *See Pearce v. E.F. Hutton Group, Inc.*, 664 F. Supp. 1490, 1497-98 (D.D.C. 1987) ("Even assuming the District's adoption of the false light tort is due to a policy of providing maximum protection, that policy would not be advanced" by application to a non-resident; "[i]f plaintiff was not (and is not now) domiciled in the District of Columbia, the District's interests will not be advanced by an application of D.C. law"); *see also Foretich*, 741 F. Supp. at 250 ("the District's interests will not be advanced by the application of its 'false light' tort to a resident of another state").

---

[13] *See also id.* at 394 n.5 ("to the extent [the complaint] asserts a claim for false light publicity, it fails to state a proper cause of action."); *Foretich v. Glamour*, 741 F. Supp. 247, 250 (D.D.C. 1990) ("It is clear that Virginia law does not recognize a common law tort of 'false light' defamation"); *Johnson v. Richmond Newspapers, Inc.*, No. LB-715-4, 1996 WL 1065656, at *2 (Va. Cir. Ct. Dec. 13, 1996) (noting that although some jurisdictions "recognize[] a 'privacy tort' permitting recovery for the publication of private facts[,] Virginia does not.") (internal citations omitted).

Virginia law would prevail even if a true conflict with D.C. law existed. Under the Restatement, "[w]hen there has been publication in two or more states of an aggregate communication that invades a person's right to privacy," the "local law of the state where the plaintiff has suffered the greatest injury" governs, which "will usually be the state of the plaintiff's domicil if the matter complained of has there been published." Restatement (Second) of Conflict of Laws § 153 cmt. d (1971).[14] That is the case here.

Any injury to interests protected by Plaintiffs' privacy torts would have taken place in Virginia. Virginia is where Plaintiffs reside, where their family life is centered, and hence where any "mental anguish, distress, and humiliation" arising from the alleged violation of that private family life would have taken place. *See* Am. Compl. ¶ 66; *cf.* Restatement (Second) Conflict of Laws § 153 cmt. d. "[I]nvasion of privacy is a personal injury – an injury to feelings. . . [r]ules of privacy are designed to protect a person's interest in being let alone, not in one's reputation . . . an injury to one's feelings can occur only where the plaintiff is located at the time of the impact of the privacy invasion." *E.F. Hutton*, 664 F. Supp. at 1499; *see also White*, 909 F.2d at 518 ("invasion of privacy . . . differs from an action for defamation because a defamation tort redresses damage to reputation while a . . . privacy tort redresses mental distress from having been exposed to public view"). Courts in the District of Columbia accordingly apply the law of out-of-state plaintiffs' domicile to claims that publications from the District have invaded their privacy. *See, e.g.*, *E.F. Hutton,* 664 F. Supp. at 1496-1500; *Foretich v. Glamour*, 741 F. Supp. at 250-51; *see also Foretich v. CBS*, 619 A.2d 48, 54 (D.C. 1993) (Rogers, C.J.) (affirming

---

[14] Although most St. Columba's parishioners reside in D.C., the parish includes members in Maryland and Virginia, who also received the October letter. *See generally* Am. Compl. ¶ 33 (alleging letter went to "[o]ver 3,500 households in the D.C. metropolitan area").

application of Virginia law "because appellant lived in Virginia at the time of the broadcast").

Accordingly, Virginia law governs Counts II and III and they must be dismissed.

### B. Plaintiffs' "False Light" Claim Would Also Fail Under D.C. Law for the Same Reasons As Their Defamation Claim.

Plaintiffs' "invasion of privacy" claims would also fail under District of Columbia law.

Although "invasion of privacy false light is distinct from the tort of defamation, the same First

Amendment protections apply." *Weyrich*, 235 F.3d at 628-29 (citing *Moldea v. New York Times Co.*, 15 F.3d at 1151 ("a plaintiff may not avoid the strictures of the burdens of proof associated

with defamation by resorting to a claim of false light invasion"), *rev'd in part on reh'g on other grounds*, 22 F.3d 310 (D.C. Cir. 1994)); *White*, 909 F.2d 518 ("truth or assertion of opinion are defenses in both causes of action") (citing *Rinsely v. Brandt*, 700 F.2d 1304, 1307 (10th Cir.

1983)). Plaintiffs' "false light" claim would thus fail under D.C. law for substantially the same reasons as their defamation count, explained *supra*.

First, nothing in either letter places either of them in a false light. No statements in the

letters concerning either Plaintiff are false, and no reasonable person, for reasons already stated,

could understand anything in either letter as in any way even suggesting that "Andrew and Fiona

Parnigoni . . . were dangerous to children" or "a threat to their safety and well-being." Am.

Compl. ¶ 63. And to whatever extent the letters could be read as implying that "parents should

take action to ensure that their children did not become victims of sexual abuse," *id*., it is because

the disclosures in Rev. Vincent's letter served as a general reminder of threats to children, and

not a suggestion that the Church believed that Plaintiffs' son (a three-year-old child, whom the

Church made a point of *not* asking to withdraw from the school) or Mrs. Parnigoni (a teacher to

whom the Church continued to entrust the care of young children) posed any such a danger. *Cf.*

*Klayman*, 783 A.2d at 619 (where publication was not reasonably susceptible to defamatory

meaning, Court of Appeals was "for the same reasons . . . constrained to agree . . . that the statement did not place [plaintiff] in 'a 'highly offensive' false light'").

Second, for "false light" claims, just like defamation claims, "[o]nly statements that are 'provable as false' are actionable," *Howard v. Antilla*, 294 F.3d 244, 249 (1st Cir. 2002) (citation omitted), and equally cannot be based on expressions of opinion that do not imply such facts in context.  *See Moldea,* 15 F.3d at 1140 (defendant must publish "untrue facts").  The expressed view that parents were entitled to know about David Parnigoni – even if it could be read to suggest that parents would be entitled to have reservations based on that knowledge – would have been a constitutionally protected opinion, *see* Part I.B, *supra*, and supports a false light claim no more than a defamation claim.

### C.    Plaintiffs' "Publication of Private Facts" Claim Would Also Fail Under D.C. Law Because The Fact Allegedly Publicized Was Not Publicized, Was Not Private, And Was Of Legitimate Public Concern To The Parish.

The "public disclosure of private facts" claim (Count III) equally fails under D.C. law. The embarrassing disclosure in Rev. Vincent's letter – David Parnigoni's sex offense – had been published in the Atlantic Reporter a mere week before the Church's letter.  *See Parnigoni v. District of Columbia*, 933 A.2d 823 (D.C. October 11, 2007).[15]  Thus, Plaintiffs instead base Count III on the allegation that Reverent Vincent disclosed Plaintiffs' "personal and private decision to withdraw their son from the School in an effort to avert the disclosure," and allege that *this* disclosure (as opposed to the publicity given to Mr. Parnigoni's sex offender status)

---

[15] Unlike Counts I and II, Count III is based solely on the October letter, which was sent by Rev. Vincent.  Am. Compl. ¶ 69.  Thus, Ms. Berry must be dismissed from Count III in any event.

caused them "nine million dollars[']" harm.[16]  Am. Compl. ¶¶ 69, 73.  This attempt to construct a privacy claim is meritless.

Invasion of privacy by 'publication of private facts' requires a plaintiff to prove that the defendant "g[a]ve[] publicity to a matter concerning the private life of [the plaintiff]," and that "the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public."  *Vassiliades v. Garfinckel's, Brooks Bros.*, 492 A.2d 580, 587 n.1 (D.C. 1985) (citing Restatement (Second) of Torts § 652D).  Plaintiffs satisfy *none* of these elements.

First, Rev. Vincent's letter does not say that Plaintiffs "withdr[ew] their son from the School in order to avert the disclosure."  It says that "[u]ntil recently [David and Fiona's] son attended the Nursery School" and that "[the Church] did not ask the Parnigonis to remove their son from the school."  Ex. A at 2.  The letter states that Andrew was no longer a student; it does not say *why*.  It neither reveals nor suggests that Plaintiffs withdrew him to avert the disclosure.[17]  The Court need not accept plaintiffs' inferences "if such inferences are unsupported by the facts set out in the complaint."  *Kowal*, 16 F.3d at 1276.

---

[16] Plaintiffs do not allege that it was tortious to reveal their relationship to David Parnigoni.  Nonetheless, they insinuate their relationship to David Parnigoni was somehow a 'private' matter.  *See* Am. Compl. ¶ 13 (alleging that Mrs. Parnigoni's "name and association with David Parnigoni was never, prior to the time of the Defendants' actions that are the subject of this civil action, published nor disseminated to the public").  It was not.  Fiona Parnigoni's marriage to David Parnigoni was not secret, and the interest of St. Columba's parishioners in knowing about Mr. Parnigoni's conviction in any event includes "to some reasonable extent . . . the members of his family or even others who have been closely associated with him, although there is nothing else about them to attract public attention."  Restatement (Second) of Torts § 652D cmt. i (1971).  As the October letter did no more than identify family members, it was a "reasonable extent" of disclosure.

[17] Plaintiffs cannot salvage this Count by claiming that Defendants revealed this fact outside the October letter, as it is the publication of this letter to the parish on which they depend to allege the "publicity" requirement of the tort.  *See* Am. Compl. ¶¶ 62, 68.

Second, the facts the letter reveals are simply not private.  The fact that Andrew "[u]ntil recently . . . attended the Nursery School" would have been readily apparent from his absence from the classroom; "there is no liability for giving further publicity to what the plaintiff himself leaves open to the public eye."  Restatement (Second) of Torts § 652D cmt. b (1977).[18]

Third, the supposed disclosure would not have been "highly offensive."  *Cf.* Restatement § 652D cmt. b (1971).  Mrs. Parnigoni's offer to withdraw Andrew from the School if doing so would quell Defendants' concerns about Mr. Parnigoni conveys that Mrs. Parnigoni tried to take steps that, in her mind, were accommodating and reasonable to protect her family.  There is nothing offensive about this disclosure; it in fact reflects positively upon her.  Plaintiffs' attempt to base a nine-million-dollar privacy tort on *this* alleged disclosure – when any embarrassment clearly would have been caused by the disclosure of David Parnigoni's sex offense with a child, and not their withdrawal of their son from the school – is unsupportable.

Fourth, the Church's handling of Andrew Parnigoni's enrollment at the school was of legitimate interest to the parish, which was the audience for the letter.  Rev. Vincent's letter discussed how the Church had handled a number of sensitive situations.  The leadership of St. Columba's is accountable to, and ultimately selected by, its parishioners, who have an interest in knowing whether the persons leading and representing the community are doing so in accordance with both values of secular importance (such as prudence and competence) and religious importance (such as accordance with the Church's spiritual beliefs) to the community. The Church's reassurance that it "did not ask the Parnigonis to remove their son from the

---

[18] Although the Court cannot consider matters outside the pleadings in this procedural posture, Plaintiffs' claim that this fact is "private" is particularly disingenuous.  Plaintiffs, not Defendants, were the ones who publicized that "the Parnigoni's [sic] removed their son from the nursery school in an effort to protect both Mrs. Parnigoni and her son from this unwanted attention."  *See* Letter from Mark E. Schamel, Ex. C at 2.

school," Am. Compl. ¶ 32, directly informs parishioners about information they need to make such a judgment.[19]

The publicizing of Mr. Parnigoni's sex offense may well have been damaging to Plaintiffs insofar as it reminded some members of the parish of his conviction or introduced others to this fact for the first time.  But any such harm would have been a function of republishing a fact already widely publicized – and not because the Church reassured its members that it did not force their son to withdraw from the school.  In the event the Court reaches the merits of Count III, it should be dismissed.

## III.    THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM FAILS BECAUSE DEFENDANTS' ALLEGED CONDUCT WAS NOT AN 'OUTRAGE' AND PLAINTIFFS' ALLEGED INJURIES WERE NOT 'SEVERE' (COUNT IV).

Count IV seeks to dress up the flawed defamation claim as one for intentional infliction of emotional distress.[20]  But the First Amendment applies equally to claims labeled as infliction of emotional distress when the underlying conduct is a public statement.  Thus, in *Provencio v. Paradigm Media, Inc.*, 44 S.W.3d 677, 683 (Tex. App. 2001), where the defendant truthfully informed neighbors of the plaintiff's sex offender registration, the court affirmed summary judgment on the intentional infliction of emotional distress claim because "[t]he same protections which the First Amendment affords defendants from libel claims also protect them from non-libel claims that are based on the same defamatory publication."  *See generally Hustler Magazine v. Falwell*, 485 U.S. 46 (1988).

---

[19] It is particularly odd that Plaintiffs try to sue Defendants for this statement.  As discussed *supra*, the Church's reassurance that it did *not* demand Andrew's removal from the school reflects favorably on the Parnigoni family by disavowing any connotation that the Church believed that their son was somehow a "threat to the safety and well-being of students."  *Contra* Am. Compl. ¶ 48.

[20] Plaintiffs again fail to comply with Fed. R. Civ. P. 10(b) by combining separate letters sent by separate Defendants – whom Plaintiffs do *not* allege were acting in concert – into a single count. *See* n.9 *supra*.

Apart from the First Amendment considerations, this claim also fails because Count IV does not allege the rudiments of a claim for intentional infliction of emotional distress. The tort has four elements: "(1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable; (3) there was a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress was severe." *Harris v. Kreutzer*, 624 S.E.2d 24, 33 (Va. 2006).[21] Together, these elements are meant to impose a rigorous standard, for the "tort of intentional infliction of emotional distress is 'not favored' in the law." *Almy v. Grisham*, 639 S.E.2d 182, 189 (Va. 2007) (citing *Harris*).

Here, Count IV most obviously fails because it does not allege facts to support the claim, but recites the elements in formulaic fashion, without more. Even notice pleading "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007)). Courts in this district routinely dismiss for failure to state a claim intentional infliction of emotional distress complaints where the facts alleged are insufficient to support these elements. *See, e.g., Metropolitan Life Ins. Co. v. Barbour*, No. 07-1665, 2008 WL 2096350, at *8 (D.D.C. May 19, 2008) (alleged facts insufficient to amount to outrage); *Martin v. Arc of Dist. of Columbia*, 541 F. Supp. 2d 77 (D.D.C. 2008) (alleged facts insufficient to amount to outrage); *Richards v. Duke University*, 480 F. Supp. 2d 222, 241 (D.D.C. 2007) (alleged facts insufficient to amount to severe emotional distress).

---

[21] The tort of intentional infliction of emotional distress, by definition, deals with injuries to feelings and, like the privacy counts, is hence governed by Virginia law. *See* discussion in Part II.A, *supra*. The standard in the District of Columbia, however, is the same. *See Blodgett v. Univ. Club*, 930 A.2d 210, 230-31 (D.C. 2007). In both Virginia and D.C., "[i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Id.* (citing *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998)).

Specifically, Count IV does not contain allegations that satisfy either the "outrageousness" or "severity" elements of the cause of action. Whether alleged conduct "may reasonably be regarded as so extreme and outrageous as to permit recovery" is "for the court to determine, in the first instance." *Womack v. Eldridge*, 210 S.E.2d 145, 148 (Va. 1974). Here, the temperate and thoughtful letters − which referred solely to public facts, urged "decency and compassion" and thanked the community for "uplifting . . . support" for Mrs. Parnigoni during the controversy[22] − lack all the earmarks of "outrageous" conduct, for such conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Harris*, 624 S.E.2d at 33. It is even "insufficient for a defendant to have acted with an intent which is tortious or even criminal." *Id.* (citation omitted).[23]

Thus, courts routinely hold that revealing someone's status as a sex offender, even where the accusations are false or misleading, is legally insufficient to meet the "outrage" requirement. In *Roe ex rel. Roe v. Heap*, No. 03AP-586, 2004 WL 1109849, at *27 (Ohio Ct. App. May 11, 2004), the defendant said that the plaintiff, the father of a child in a sports league, had been convicted of sexual crimes. The court found that the claims were not substantially true, were "uncharitable and of thoughtless character," and "were arguably unnecessary" to ensure the safety of children in the league, but held nevertheless that they were "not so extreme and outrageous" as to constitute intentional infliction of emotional distress. *See also Miles v. Nat'l*

---

[22] *See* Ex. A at 3; Ex. B.

[23] The standard is the same in D.C; conduct must go "beyond all possible bounds of decency and [be] regarded as atrocious and utterly intolerable in a civilized community." *Crowley v. N. Am. Telecomm. Ass'n*, 691 A.2d 1169, 1172 (D.C. 1997) (internal citation omitted); *see also id.* (being subjected to "contempt, scorn, and other indignities . . . [w]hile offensive and unfair . . . is not in itself of the type actionable on this tort theory") (citing *Elliot v. Healthcare Corp.*, 629 A.2d 6, 9 (D.C. 1993)).

*Enquirer, Inc.*, 38 F. Supp. 2d 1226, 1232 (D. Colo. 1999) (no showing of outrage where the defendant published article that included the plaintiff on list of "pedophiles and sex offenders"); *Lindemuth v. Jefferson County Sch. Dist.*, 765 P.2d 1057, 1059 (Colo. Ct. App. 1988) (holding that "reasonable persons could not characterize" revelation of plaintiff's sex offense plea fourteen years prior "as atrocious and utterly intolerable in a civilized community").

Count IV also lacks factual allegations that would satisfy the "severity" requirement. It contains only the boilerplate allegation that plaintiffs have "suffered severe emotional distress, embarrassment and humiliation." Am. Compl. ¶ 78. Even if they had alleged symptoms such as "nightmares, difficulty sleeping, extreme loss of self-esteem and depression, requiring additional psychological treatment and counseling . . . mortification, humiliation, shame, disgrace, and injury to reputation," such allegations would be insufficient, for the injury must be so "severe that no reasonable person could be expected to endure it." *Harris*, 624 S.E.2d at 34 (citing *Russo v. White*, 400 S.E. 2d 160, 163 (Va. 1991)). Plaintiffs' failure to plead *any* facts supporting the severity requirement requires dismissal of Count IV.

## IV.   MRS. PARNIGONI'S SUPPOSED RELIANCE ON DEFENDANT JULIA BERRY'S PREDICTION ABOUT HOW THE CONTROVERSY WOULD SUBSIDE DOES NOT CREATE A CLAIM FOR PROMISSORY ESTOPPEL (COUNT V).

Count V seeks recovery on a promissory estoppel theory, alleging that Fiona Parnigoni relied to her detriment on a statement by the Nursery School Director − made before many of the events alleged in the Amended Complaint took place[24] – that the controversy would blow over and not affect her employment. Am. Compl. ¶ 83.[25] Ultimately, the School elected not to renew her contract for the 2008-2009 school year.

---

[24] *See* Am. Compl. ¶ 83 (alleging that statement was made "on or around October 18, 2007").

[25] Fiona Parnigoni raises this claim "against all defendants" even though she alleges a promise only by Ms. Berry and does not allege that any of the other Defendants were acting in concert

This claim stumbles at the threshold, because promissory estoppel is an equitable doctrine, *Granfield v. Catholic Univ. of Am.*, 530 F.2d 1035, 1041 n.15 (D.C. Cir. 1976), and it is well established that "a party may not assert a promissory estoppel claim where there is an enforceable contract." *Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61, 71, (D.D.C. 2005) (citing *Bynum v. Equitable Mortgage Group*, No. 99-2266, 2005 WL 818619 at *16 (D.D.C. Apr. 7, 2005)).   As the Amended Complaint recognizes, Mrs. Parnigoni had a contractual relationship with the School.  *See* Am. Compl. ¶¶ 83-84.  Moreover, she was under contract at the time of the alleged conversation with the School Director.  That contract, not the oral reassurance in the second month of school that "the storm would soon pass," governs her retention.

In any event, Mrs. Parnigoni's alleged reliance was not reasonable as a matter of law and could not have been detrimental.  First, the alleged promise was made in October 2007, with the school year just underway.  It was not reasonable to expect that the School would rest its decision to renew her contract on little more than one month's performance in the 2007-2008 school year, without regard to her performance during the remainder of the year, including her compliance with school policies.  Second, there is no allegation that Ms. Berry's promise that "the storm would soon pass," even if made and relied upon at the time, had any impact on Mrs. Parnigoni's job search when renewal decisions in fact were made many months later.  Count V should be dismissed.

## V.   THE "LOSS OF CONSORTIUM" CLAIMS ARE DERIVATIVE (COUNTS VI, VII, AND VIII).

Counts VI, VII, and VIII allege "loss of consortium" due to loss of affection and companionship.  A "loss of consortium claim depends on whether the underlying claim . . . has

---

with Ms. Berry or exerting control over her.  As a result, Defendants other than Ms. Berry should be dismissed from this Count in any event.

been proven"; insofar as the predicate claims are dismissed, these claims must be dismissed as well. *See Hill v. Medlantic Health Care Group*, 933 A.2d 314, 331 (D.C. 2007). For the reasons given above, the predicate claims of defamation, invasion of privacy, and infliction of emotional distress should be dismissed.[26]

The loss of consortium counts should be dismissed for the further reason that Virginia, Plaintiffs' state of residence, does not recognize a claim for loss of consortium. *See Villnow v. DeAngelis, Winfield*, No. L00-2406, 2001 WL 34037316, at *3 (Va. Cir. Ct. June 18, 2001); *see also Anderson v. Sharma*, No. 125374, 1992 WL 884771, at *3 (Va. Cir. Ct. June 20, 1992) ("no cause of action exists in Virginia for loss of consortium").[27] Counts VI, VII, and VIII should be dismissed.

## VI. THE PROVISION OF TRUTHFUL INFORMATION ABOUT MR. PARNIGONI WAS NOT WRONGFUL AND CANNOT STATE A CLAIM FOR INTERFERENCE WITH MRS. PARNIGONI'S ECONOMIC RELATIONS (COUNT IX).

Mrs. Parnigoni claims that, by reason of the letters, some nursery school students from St. Columba's will not attend the summer camp she operates; that Defendants intended to cause parents to withdraw children from the camp; and that the withdrawals caused her "three million dollars" in damages. Am. Compl. ¶¶ 105-111. Because the alleged conduct is not wrongful as a matter of law, her claim for interference with prospective economic relations must be dismissed.

To state a claim for intentional interference with prospective economic relations, it is not enough for a plaintiff to allege that a defendant intentionally caused third parties to decline to

---

[26] Plaintiffs' cause of action for Promissory Estoppel (Count V) cannot form the predicate for a loss of consortium claim, as Mrs. Parnigoni does not claim damages for emotional distress under that theory. *See* Am. Compl. ¶ 85.

[27] Under District of Columbia law as well, there is no recognized claim at least for loss of parent-child consortium. *See Herbert v. District of Columbia*, 808 A.2d 776, 779 n.3 (D.C. 2002) (citing *District of Columbia v. Howell*, 607 A.2d 501, 506 (D.C. 1992)); *Parker v. Martin*, 905 A.2d 756, 764 (D.C. 2006) (same).

contract with the plaintiff.  A "necessary prerequisite to recovery under this theory is that the interference alleged have been . . . *improper*."  *Int'l City Mgmt. Ass'n Ret. Corp. v. Watkins*, 726 F. Supp. 1, 6 (D.D.C. 1989) (emphasis added) (citing Restatement (Second) of Torts §§ 766-67 (1977)).  Mrs. Parnigoni has not done so here, for the only conduct she alleges to support this claim is the "dissemination of the defamatory letters."  Am. Compl. ¶ 108.  But as explained, the letters were not defamatory and did not constitute an invasion of Plaintiffs' privacy.

The Restatement is unequivocal:  the provision of "truthful information" is "clearly not improper . . . even though the facts are marshaled in such a way that they speak for themselves and the person to whom the information is given immediately recognizes them as a reason for breaking his contract or refusing to deal with another."  Restatement (Second) of Torts § 772 & cmt. b (1979).  Thus, for example, in *Int'l City Mgmt. Ass'n Ret. Corp.*, 726 F. Supp. at 6-7, the court held "as a matter of law" that the defendant's letter informing the plaintiff's potential customers of accurate facts about plaintiff "was not improper and therefore cannot provide the basis for a claim of tortious interference with prospective contractual relations."

## VII.    DEFENDANTS WERE UNDER NO DUTY TO ANTICIPATE AND DISCLOSE TO PLAINTIFFS THAT THEY WOULD NOTIFY THE PARISH OF MR. PARNIGONI'S CRIMINAL CONVICTION (COUNT X).

The Amended Complaint adds a claim for misrepresentation, based on the Nursery School's alleged negligent failure to inform them at the time of Andrew's enrollment that the Church would notify the parish about Mr. Parnigoni's criminal conviction and registration as a sex offender.  Plaintiffs assert this was an "omission" of a fact Defendants had "an affirmative duty to disclose."  Am. Compl. ¶¶ 113-115.  Count X fails to state a claim for four reasons.

A claim of negligent misrepresentation "must allege that defendant (1) made a false statement or omission of fact; (2) the statement was in violation of a duty to exercise reasonable care; (3) the false statement or omission involved a material issue; (4) the plaintiff relied to his

31

detriment on the false information; and (5) the defendant's conduct was the proximate cause of plaintiff's injury." *Bell ex rel. Albert R. Bell Living Trust v. Rotwein*, 535 F. Supp. 2d 137, 144 (D.D.C. 2008) (citing *Burlington Ins. Co. v. Okie Dokie, Inc.*, 329 F. Supp. 2d 45, 48 (D.D.C. 2004)).  Plaintiffs' allegations are deficient with respect to the first, second, and fourth elements.

At the outset, however, the Court need not consider those deficiencies, for the Amended Complaint reveals that Plaintiffs have waived their misrepresentation/omission claim.  Although Count X includes the boilerplate allegation that "[a]t no time did Defendants inform Plaintiffs that if Andrew enrolled in the School, the disclosures detailed above would be made," Am. Compl. ¶ 113, the detailed factual allegations set forth in the "Background Facts" contradict that conclusory assertion.  In Paragraph 18, Plaintiffs acknowledge that the School Director *did* tell Mrs. Parnigoni in August 2007, before the school year started, that she intended to tell any parent who inquired about Mr. Parnigoni's conviction:

> The Director explained that Mrs. Parnigoni was required to disclose the details of her husband's conviction *so that the Director could explain it to any parent who might ask a question regarding it*.

Am. Compl. ¶ 18 (emphasis added.)  The Amended Complaint goes on to state that, not only did Mrs. Parnigoni accede to the request for details of the conviction ("she provided Ms. Berry with all of the information she requested"), but she also proceeded to enroll Andrew in the school.  In sum, Plaintiffs admit that they were, in fact, advised that the School intended to disclose the details of Mr. Parnigoni's conviction to any and all parents who inquired.[28]  As a matter of law, it cannot matter that, after further consultation (including consultation with counsel), the disclosure was made by letter and not in a conversation between the Director and one or more parents.

---

[28] Needless to say, notice of the School's intention should have given Plaintiffs certain knowledge that the information would spread throughout the school community and parish.

Putting waiver aside, however, the claim is deficient, first, because the alleged omission – "that the disclosures [regarding David Parnigoni] would be made" – was not one of then existing "fact" but of future intention. To state an action for misrepresentation based on future intention, a plaintiff must plead that the defendant had the intent to mislead *at the time of the alleged misrepresentation*. *See generally* Restatement (Second) of Torts § 530 (1977). Conspicuously missing from the Amended Complaint is an allegation that any Defendant had formed a plan to issue a letter about Mr. Parnigoni at the time of the alleged omission (presumably March 2007, when Andrew was admitted, or August 2007, when he enrolled, *see* Am. Compl. ¶ 19).[29]

Second, an omission can be actionable "only if [the defendant] is under a duty to the other to exercise reasonable care to disclose the matter in question." Restatement (Second) of Torts § 551(1) (1977). The Church and School unquestionably had a duty to exercise care to ensure the safety of the nursery school children entrusted to it. There was no duty, however, to disclose in advance to any one parent the institution's potential plans to address such safety concerns.

Third, the Amended Complaint alleges vaguely that Plaintiffs relied on the omission "to their detriment." But the only action taken in reliance was the enrollment of Andrew in the School. That action cannot constitute compensable injury.

### CONCLUSION AND RELIEF REQUESTED

Plaintiffs deny that the conduct underlying David Parnigoni's criminal conviction − playing "strip ping pong" with an 11-year old boy, which is a matter of public record − was serious or posed any threat to the safety of children. To Mr. Parnigoni, his conduct was "private" and "consensual." Particularly in the present day, St. Columba's views its obligations to protect

---

[29] Plaintiffs acknowledge that the School Director did tell Mrs. Parnigoni in August 2007, before the school year started, that she intended to tell any parent who inquired about Mr. Parnigoni's conviction and therefore "to disclose the details of her husband's conviction."

33

the children entrusted to its care from inappropriate sexual conduct quite differently.   The Church was in possession of public information concerning Mr. Parnigoni's criminal conviction and listing on the Virginia Sex Offender and Crimes Against Minors Registry.   Mr. Parnigoni was married to a teacher in the Nursery School run by the Church and, as of August 2007, was also the father of a child enrolled in the School.   The Church made a truthful, restrained disclosure of the public information in its possession to the members of its church and nursery school community.   From this, the Parnigonis assert a plethora of ten claims for relief seeking nineteen million dollars in damages.   It is the public community that was harmed and at risk from the actions of David Parnigoni, not the Parnigonis who have been harmed by the Church. Hopefully, no criminal incident concerning Mr. Parnigoni will ever happen again.   But the Church was entitled to disclose the information that it did, to ensure that parents were advised and children were protected from the risk of harm presented by his conviction.

The Amended Complaint should be dismissed in its entirety for failure to state a claim upon which relief can be granted.

Respectfully Submitted,

  /s/ David W. DeBruin_____
David W. DeBruin (D.C. Bar No. 337626)
Luke C. Platzer (D.C. Bar No. 501274)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
(202) 639-6015 (tel)
(202) 637-6375 (fax)

*Counsel for Defendants*

Date:  June 4, 2008

34

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 4th day of June 2008, I caused a copy of the foregoing

Statement of Points and Authorities in Support of Defendants' Motion to Dismiss and attached

Exhibits to be served upon the following by First Class Mail and via the Court's ECF system:

Sundeep Hora
Leslie David Alderman, III
ALDERMAN, DEVORSETZ & HORA PLLC
1025 Connecticut Ave., NW
Suite 615
Washington, DC 20036

*Counsel for Plaintiffs*

_/s/ David W. DeBruin _____
David W. DeBruin

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| FIONA PARNIGONI, DAVID PARNIGONI, and ANDREW PARNIGONI, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:08-cv-00613 (RBW) |
| ST. COLUMBA'S NURSERY SCHOOL, ST. COLUMBA'S EPISCOPAL CHURCH, VESTRY OF ST. COLUMBA'S PARISH, REV. JANET VINCENT, and JULIA H. BERRY, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**[PROPOSED] ORDER GRANTING DEFENDANTS MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

The Motion of Defendants St. Columba's Nursery School, St. Columba's Episcopal Church, Vestry of St. Columba's Parish, Rev. Janet Vincent, and Julia H. Berry to Dismiss Plaintiffs' Amended Complaint is GRANTED.  It is hereby ORDERED that Plaintiffs' Amended Complaint is DISMISSED with prejudice.

_____
Date

_____
Hon. Reggie B. Walton
United States District Judge

# EXHIBIT A

ST. COLUMBA'S EPISCOPAL CHURCH
*4201 Albemarle Street, N.W., Washington, D.C. 20016 ⟿ 202-363-4119 FAX 202-686-2671 www.columba.org*

October 18, 2007

Dear St. Columba Parishioners and Nursery School Parents,

St. Columba's loves children. We love and nurture them in our varied parish programs and through our Nursery School. We also take seriously our responsibility to provide them with the safest possible environment in which to thrive and grow.

One way of ensuring the protection of our children is to keep parents and all of our members informed about the ways in which we safeguard our youngest members and students. This letter aims to do that in three ways.

1.  Installation has begun on automated security systems that will allow us to control and monitor the many access points to our building. This system will provide overnight security but more importantly it will help us to monitor access to our building during the day and evening. Included in the installation will be security cameras and sensor equipment, keyless entry and more. The work will be completed sometime in December. We are also in the process of creating a simple sign-in procedure for entry to our Albemarle Street and main Nursery School entrances. Visitors and vendors will be asked to sign a register as they are greeted by staff members or volunteers. To that end, we will be installing a larger window at the church's Albemarle entrance and reception office to facilitate this new sign-in procedure. The parish office has already begun the practice of sending out a weekly (and daily, if needed) communication to parish and Nursery School staff announcing repairs, deliveries and other routine visits by various service providers. These are simple procedures, practiced by many institutions, that will help us to enhance our welcome and security.

2.  Enclosed with this letter is a copy of St. Columba's *Standards, Policies and Procedures for Ministries Involving Children and Young People.* All but the last section have been in effect for some years and many of you who work with our younger members will be familiar with them. These Standards, Policies and Procedures have been reviewed by legal counsel and conform with Episcopal Church guidelines and the best practices of similar organizations. They apply to the parish and our Nursery School and I urge you to read them carefully.

3.  Over the past several months three situations, or renewed concern about situations, have led us to review our Standards, Policies and Procedures with legal counsel and to weigh carefully our obligation to provide disclosure to our parish and Nursery School community. St. Columba's vestry and the Nursery School board have been fully informed about these situations and have actively encouraged our obtaining professional advice to recommend appropriate responses to the three situations and for the future.

On Sept. 20, 2007, Emily Gowdy Canady (Director of Youth Ministries,) Martin Smith (Senior Associate Rector), Julia Berry (Director, St. Columba's Nursery School), Wendell Belew (Chair, St. Columba's Nursery School Board of Governors) and I met with attorneys Mark Biros and Meredith Bailey of Proskauer Rose LLP. As a result of that meeting, their subsequent written advice, further meetings and our revised Standards, Policies and Procedures, I write to give you information already in the public domain but perhaps not known to all parishioners and Nursery School parents.

- Mr. David Parnigoni, the husband of Fiona Parnigoni, a teacher at St. Columba's Nursery School since June 2001, is registered with the Virginia Sex Offender and Crimes Against Minors Registry as a result of a July 3, 2004, conviction for indecent exposure to a minor. Until recently their son attended the Nursery School. I want to assure you that steps have been taken to prevent Mr. Parnigoni from entering St. Columba's grounds or participating in St. Columba's Nursery School events. I am providing you this notice to enable you to make informed decisions as to whom you entrust the care and supervision of your child. This disclosure is in no way intended to harm the Parnigoni family. Given the seriousness of the issue and our inability to anticipate every possible future scenario we believe our best course of action is to give parents the information they need to protect their children. Mrs. Parnigoni has been informed of this decision to disclose. We did not ask the Parnigonis to remove their son from the school.

- Mr. Vincent Oliver, a resident of Friendship Terrace (4201 Butterworth Place NW, Washington, DC 20016), is listed on the National Sex Offender Public Website maintained by the U.S. Department of Justice (www.nsopr.gov). He has been convicted twice of sexual offenses against children. Mr. Oliver has been a sometime participant in our 9:00 a.m. Sunday service in the church. This service is the one attended by most of our school-age children. I met with Mr. Oliver to discuss his participation and this disclosure. He has decided to remove himself from the parish.

  Friendship Terrace is the location of Sunday School classes—this year a Sr. High class. We strictly adhere to our policies regarding adequate adult supervision for all members under 18 years of age. Friendship Terrace is also the designated emergency shelter for our Nursery School children. Please be assured that Nursery School policy ensures adequate adult supervision for students.

- A third situation involves a member of the parish who is not on a public registry (and who therefore will not be named), but who has shown persistent and inappropriate interest in working with our young people. His repeated attempts to circumvent the strict limitations placed on him have resulted in my barring him from parish activities and premises. This action had been taken by another parish in our diocese prior to his involvement with us.

These are sad disclosures, but they are necessary for the sake of our children. In making them we trust the basic sense of decency and compassion of each member of the parish and each family with a child in our Nursery School. I also make them with complete confidence that you are entitled to information that may impact the safety of your children. It is important to note that I am not disclosing the attempted abuse or abuse of a child in our care.

These policies and disclosures will raise questions for some and so the wardens, Chair of the Nursery School Board of Governors and I invite you to a special meeting for parish members and Nursery School families to be held on Thurs., Nov. 1, 2007, at 7:00 p.m. in the Great Hall. Julia Berry and Emily Gowdy Canady will round out the panel and we will answer questions and discuss concerns.

We are blessed by the presence of so many children in our midst and we gladly accept the responsibility to protect them.

Sincerely,

The Rev. Janet Vincent
Rector

# EXHIBIT B

## SAINT COLUMBA'S NURSERY SCHOOL

November 9, 2007

Dear Families,

I want to thank each of you who took time this past month to stop by, send a note, or make a phone call in response to the recent letter and policies that were sent out informing the community about security changes being put in place at St. Columba's. Your words and letters of support for the school and Mrs. Parnigoni and your thoughtful questions about these changes were uplifting and reassuring to us as we wrestled with the uncomfortable knowledge that the world can be a less-than safe place for our children. I want especially thank those of you who were able to attend last week's special meeting to voice your concerns and questions to our rector, the wardens, youth and children's ministry leaders, our board chair, and me. I know we all learned a great deal from the evening. It was heartening to hear your voices speak so eloquently in support of the nursery school and its teachers.

The parish will offer two additional events for all parents on the topic of child safety. **The first—to be held from 7:00 to 8:30 pm in the Great Hall on Thursday, November 15—will focus on a variety of child safety issues as well as how to talk to children about them in an age-appropriate way.** Jennifer A. Crumlish, Ph.D., from the Washington Psychological Center, and Holly Joyner, a counselor at Beauvoir Elementary School, will lead the discussion and answer questions. Pattie Ames, the Director of Children's Ministries, will also be there to address to answer questions about programs for children's at St. Columba's.

**Then on Sunday, November 18 there will be a showing of the video,** *Safeguarding God's Children for Parents* from 12:30 to 1:30 pm in the Great Hall. The thirty-minute video will be followed by a thirty-minute discussion led by Emily Gowdy Canady, Director of Youth Ministries at St. Columba's. This video covers safety issues in churches as well as in other situations and is part of the training program used to prepare all who work with children in teaching or ministry in the diocese.

The Thanksgiving holiday and parent-teacher conferences during the first week of December are already looming on the horizon. Though time moves quickly, each day provides many opportunities to guide children along the path to the grown-up people they will someday become. The teachers at St. Columba's are deeply invested in their work because they know that growing good and thoughtful people is the most important work there is. I am grateful that you chose us to be your partners in this work.

Best wishes,

4201 Albemarle Street, NW  Washington, DC 20016  202/363-4121 Fax 202/686-9774

# EXHIBIT C

# SCHERTLER & ONORATO, L.L.P.

| | | |
|---|---|---|
| David Schertler<br>*DC & IL Bars* | Vincent H. Cohen, Jr.<br>*DC, MD & NJ Bars* | Claire Morris Clark<br>*VA Bar* |
| Danny C. Onorato<br>*DC & CA Bars* | David H. Dickieson<br>*DC, MD, VA & PA Bars* | Veronica Renzi Jennings<br>*MD Bar* |
| | Lisa Fishberg<br>*DC, MD & NY Bars* | Habib F. Ilahi<br>*DC & TX Bars* |
| | Mark E. Schamel<br>*DC, MD & NY Bars* | Michael Starr<br>*DC Bar* |
| | Robert J. Spagnoletti<br>*DC, NJ, NY & TX Bars* | Peter V. Taylor<br>*DC Bar* |

November 7, 2007

**VIA First Class Mail**

    **Re:**    ***Fiona Parnigoni***

Dear Sir or Madam:

Fiona Parnigoni has been a teacher at St. Columba's Nursery school for many years. She has worked with many children and their families in that time and is held in high regard by parents, children and her colleagues on the teaching staff. Mrs. Parnigoni has always strived to do her job in a professional manner and each day brings with her enthusiasm, dedication and respect for all those she comes in contact with. Under her care and supervision no harm has ever come to a child. Mrs. Parnigoni goes above and beyond the call of duty to make sure all the children in her care are kept safe.

The incident involving Mr. Parnigoni, which happened 4 years ago, involved no allegation of sexual contact or conduct and the immature prank remains under appeal. Mrs. Panigoni has always been truthful, honest and open about this situation ever since it happened. There have never been any questions or issues regarding this matter as it did not involve any sexual misconduct and that all involved were aware that the juvenile behavior at issue was not criminal. There has never been an allegation or belief by anyone that Mr. Parnigoni is in any way a risk to anyone.

It is important to note that the Parnigoni's have never been members of St. Columba's parish and do not reside in the area. It is with regret that the Parnigoni's are forced to explain something that has no bearing on Fiona's position. This disclosure to the entire parish and community has caused great harm both emotionally and financially to Mrs. Parnigoni as counsel has to be retained to protect her privacy and reputation.

The wording of the disclosure by St. Columba's insinuates that there is a serious issue that requires parents to make a decision as to who is caring for their children. The language is misleading as it is Mrs. Parnigoni who is caring for the children. The disclosure you received indicates that "steps have been taken" to assure that Mr. Parnigoni will not be on the St. Columba's property. Again, that language is misleading and hurtful to the Parnigoni's. The only steps have been an agreement by the family that Mr. Parnigoni will not come on to St. Columba's property and this was relayed verbally to the director of nursery school before the start of the school year. The Parnigoni's removed their son from the nursery school in an effort to protect both Mrs. Parnigoni and her son from this unwanted attention and give them both privacy they are entitled to as individuals.

Fiona Parnigoni is an excellent teacher who has done nothing but dedicate years of her life to caring for and educating the children of St. Columba's. She will continue to provide the loving safe and nurturing care she has given since she joined the St. Columba's family.

Very truly yours,

SCHERTLER & ONORATO, L.L.P.

Mark E. Schamel