## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FIONA PARNIGONI, ET AL.   )
           )
      Plaintiff )
           )
     v.      )  Civil Action No. 1:08-cv-00613 (RBW)
           )
ST. COLUMBA'S NURSERY  )
SCHOOL, ET AL.     )
           )
      Defendants )

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
### TO DISMISS AMENDED COMPLAINT

   Plaintiffs Fiona Parnigoni, David Parnigoni and Andrew Parnigoni, by and through their

undersigned counsel, file this Memorandum in Opposition to Defendants' St. Columba's Nursery

School, St. Columba's Episcopal Church, Vestry of St. Columba's Parish, Rev. Janet Vincent and

Julia Berry (collectively the "Defendants"), Motion to Dismiss Amended Complaint Pursuant to

Federal Rule of Civil Procedure 12(b)(6).  For the reasons set forth below, Defendants' Motion to

Dismiss should be denied.

### I.  Introduction

   It is evident from Defendant's Motion to Dismiss, indeed from its opening paragraphs, that

the Defendants' strategy is to shift the Court's focus from Defendants' wrongdoing by

sensationalizing the circumstances that led to David Parnigoni's criminal conviction for indecent

exposure and by arguing that their version of the facts warrant dismissal at this preliminary stage of

the proceedings.  In a culture where more people vote for who will be the next American Idol

instead of who will be the next president of the United States, it becomes somewhat understandable

why the Defendants have opted for a "sex sells" strategy instead testing the sufficiency of the

Amended Complaint and confining their arguments to the facts and claims contained within the

four corners of the Complaint—which Defendants are required to do at this preliminary stage of the litigation.

We begin by stating the obvious: David Parnigoni is a convicted sex offender. This is a fact, and it is not in dispute. The subject of this *civil* suit is not to relitigate his *criminal* conviction. Therefore, the circumstances that led to Mr. Parnigoni's conviction, his reputation or the fact that the Defendants made the decision to re-publicize his criminal conviction *over three years* later, are not at issue in this case. Defendants attempt throughout their Motion to use Mr. Parnigoni's conviction as a basis for their defamatory actions against his wife and three-year old child. The focus of Plaintiffs Amended Complaint is the manner in which the Defendants made their disclosures and knowingly and purposefully sought to punish <u>Fiona</u> Parnigoni by destroying her reputation and her ability to work in her chosen profession as a nursery school teacher.

Defendants do not contest that they could easily have made a factually accurate disclosure without purposefully creating defamatory implications or casting Mrs. Parnigoni and her son as a threat to the safety of children. Defendants would have the Court believe that their conduct was justified because their motivation was pure: to protect the children of its community from the "risk of sexual abuse." Even without the benefit of discovery in this case, we know that this is untrue, and that, in fact, Defendants sought to punish Fiona Parnigoni for her "poor choice" and for making a "bad decision" to marry David Parnigoni.

Even if we set aside the fact that the Church, when Fiona Parnigoni first made them aware of David Parnigoni's conviction in 2003, chose not to make *any* disclosure *whatsoever* at that time, there is no justification for its decision, over three years later, to disseminate the disclosures at issue. Moreover, there was no basis to make the defamatory disclosures to entire parish let alone each and every parent of a student who attended the nursery school. Defendants' disclosure resulted in over 3,500 households in the D.C. metropolitan area receiving the defamatory letters.

Plaintiffs respectfully request that the Court reject Defendants' sensationalistic tactics and focus on the sole issue before this Court: whether Plaintiffs' claims warrant dismissal under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. As will be demonstrated below, Defendants Motion to Dismiss should be denied as all of the claims asserted in the Amended Complaint meet this legal threshold.

## II.    Factual Background

As Defendants' Motion is brought pursuant to Fed. R. Civ. P. 12(b)(6), Plaintiffs strictly adhere to the statement of Background Facts contained in the First Amended Complaint.

For the past seven school terms, Fiona Parnigoni has been a valued and respected teacher at St. Columba's Nursery School (the "School"). Am. Compl. at ¶ 11. She has always been well regarded by her students, their parents and her colleagues as an enthusiastic and dedicated teacher who has her students' best interests at heart. During her seven-year tenure, there has never been a single instance where a child in her care was endangered or at risk of being harmed in any way. *Id.* at ¶ 12.

In 2004, Mrs. Parnigoni's husband (then fiancée) was charged and convicted of indecent exposure, the details of which is fully set out in Defendants' Motion at pp. 2-4. Mrs. Parnigoni was in no way involved in this incident, and she had no connection whatsoever with Mr. Parnigoni's criminal case. Indeed, her association with David Parnigoni was never, prior to Defendants' actions that are the subject of this civil action, published or disseminated to the public. Likewise, David Parnigoni is in no way affiliated with the school or parish at St. Columba's. *Id.* at ¶ 13.

In 2004, during the pendency of David Parnigoni's criminal case, Fiona informed Karen Strimple, the Director of the School at the time, of Mr. Parnigoni's criminal offense. Upon information and belief, Ms. Strimple informed the Board of Governors of the Church and the Rev. James Donald, the Rector at the time, of Mr. Parnigoni's situation. *Id.* at ¶ 15. Defendants took no

action at that time because they determined that no action was necessary or warranted, and Fiona continued to work at the School as a teacher without any further discussion or incident. *Id.* at ¶ 16.

Over three years later, in August of 2007, Julia Berry, who replaced Karen Strimple as Director of the Nursery School, during a meeting with Mrs. Parnigoni, demanded that she provide details regarding her husband's 2004 conviction. *Id.* at ¶ 18. Mrs. Parnigoni provided Director Berry with all of the information she requested. Mrs. Parnigoni also offered to put Ms. Berry in contact with her husband's attorneys if she felt she needed additional information. *Id.*

Around this time, Mrs. Parnigoni enrolled her three-year-old son, Andrew Parnigoni, in the School. The Parnigonis had submitted an application to the School on behalf of Andrew in February 2007. The School notified the Parnigonis of his acceptance in March 2007. At no time did the Defendants notify the Parnigonis that if they enrolled Andrew at the School, that a public disclosure would be made regarding Andrew's enrollment and that his father, David Parnigoni, was a convicted sex offender. *Id.* at ¶ 19.

On or around September 6, 2007, the first day of the 2007-2008 term for teachers, the Director informed Mrs. Parnigoni that the Board was "nervous" about her husband's 2004 conviction. *Id.* at ¶ 20. Mrs. Parnigoni informed the Director that she would walk Andrew off school grounds a block away on the single day per week when her husband was required to pick Andrew up from school. The Director later informed Mrs. Parnigoni that the Board felt "relieved" in light of Mrs. Parnigoni's decision to walk Andrew off the premises to her husband's car. *Id.* at ¶ 21.

The Director then asked Mrs. Parnigoni to share her husband's lawyer's contact information so that St. Columba's counsel could make a "courtesy call." Mrs. Parnigoni complied. The Church's legal counsel contacted Mr. Parnigoni's attorney and informed him that based on the steps that have been put in place, "everything is fine" and that the Parnigonis need not be worried and that they would not hear from the Church again on this issue. *Id.* at ¶ 22.

On October 3, 2007 a meeting was held between the Rev. Vincent, Director Berry, Wendall Belew (Chairman of the Board of Governors), Mrs. Parnigoni and the parties' counsel. Rev. Vincent announced that the purpose of this meeting was to inform the attendees of her decision to make a full public disclosure and that she would not entertain any discussion or plea to change her decision. The Church intended to disclose David Parnigoni's 2004 conviction and the fact that Mrs. Parnigoni, a teacher of the school, was married to a convicted sex offender, to all parents of students of the Nursery School and the entire Parish. The Rector repeated that she was not willing to negotiate but only to inform. *Id.* at ¶ 25.

In order to avoid embarrassment to her and her family, Mrs. Parnigoni asked whether she could withdraw Andrew from the School to avert the embarrassing disclosure. She was informed by Church's counsel that it would certainly "help" if Andrew was not a student of the school and that she was encouraged to withdraw him from the School. *Id.* at ¶ 26. Mrs. Parnigoni removed Andrew from the School on or about October 1, 2007 and scrambled to find suitable daycare for him. *Id.* at ¶ 27. Around this time, Mrs. Parnigoni also offered to resign her position at the school in order to avert public disclosure. Her offer was rejected outright. *Id.* at ¶ 28.

On Friday, October 12, 2007, the Director, Julia Berry, met with Mrs. Parnigoni's co-teacher and two other colleagues. During this meeting, the Director stated that while she was sorry that this had happened to Mrs. Parnigoni, she put the blame for the entire situation on Mrs. Parnigoni, and declared that if Mrs. Parnigoni had not married David Parnigoni, she "would not be in this position." *Id.* at ¶ 29.

On or about October 15, 2007, the Rector addressed the school staff to inform them about the public disclosure that would be made regarding David and Fiona Parnigoni. During this meeting, the Rector made it clear to those present that this decision was based <u>solely</u> on what she termed as Mrs. Parnigoni's "poor judgment in marrying David." The Director affirmatively rejected

the idea that the disclosure was premised on concerns that arose because of Andrew's enrollment in

the School. When asked by a staff member whether Mrs. Parnigoni's resignation would alleviate the

purported need for disclosure, the Rector said that it would not make a difference, that disclosure

was a direct consequence of "Fiona marrying Dave" and that the disclosure would be made even if

she resigned.  Moreover, the disclosure would be repeated on an annual basis going forward.  The

Rector then stated that she was there to inform and not to answer questions. *Id.* at ¶ 31.

On or about October 18, 2007, Rector Vincent sent a letter (the "October 18, 2007 letter")

to the parents of the students of the School and to all members of the Church's parish. The letter

stated, in part:

> Dear St. Columba Parishioners and School Parents,
>
> St. Columba's loves children.  We love and nurture them in our varied parish
> programs and through our Nursery School.  *We also take seriously our
> responsibility to provide them with the safest possible environment in which to thrive and
> grow.*
>
> One way of ensuring the protection of our children is to keep parents and all
> of our members informed about the ways in which we safeguard our
> youngest members and students.
>                          …
> On Sept. 20, 2007, Emily Gowdy Canady (Director of Youth Ministries),
> Martin Smith (Senior Associate Rector), Julia Berry (Director, St. Columba's
> Nursery School), Wendell Belew (Chair, St. Columba's Nursery School Board
> of Governors) and I met with attorneys Mark Biros and Meredith Bailey of
> Proskauer Rose LLP.  As a result of that meeting, their subsequent written
> advice, further meetings and our revised Standards, Policies and Procedures,
> I write to give you information already in the public domain *but perhaps not
> known to all parishioners and Nursery School parents:*
>
> • Mr. David Parnigoni, the husband of Fiona Parnigoni, a teacher at St.
> Columba's Nursery School since June 2001, is registered with the Virginia
> Sex Offender and Crimes Against Minors Registry as a result of a July 3,
> 2004 conviction for indecent exposure to a minor.  Until recently their son
> attended the Nursery School.  I want to assure you that steps have been
> taken to prevent Mr. Parnigoni from entering St. Columba's grounds or
> participating in St. Columba's Nursery School events.  *I am providing you this
> notice to enable you to make informed decisions as to whom you entrust the care and
> supervision of your child.*  This disclosure is in no way intended to harm the
> Parnigoni family.  Given the seriousness of the issue and *our inability to*

> *anticipate every possible future scenario we believe our best course of action is to give parents*
> *the information they need to protect their children.* Mrs. Parnigoni has been informed
> of this decision to disclose. We did not ask the Parnigonis to remove their
> son from the school.
>
> > …
>
> *These are sad disclosures but they are necessary for the sake of our children…*I also make
> them with complete confidence that *you are entitled to information that may impact*
> *the safety of your children. It is important to note that I am not disclosing the attempted*
> *abuse or abuse of a child in our care.*
>
> These policies and disclosures will raise questions for some and so the
> wardens, Chair of the Nursery School Board of Governors and I invite you
> to a special meeting for parish members and Nursery School families to be
> held on Thurs., Nov. 1, 2007 at 7:00 p.m. in the Great Hall. Julia Berry and
> Emily Gowdy Canady will round out the panel and we will answer questions
> and discuss concerns…
>
> Sincerely,
>
> The Rev. Janet Vincent
> Rector
>
> (emphasis added)

*Id.* at ¶ 32.

Over 3,500 households in the D.C. metropolitan area received the October 18, 2007 letter.

It is unknown how many thousands of individuals read the letter. *Id.* at ¶ 33. On the same day that

the letter was sent to the parents and the entire parish, Julia Berry, sent an email to the DC

Directors' Exchange list-serve, a group consisting of approximately 37 nursery school directors in

the Washington, D.C. area, to request advice on the situation at St. Columba's. In the email Julia

Berry stated, in part:

> I have a teacher who is married to a registered sex offender. Since her
> marriage to him five years ago**,** *the school has had a "husband may not come onto the*
> *premises" policy which has seemingly served well* particularly since the incident was
> well known in our community as well as the neighboring elementary school.
> This year her son was admitted to the school and i [sic] approached the
> board about the legal status of the child, mother/teacher, and husband. I also
> went to the Rector. In short order, the Rector and others upstairs had
> retained an attorney, changed the policy of the church to state that full
> disclosure would be made in all instance….

> We had some cataclysmic meeting with both sets of attorneys (our recommended that she be fired), *the child was withdrawn from school, the teacher offered to resign if we would not disclose, but as of today, full disclosure has been made to the entire parish as well as the school (several thousand people).* Needless to say, my staff (some of them anyhow) are angry bitter etc. The letters are landing in mailboxes today and tomorrow…
>
> …

*Id.* at ¶ 34 (emphasis added).  As a result of the Director's email, virtually every school director in the Washington, D.C. area became aware of Ms. Parnigoni's private circumstances.  The recipients were all prospective employers of Mrs. Parnigoni.  *Id.* at ¶ 35.

Shortly after the October 18, 2007 letter was sent, Defendant Berry met with Mrs. Parnigoni and informed her that the Board would renew her contract for the next year and that her teaching position with the school was safe. *Id.* at ¶ 37.

Per the October 18, 2007 letter, on November 1, 2007 a meeting, open to the public, was held to address any questions or concerns that the letter might have raised.  Upon information and belief, some attendees of the meeting indicated that they believed the Rector's letter unfairly cast Mrs. Parnigoni as a threat to children. *Id.* at ¶ 38.  On October 31, 2007, the Parnigoni family received a letter from a parent who wrote in part:

> I think that it's equally important that you realize that there are many of us who you don't know- both parents of the Nursery and people within this community – who recognize the incredible toll this must be on you and your family, and *find this approach totally unjustified.  I don't know the details of your situation (nor do I wish to find out) but am confident that you, as a teacher at Saint Columba's Nursery, have our children's safety and best interest at heart- just as you do your own child.*  For this reason*, I am saddened that you and your family's name and reputation have been tarnished, your personal affairs publicized,* and that your son was taken out of the school as a result of this incident but hope that the "storm" will soon pass…I wish to extend my humblest apologies to you and your family on behalf of those of us who see this as a *huge injustice and hope that you can find it in your heart to forgive those who believed it to be the right decision.*

*Id.* at ¶ 39 (emphasis added).  Mrs. Parnigoni also received a copy of a letter that was sent to Rev. Vincent from a parent of the School in which the parent wrote, in part:

> *I am deeply troubled* by the letter that was sent to St. Columba Parishioners and Nursery School Parents on October 18, 2007…I have not had the privilege of ever having met Mrs. Parnigoni but trust that she is equally trustworthy as our son's teachers and would ensure the safety of our children from her husband (if even warranted) or anyone else.
>
> *I assume that Mrs. Parnigoni disclosed her husband's conviction in 2004 and that appropriate measures from the parish wardens and school were taken at the time. In your letter, there was no disclosure of any other incident from Mr. Parnigoni since then, so I am puzzled as to why it is necessary to name him three years later?* I know very little of Mr. Parnigoni or the circumstances for his conviction but am in full agreement with you that the safety of our children is of utmost importance. What troubles me, Reverend, is at what cost? Does compassion and forgiveness take a back seat when we think that there could be potential harm?…I am deeply disappointed that you and the Parish wardens feel comfortable with pointing fingers and naming everyone who has done a past wrong and turn their lives and that of their families; upside down in one fell swoop. What's next?
> …
> I, along with many others, have decided not to participate at the November 1st meeting *because we feel that the Parnigoni's personal affairs have already received far too much attention.*
> …
> I do appreciate the difficulties in gauging the balance between the right to know and respecting an individuals privacy by having faith in them. The damage to Mrs. Parnigoni [and] her family…has already been done.

*Id.* at ¶ 40 (emphasis added).

On or about November 9, 2007, Director Julia Berry sent another letter (the "November 9, 2007 letter") to the parents of students who attended the nursery school and upon information and belief, the entire parish as well. In the letter, which was sent to thousands of households in the area, Ms. Berry only reinforced her prior statement that Mrs. Parnigoni was a potential threat to the School's children. She wrote, in part,

> I want to thank each of you who took time this past month to stop by, send a note, or make a phone call in response to the recent letter and polices that were sent out informing the community about security changes being put in place at St. Columba's. Your words and letters of support for the school and Mrs. Parnigoni and your thoughtful questions about these changes were uplifting and reassuring to us *as we wrestled with the uncomfortable knowledge that the world can be a less-than safe place for our children.*

*Id.* at ¶ 41 (emphasis added). Ms. Berry continued the letter by thanking everyone who attended the November 1, 2007 "special meeting" and to inform recipients of two follow up events: "The first…on November 15—will focus on a variety of **child safety issues** as well as how to talk to children about them in an age-appropriate way…Then on Sunday, November 18 there will be a showing of the video, Safeguarding God's Children for Parents…" *Id.*

Mrs. Parnigoni contract was not renewed for the 2008-2009 school year. In response to questions from a parent regarding why Mrs. Parnigoni's contract was not renewed, Defendant Berry stated that it was because of the disclosures contained in the October 18, 2007 letter and because current parents allegedly wanted to withdraw from Mrs. Parnigoni's class and prospective students did not want to be in her class next year. *Id.* at ¶ 43. During the summer months, Mrs. Parnigoni runs a summer camp for three-to-six year old children called the Teddy Bear Camp. The camp is held on the grounds of another church in the area. Mrs. Parnigoni has been involved with this camp since the summer of 2000. Some of the students at the School attend Mrs. Parnigoni's Teddy Bear Camp during the summer. *Id.* at ¶ 44. At all times relevant to this action, the Defendants were aware of Mrs. Parnigoni's involvement with the Teddy Bear Camp and that any harm caused to her professional reputation would likewise affect enrollment at her camp.

### III.   Legal Standard

A court has limited discretion to grant a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Christensen v. Quigley Mem. Hosp.*, 656 F. Supp. 14, 16 (D. Mass 1985). In ruling on a motion to dismiss for failure to state a claim, it must be recalled that the purpose of a 12(b)(6) motion is to test the sufficiency of the complaint, not to decide the merits of the action. *Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir.1991); *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 887 F.Supp. 811, 813 (M.D.N.C.1995).

"[A] Complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v Gibson*, 355 U.S. 41, 45-46, (1957). In deciding a motion to dismiss, a court must "consider only the facts and allegations set forth in the complaint and must view them in a light most favorable to the plaintiff." *Harper v. Cserr*, 544 F.2d 1121, 1122 (1st Cir. 1976). The Court must grant the plaintiff the benefit of all inferences that can be derived from the alleged facts. *Conley*, 355 U.S. at 45-46.

The issue is not whether the plaintiff will ultimately prevail on his claim, but whether he is entitled to offer evidence to support the claim. *See, e.g., Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds* by *Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). "T]he complaint need only set forth 'a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), giving the defendant fair notice of the claim and the grounds upon which it rests." *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003). "Such simplified 'notice pleading' is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues." *Conley*, 355 U.S. at 47-48.[1]

---

[1] In Defendants' recitation of the applicable legal standard the Court should apply, Defendants cite *Coles v. Washington Free Weekly, Inc.,* 881 F. Supp. 26 30 (D.D.C. 1995), for the proposition that "summary procedures are…essential…[t]he threat of being put to the defense of a lawsuit…may be be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself." Motion at 8. To place this quote in the proper "context," Plaintiffs respectfully submit that the "summary procedures" referred to by the court in *Coles* (as well as the decision that this quote was derived from, *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966)) is summary judgment and not a motion under Rule 12(b)(6) as is the case here.

## IV.    Argument

## A.    THE COURT SHOULD DISREGARD MATERIALS AND ISSUES RAISED BY THE DEFENDANT THAT ARE OUTSIDE OF THE AMENDED COMPLAINT

Defendants have devoted considerable time and energy in their Motion to a detailed discussion of David Parnigoni's criminal conviction.  Defendants offer their account of his criminal case through a press release from a school where Mr. Parnigoni was formerly employed, a newspaper article and the District of Columbia Court of Appeal's decision from his criminal case. The Court should view the inclusion of this account of Mr. Parnigoni's criminal case for what it is: an attempt to inflame the Court and distract it from adjudicating Defendants' Motion on its merits.

The entire account of Mr. Parnigoni's criminal conviction and the circumstances that led to his conviction is not only irrelevant to the issue of whether Plaintiffs' allegations state a claim, but is wholly inappropriate within the context of a 12(b)(6) motion and should be disregarded by this Court outright.  *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (stating that in a motion to dismiss the court must ignore material outside the pleadings); *see also,* Fed. R. Civ. P. 12(b) (when "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56").

The Court should likewise decline to exercise its discretion in taking judicial notice of the circumstances that led to Mr. Parnigoni's criminal conviction. "Judicial notice is an adjudicative device that alleviates the parties' evidentiary duties at trial, serving as a substitute for the conventional method of taking evidence to establish facts." *York v. American Tel. & tel. Co.*, 95 F.3d 948, 958 (10th Cir. 1996).  The court has discretion to take judicial notice of these materials outside of the Amended Complaint, however, Defendants detailed account of Mr. Parnigoni's criminal case is not probative of a single issue before this court.   More importantly, consistent with Defendants' "sex sells" strategy of deflection, the account of Mr. Parnigoni's criminal case appears to be offered

for the truth of the matters asserted, which is impermissible when taking judicial notice.  *Wyatt v. Terhune*, 315 F.3d 1108, 1114 (9th Cir. 2003); *see also, Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 830 (8th Cir. 2003)(stating that "disputed papers should not be the subject of judicial notice on a motion to dismiss" and refusing to judicially notice documents which are offered "to prove the truth of the matters within them" which the other party disputes).[2]

Defendants also improperly include as an exhibit to their Motion, a November 7, 2007 letter submitted by Mr. Parnigoni's counsel, Mark E. Schamel, to the parents of the nursery school. Defendants explicitly acknowledge in their Motion that this letter is not included or even "referenced in the Amended Complaint…."  Defs. Mem. at 7.  Defendants explain that while they do not rely on the letter "for the purposes of this motion, as the sole question in this procedural posture is whether Plaintiffs' allegations state a claim" they nevertheless include the letter to "assist" the Court with the "context of Plaintiffs' allegations."  Defs. Mem. at 7 n.6.  Defendants' inclusion of a document that they admit is not referenced in the pleading and their flimsy justification for doing so is wholly improper and an affront to the intelligence of the Court and to Plaintiffs.  Even if we assume that the Court needed "context"—which it does not given that the Amended Complaint is sufficiently detailed—the letter is of no benefit whatsoever to the Court's determination of the issues before it.  Indeed, Defendants fail to cite any legal authority whatsoever that would support

---

[2] With respect to the newspaper article Defendants seek to introduce by way of judicial notice, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts appearing in newspapers, however, the facts in the articles in question must not be subject to reasonable dispute and must be "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  *Fant v. Residential Services Validated Publ.*, et al., No. Civ.A.1:06-CV-00934-SMS, 2007 WL 833178 (E.D.Cal. March 16, 2007) (declining to take judicial notice of newspaper articles in the context of motion to dismiss).  Even if we assume that the newspaper account of Mr. Parnigoni's conviction is relevant to this case—which it is not—the facts contained in the newspaper article that Defendants cite are subject to reasonable dispute and are incapable of verification by sources whose accuracy cannot reasonably questioned.

the inclusion of a document not referenced in the pleadings in order to provide a court with "context."

All of these materials should be excluded from the Court's consideration. *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir.1999). *See Tatum v. R.J. Reynolds Tobacco Co.*, 294 F.Supp.2d 776, 781-82 (M.D.N.C.2003) (reasoning that because complaint did not reference documents at issue, documents should be excluded from consideration on a motion to dismiss).

## B.    PLAINTIFFS STATE A VALID CLAIM OF DEFAMATION BY IMPLICATION (COUNT I)

Defendants unnecessarily argue that the Amended Complaint fails to meet the threshold element of a defamation claim, *i.e.* that the Defendants made a false statement concerning the Plaintiffs. Defendants miss the point. Count I of Plaintiffs' Amended Complaint pleads with specificity a claim of defamation by implication. "A statement can be either facially defamatory or defamatory by implication, that is, a statement from which a reasonable person could draw a defamatory inference." *Raymen v. United Senior Assoc., Inc.* 409 F. Supp.2d (D.D.C. 2006) (*J. Walton*) (citation omitted). "[D]efamation by implication stems not from what is literally stated, but from what is implied." *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990). A claim for defamation by implication is not required to be predicated on a false statement because it is well established under District of Columbia law that a defamatory inference can be derived from a factually accurate statements. *Id.* (citing *Southern Air Transport v. American Broadcasting Companies, Inc.*, 877 F.2d 1010, 1014 (D.C. Cir. 1989)).

It is the juxtaposition of factual statements regarding Fiona Parnigoni's status as David Parnigoni's wife, with other non-factual statements regarding the Defendants' purported motive for why disclosure was necessary that creates the defamatory inference: that Fiona Parnigoni was a potential pedophile and posed a danger to children, that children were unsafe in her care, and that

parents should take action to ensure that their children were not in the past, and did not in the future, become victims of sexual abuse under Ms. Parnigoni's care. Likewise, the Defendants' statements implied that Andrew Parnigoni's mere presence at the school created a danger for the other children.

The paragraph devoted to the Parnigonis from Rev. Vincent's October 18, 2007 letter speak for itself:

> Dear St. Columba Parishioners and School Parents,
>
> Mr. David Parnigoni, the husband of Fiona Parnigoni, a teacher at St. Columba's Nursery School since June 2001, is registered with the Virginia Sex Offender and Crimes Against Minors Registry as a result of a July 3, 2004 conviction for indecent exposure to a minor. *Until recently their son attended the Nursery School. I want to assure you that steps have been taken to prevent Mr. Parnigoni from entering St. Columba's grounds* or participating in St. Columba's Nursery School events. *I am providing you this notice to enable you to make informed decisions as to whom you entrust the care and supervision of your child.* This disclosure is in no way intended to harm the Parnigoni family. Given the seriousness of the issue and *our inability to anticipate every possible future scenario we believe our best course of action is to give parents the information they need to protect their children.* Mrs. Parnigoni has been informed of this decision to disclose. *We did not ask the Parnigonis to remove their son from the school.*

*See* Am. Compl. at ¶ 32 (excerpt of October 18, 2007 Ltr. from Rev. Vincent to Nursery School Parents and Parish) (emphasis added).

The manner in which the disclosure regarding David Parnigoni's criminal conviction for indecent exposure is juxtaposed with the assertion that steps have been taken to prevent him entering school grounds with the statement that the notice is being provided so that parents can make "an informed decision as to whom [they] entrust the care and supervision of your child" leads to the only plausible defamatory inference that Fiona Parnigoni was a threat as well. After all, whom else could the Church be referring to when it refers to "entrusting the care of your child?" David Parnigoni was certainly not in charge of caring for their children. Moreover, it is uncontroverted that the statement regarding "care of your child" is contained in a paragraph that is devoted

*exclusively* to the Parnigonis. There is no basis for Defendants to assert a broader context to the two other disclosures contained in Rev. Vincent's letter. The only plausible conclusion is that Defendants desired to imply that Fiona Parnigoni was a dangerous person who could harm the children in her care.

The same conclusion results with respect to Andrew Parnigoni when we examine the juxtaposition of the statement regarding how the Church ensures the "protection of [its] children" by keeping parents and members of the parish informed of the "safeguards" it puts in place to avert a potential sexual assault, and the Church's "inability to anticipate every possible future scenario" and giving "parents the information they need to protect their children" with the factual statements that "until recently [Andrew] attended the Nursery School," however, "the Church did not ask the Parnigonis to remove their son from the school." The defamatory implication here is that Andrew Parnigoni was removed from the school because he was a danger to his classmates and while the Church may not have requested that he be removed, they did not discourage it. Defendants characterize Plaintiffs suggestion that the letter implied that Andrew Parnigoni was a threat to other children as "far fetched." Defs. Mem. at 14. Plaintiffs beg to differ. Instead, Plaintiffs believe it begs the question as to why would the Church even make mention of three-year old Andrew Parnigoni and the fact that he was removed from the school in the context of a disclosure that was purportedly focused on his father's criminal conviction and an assertion by the Church that it implemented measures to protect the school's children from sexual abuse. Stated another way, *if Andrew was not a risk to the children, then there would be absolutely no justification for the Church to disclose the fact that he was removed from the school and that they did not request it.* It should not be overlooked that in this internet age, Andrew Parnigoni's name and the circumstances of his departure from the School is likely to remain forever associated with his father's misconduct, because of the Defendant's actions complained of herein.

Instead of letting the issue regarding Mrs. Parnigoni die down, three weeks later, Director Berry sent another letter to nursery school parents attaching Mrs. Parnigoni's name yet again to a thinly veiled reference to pedophilia. In the November 9, 2007 letter, Director Berry wrote, "Your words and letters of support for the school and Mrs. Parnigoni and your thoughtful questions about these changes were uplifting and reassuring to us *as we wrestled with the uncomfortable knowledge that the world can be a less-than safe place for our children*." Am. Compl. at ¶ 42. Once again, the Defendants created a defamatory implication that Mrs. Parnigoni was connected to pedophilia and making the world "a less than safe place for our children."

 "It is only when the court can say that the publication is *not reasonably capable of any defamatory meaning* and cannot be reasonably understood in any defamatory sense that it can rule as a matter of law, that it was not libelous." *White*, 909 F.2d at 518 (emphasis added). As to be expected, Defendants argue that Plaintiffs' interpretation of the statements contained in the October 18, 2007 is subjective and self-serving, and therefore not a real indicator of whether the publication is "reasonably capable of *any* defamatory meaning…" Plaintiffs' response is simple: Don't take our word for it, look at reaction of the people who actually received the letter.

Paragraph 39 of the Amended Complaint contains an excerpt from a letter to Fiona Parnigoni family from a recipient of the Rector's October 18th letter. The author wrote, in part, "I don't know the details of your situation (nor do I wish to find out) but I am confident that you, as a teacher at Saint Columba's Nursery, *have our children's safety and best interest at heart*-just as you do your own child. For this reason, I am saddened that you and your family's name and reputation have been tarnished, your personal affairs publicized, and that your son was taken out of the school as a result of this incident…" Am. Compl. at ¶ 39. The author acknowledges the defamatory inferences that Fiona Parnigoni was a threat to the safety of children ) and sought to refute those inferences by writing a letter of support. More importantly, this letter establishes, as a matter of law, that the

statements contained in October 18th letter are reasonably capable of *any* defamatory meaning."
This is but one example from a recipient who chose to voice her concerns out of the 3500
households recipients (and the unknown thousands of individuals who actually read the letter) of the
Rector's letter.[3]  At this preliminary stage of the proceedings—without the benefit of <u>any</u>
discovery—Plaintiffs have presented uncontroverted evidence that the Rector's letter was reasonably
capable of a defamatory interpretation and therefore, it is now a question for the jury.  *See Klayman v.
Segal*, 783 A.2d 607, 614 (D.C. 2001) (holding that it becomes a question for the jury if it appears
that a statement is at least capable of a defamatory meaning); *Raymen,* 409 F. Supp.2d at 21 ("If the
Court determines that the statement is capable of a defamatory meaning, dispositive motions must
be denied, and a jury must decide whether a defamatory meaning was understood by the recipients.).

Defendants attempt to downplay the significance of the parent letters contained in
paragraphs 39 and 40 of the Amended Complaint by merely mentioning them in a footnote.
Conveniently, Defendants interpret the letters as discussing "whether it was necessary to name *Mr.*

---

[3] There are additional correspondence not included in the Amended Complaint that further illustrate
that the recipients of the October 18th letter believed that the Rector's letter implied that Fiona and
her son, Andrew, were a danger to the children in St. Columba's community.  For example, in a
testimonial from an anonymous author in support of reinstating Mrs. Parnigoni to her teaching
position, the author wrote,

> The handling of Fiona Parnigoni's situation has been particularly offensive.  The
> choice to notify the ENTIRE St. Columba's Church and Nursery School community
> with a vague and alarming letter was ill chosen.  It is ironic that her subsequent
> termination has been handled with such secrecy…Fiona will have a difficult time
> finding work as a teacher.

Sarah Yeaw, a police officer and parent of a student in the nursery school wrote,

> On another note, as a D.C. Police Officer, I can honestly tell everyone that there are
> a million sides to every story…<u>As a police officer, I would be the first one to remove
> my child if I though there was a danger, because I have seen firsthand what awful
> things are out there.</u>

Parnigoni, not about whether naming him suggested anything untoward about *Mrs.* Parnigoni."
Defs. Mem. at 15 n. 11 (emphasis in original). Defendants' interpretation of these letters belies
comprehension. It is patently obvious from a plain reading that the authors felt compelled to stand
up for the unfair depiction of Mrs. Parnigoni as a threat to their children: "*but I am confident that you,
as a teacher at Saint Columba's Nursery, have our children's safety and best interest at heart*-just as you do your
own child. For this reason, I am saddened that *you and your family's name and reputation* have been
tarnished, your personal affairs publicized, and that your son was taken out of the school as a result
of this incident…" Am. Compl. at ¶ 39.

In order for a statement to be defamatory, the "language must make plaintiffs appear
'odious, infamous, or ridiculous.'" *Klayman*, 783 A.2d at 613 (quoting *Howard Univ. v. Best*, 484 A.2d
958, 989 (D.C. 1984). "A statement is defamatory if it tends to injure [the] plaintiff in his trade,
profession or community standing, or lower him in the estimation of the community. *Id.* (citing
*Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 594 (D.C. 2000). Fiona Parnigoni is a nursery
school teacher and the Director of the Teddy Bear Camp, a summer camp for three to six year olds.
The Rector and Berry's letters implied that she was a threat to children and that children in her care
were vulnerable to sexual abuse. There is no credible way Defendants can argue, as a matter of law
no less, that the defamatory implications contained in the letters at issue did *not* make Fiona
Parnigoni appear odious or infamous or that her profession as a school teacher or standing in the
community was not injured. Likewise, there is no basis to argue that Andrew Parnigoni's estimation
in the community was not lowered or that he was not made to appear as villain or someone to be
feared by parents and his peers because of the risk he posed to other children. Contrary to

---

These testimonials refute what the readers interpreted to be defamatory implications regarding Mrs.
Parnigoni contained in the Rector's letter.

Defendants' assertion, it is no defense that they did not actually intend to convey a defamatory meaning. *White*, 909 F.2d at 519.

Defendants posit that the D.C. Circuit has added the additional requirement that "a plaintiff must [] show that the 'communication . . . supplies additional, affirmative evidence suggesting that the defendant intends or endorses the defamatory inference.' Defs. Mem. at 12 (citing *White*, 909 F.2d at 520). Defendants' citation to the *White* decision fails to include a portion of the quote that is of significance to the Court's determination here. Specifically, the Court in *White* stated, "But if the communication, *by the particular manner or language in which the true facts are conveyed*, supplies additional, affirmative evidence suggesting that the defendant intends or endorses the defamatory inference, the communication will be deemed capable of bearing that meaning." *Id.* The manner in which the disclosures were made is self-revealing. There are several way in which Defendants could have conveyed the fact that the spouse of a school teacher was convicted of indecent exposure to a minor (albeit *over three years ago*) and that precautions have been taken to ensure that this individual does not enter school grounds. *

It is helpful to review the background that led up to Defendants decision to publish Rev. Vincent's letter. Defendants made the decision to send out the letter even though there were several alternative resolutions available that would negate the purported need for the disclosure. First, Mrs. Parnigoni and her family offered to have Andrew picked up by his father several blocks away from the School to avoid Mr. Parnigoni from entering school grounds. Defendants at first accepted this resolution then for no apparent reason, deemed it insufficient to avert the disclosure. Mrs. Parnigoni then offered to withdraw Andrew from the school altogether. While the school accepted this offer, this resolution was also deemed insufficient. Mrs. Parnigoni then offered to resign from her position. Shockingly, her offer to resign was deemed insufficient to prevent the intended disclosure. These undeniably reasonable offers of resolution, coupled with Rev. Vincent and Julia

Berry's statements that the disclosure was the result of "Fiona's poor choice in marrying David" evidence Defendants' true motivation for making the disclosures in the manner in which they did. The fact that they chose not to renew Mrs. Parnigoni's contract (who by Director Berry's own admission is a valued employee) likewise speaks volumes regarding their motivation for making the disclosure.

In a last ditch effort to avoid liability, Defendants attempt to seek refuge under the First Amendment for their defamatory statements, but to no avail. Defendants attempt to justify Rev. Vincent's statement because parents are "entitled to information that may impact the safety of [their] children' so they can 'make informed decisions as to whom [they] entrust the care and supervision of [their] child" as a constitutionally protected expression of opinion based on disclosed facts, and therefore, not the basis for a defamation claim. Defs. Mem. at 16. Even if we assume for a moment that Defendants are correct that this is a constitutionally protected opinion—which they are not— Defendants do not assert that the several other actionable statements contained in Reverend Vincent's letter are constitutionally protected. *See generally,* Defs. Mem. at 16 (under the heading, "The October Letter's Statement That Parents Were Entitled to Know about Mr. Parnigoni's Conviction Also is Constitutionally Protected as an Opinion Based on Disclosed Facts").

"Expressions of opinion are entitled to constitutional protection unless they imply the existence of undisclosed defamatory facts as the basis of the opinion." *Myers v. Plan Takoma, Inc., et al.*, 572 A.2d 44, 47 (D.C. 1983); *see also, Ollman v. Evans*, 750 F.2d 970, 984 (D.C. Cir. 1984). In *Myers*, the District of Columbia Court of Appeals explained the test for determining whether a statement is constitutionally protected as an opinion based on disclosed facts:

> The test requires the court to examine the allegedly defamatory words in the context of the entire document in which they appear. Even where it appears that the words, in context, are merely a statement of opinion, *the court must also determine whether the opinion could be said to imply undisclosed defamatory facts.* In addition, the court must consider whether the allegedly defamatory words are susceptible to proof of their truth or falsity. Statements that cannot readily

> be proven true or false are, of course, more likely to be viewed as statements
> of opinion, not fact.  Finally, the court must consider the context in which
> the document containing the allegedly defamatory reference is published.

*Myers*, 572 A.2d at 47 (emphasis added).

The Court might agree with the Defendant's subjective characterization of Rev. Vincent's statement as an opinion rather than fact, if it were not required to grant all reasonable inferences in the Plaintiff's favor at this stage of the litigation.  Even disregarding the appropriate application of the inferences in a motion to dismiss, the conclusion that this statement is opinion and not fact does not automatically wrap the Defendants' statement in the mantle of the First Amendment's "opinion privilege."  The Court is required to consider "whether the opinion implies the existence of undisclosed facts as the basis for the opinion.  If the opinion implied factual assertions…then it should not receive the benefit of the First Amendment protection as an opinion. *Ollman v. Evans*, 750 F.2d at 984 (relying on the Restatement (Second) of Torts § 566.4).

As discussed above, the juxtaposition of the disclosure of David Parnigoni's criminal conviction, the statement regarding the safeguards the Church has put in place, with the statement that notice is being provided so that parents can make an informed decision regarding whom "they entrust the care and supervision of their child" implies the existence of undisclosed facts regarding Mrs. Parnigoni.  Why would David Parnigoni's criminal conviction for indecent exposure have any bearing on Fiona Parnigoni's ability to care for the children of the school, unless the Church was aware facts that they chose not to reveal.   Similarly, the juxtaposition of the statement "Given the seriousness of the issue and our inability to anticipate every possible future scenario we believe our best course of action is to give parents the information they need to protect their children" with "Mrs. Parnigoni has been informed of this decision to disclose" (in the paragraph devoted

exclusively to discussing the Parnigonis) implies factual assertions regarding Mrs. Parnigoni's potential to be a sex offender.

The entire disclosure, and the implied factual assertions contained therein, must be viewed in light of the fact that Defendants chose to make this disclosure over three years after Mr. Parnigoni's conviction. *See* Rev. Vincent's letter, Am. Compl. at ¶ 32 ("Mr. David Parnigoni, the husband of Fiona Parnigoni, a teacher at St. Columba's Nursery School since June 2001, is registered with the Virginia Sex Offender and Crimes Against Minors Registry as a result of a July 3, 2004 conviction for indecent exposure to a minor.)  The fact that the Church is disclosing an over three-year-old conviction (when it chose not to make the disclosure when it may have been relevant in 2004), implies the existence of undisclosed facts as the cause for the decision to make a disclosure in 2007. Again, the Court is not obliged to take Plaintiffs' word for it. The Court has only to look at the reaction of the people who actually received the letter.  *See* October 31, 2007 Letter from Parent to Rev. Vincent, contained at ¶ 40 of the Am. Compl. ("I assume that Mrs. Parnigoni disclosed her husband's conviction in 2004 and that appropriate measures from the parish wardens and school were taken at the time.  In your letter, there was no disclosure of any other incident from Mr. Parnigoni since then, so I am puzzled as to why it is necessary to name him three years later?"). Since there were no indications in the letter or otherwise that Mr. Parnigoni committed any further wrongdoing after his conviction, the implied undisclosed fact is that Fiona Parnigoni was guilty of actual or potential wrongdoing.[5]

---

[4] The Restatement (Second) of Torts § 566 provides: "A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."

[5] In the event that Defendants attempt to hide behind the the cautionary language of the Rev. Vincent's letter ("This disclosure is in no way intended to harm the Parnigoni family."), courts have already ruled that, especially with respect to a statements that are "factually laden" regarding the commission of a crime (*i.e*, sexual abuse against children), cautionary language is unavailing "to dilute

The same applies to Andrew Parnigoni with respect to undisclosed facts. The disclosed facts regarding Andrew's withdrawal from the School (namely that "the Church did not ask the Parnigonis to remove their son from the school") imply undisclosed facts that Andrew's withdrawal from the School was necessary to ensure the safety of the Children. Why? Because the undisclosed fact is that he is a danger to children.

In sum, Defendants have chosen to isolate a single sentence out of many defamatory statements as deserving of constitutional protection. As demonstrated above, Rev. Vincent's letter, nor any statement contained therein, qualify as constitutionally protected expression of opinion based on disclosed facts.

## C.    VIRGINIA LAW DOES NOT APPLY TO THIS ACTION

Defendants assert that Virginia law applies to Count II (False Light) and Count III (Public Disclosure of Private Facts) because, it should come as no surprise, these claims are not recognized under Virginia law. Defendants entire argument rests entirely on the fact that Plaintiff physical residence is located in the State of Virginia. *See* Defs. Mem. at 20 ("Virginia is where Plaintiffs reside, where their family life is centered and hence where any 'mental anguish, distress, and humiliation' arising from the alleged violation of that private family life would have taken place."). The Defendants conveniently neglect to mention that:

(1)  The Church is located in the District of Columbia;

(2)  The Nursery School is located in the District of Columbia;

(3)  The Vestry of the Parish is located in the District of Columbia;

(4)  The Parish of the Church is derived primarily from local residents of the District of Columbia;

---

the statement's otherwise factual implications. *Ollman v. Evans*, 750 F.2d 970, 982, 983 (D.C.Cir.1984).

(5)  The families of the students of the nursery school are primarily from the District

of Columbia;

(6)  Rev. Vincent's October letter was sent from the District of Columbia to the

entire parish and parents of the Nursery School's students;

(7)  Andrew Parnigoni was a student at the Nursery School which is located in the

District of Columbia;

(8)  Fiona Parnigoni was employed at the Nursery School which is located in the

District of Columbia;

(9)  Director Berry's November letter was sent from the District of Columbia to the

families of the nursery school students;

(10)    Fiona Parnigoni is the Director of the Teddy Bear Camp, which is located in

the District of Columbia.  Virtually all of the participants of the Teddy Bear

Camp (some of whom were students at St. Columba's) come from families who

reside or work in the District of Columbia.

In determining which jurisdiction's law to apply in tort case, District of Columbia uses the

"governmental interest" analysis and considers four factors: (1) place where injury occurred; (2)

place where conduct causing injury occurred; (3) domicile, residence, nationality, place of

incorporation, and place of business of parties; and (4) place where relationship is centered. *Drs.

Groover, Christie & Merritt, P.C. v. Burke*, 917 A.2d 1110, 1117 (D.C. 2007) (citing the four factors

from Restatement (Second) of Conflict of Laws § 145).  The "Restatement" factors help to identify

the jurisdiction with the most significant relationship to the dispute, that "presumptively being the

jurisdiction whose policy would be most advance by application of its law." *Id.* (citing *Hercules & Co.

v. Shama Rest. Corp.*, 566 A.2d 31, 40 (D.C. 1989); *see also Raymen v. United Senior Assoc., Inc.*, No.

Civ.A. 05-486, 2005 WL 607916 (D.D.C March 16, 2005).

Each of the four Restatement factors points to the District of Columbia as the jurisdiction that has the most significant relationship to this case. The place "where the injury occurred" and "where conduct causing the injury occurred" is the District of Columbia—that is where Fiona Parnigoni was employed (and where she was fired) as a nursery school teacher, where Andrew Parnigoni went to school, where Rev. Vincent and Director Berry's letters were sent, and where the majority of the recipients who received the letters reside. As to the third restatement factor, the Church, Nursery School, and the Vestry are all located in the District of Columbia and Defendants Rev. Vincent and Berry both work in the District of Columbia. Finally, the parties' relationship was "centered" in the District of Columbia. The District is where all the meetings relevant to the claims at issue occurred, including the meeting cited by Rev. Vincent in her October letter between the Defendants and their lawyers that led to the disclosure, the two public forums held on November 1, 2007 and November 15, 2007 that were held for parents and the parish community to discuss any questions or concerns the defamatory letters may have raised.

In *Dowd v. Calabrese*, 589 F. Supp. 1206, 1210-1211, (D.D.C. 1984), the court rejected the argument that Plaintiff's residence alone dictates the choice of law decision, even though the defendant in Dowd was in a much better position to argue that a foreign jurisdiction applied than the Defendants here. This is because in Dowd, the plaintiff both resided and worked in California, and the defamatory article at issue was written, researched, investigated and published in California. The Court held that the jurisdiction that has the greater interest is where "the plaintiff suffered injury by reason of his loss of reputation." *Id.* (citing the Restatement (Second) of Conflict of Laws § 150 (comment e). The Court stated,

> As indicated, defendants argue in their reply brief that Kramer's reputation was injured primarily in California. That contention is not persuasive. To be sure, Kramer was residing in that state at the time the articles appeared, and he intended to continue working there as a member of the San Francisco Strike Force. But these minimal contacts cannot be said by any measure to outweigh the far more weighty, solid, and lasting contacts Kramer had in the

District of Columbia…and the damage to his reputation that occurred in the
District.

*Id.* at 1211.

Finally, even if Virginia had an interest in this lawsuit by virtue of the Parnigoni's residence

in that state, the District of Columbia's interest is greater and would therefore apply to this action.

*See* Burke, 917 A.2d at 117 ("When both jurisdictions have an interest in applying their own laws to

the facts of the case, 'the forum law will be applied unless the foreign [jurisdiction] has a greater

interest in the controversy.") (internal citation and quotation omitted).

## D.   PLAINTIFFS STATE A VALID CLAIM OF INVASION OF PRIVACY-FALSE LIGHT (COUNT II)

Defendants next assert that Plaintiffs' false light clam fails "for substantially the same

reasons as their defamation count…" Defs. Motion to Dismiss at 21. "An invasion of privacy-false

light claim requires a showing of: 1) publicity 2) about a false statement, representation or

imputation 3) understood to be of and concerning the plaintiff, and 4) which places the plaintiff in a

false light that 614 would be [highly] offensive to a reasonable person." *Klayman v. Segal*, 783 A.2d

607, 614 (D.C. 2001) (citing *Kitt v. Capital Concerts, Inc.*, 742 A.2d 856, 859 (D.C.1999) (referencing

Restatement (Second) of Torts § 652E (1977)).

As provided in the Amended Complaint, Plaintiffs pled with specificity the elements of a

false light claim including: (1) that the October 18, 2008 and November 9, 2007 letters constitute

publicity (Am. Compl at ¶ 62); (2) that the statements in these letters contained a false imputation or

representation that Andrew and Fiona Parnigoni "were dangerous to children, a threat to their safety

and well being, and that parents should take action to ensure that their children did not become

victims of sexual abuse"  (Id. at ¶¶ 63, 65); (3) these statements were directed to and concerned

Andrew and Fiona Parnigoni " (*Id.* at ¶ 64); (4) Defendants conduct of improperly attributing to

Plaintiffs conduct and characteristics that were false was highly offensive to a reasonable person as demonstrated, in part, by the letter responses from the recipients of the letters at issue. (*Id.* at ¶ 65).

Defendants' first argument regarding dismissal of Plaintiffs' false light claim is nothing more than an attempt to improperly engage Plaintiffs and this Court in a debate about whether the letters place Plaintiffs in a false light. This debate, while certainly appropriate in a motion for summary judgment under Fed. R. Civ. 56, has no place in a motion brought pursuant to 12(b)(6) which is designed to test the sufficiency of the complaint.

To the extent that Defendants rely on assertions regarding why Plaintiffs' defamation claim fails, Plaintiffs respectfully refer the Court to Plaintiffs detailed response above as to why their defamation claim should go forward. *See generally, Weyrich v. New Republic, Inc.*, 235 F.3d 617, 623 (D.C. Cir. 2001) (stating that because defamation and false light invasion of privacy claims are so similar, a "plaintiff may only recover on one of the two theories but is free to plead them in the alternative.")

Defendants second argument is that "just like defamation claims," only "statements that are provable as false are actionable," Defs. Motion at 22, is likewise misplaced in a Rule 12(b)(6) motion. *See Klayman v. Segal*, 783 A.2d 607, 614 (D.C. 2001) (holding that when presented with a rule 12(b)(6) motion to dismiss, "we must assume, at the complaint alleges, the falsity of any express or implied factual statements made in the [publication] at issue," and "[w]e must also assume that such statements were made by appellees with knowledge of their falsity or reckless disregard for their truth.") (citing *Weyrich v. New Republic, Inc.,* 235 F.3d 617, 623 (D.C. Cir. 2001)).

Finally, Defendants again argue that the "expressed view that parents were entitled to know about David Parnigoni…[is] constitutionally protected opinion." Defs. Motion at 22. Plaintiffs are at a loss as to how to respond to Defendants assertion given that they misunderstand or misconstrue the entire basis for Plaintiffs' false light claim. As stated above, Plaintiffs false light claim is based on

Defendants attributing conduct and characteristics to Andrew and Fiona Parnigoni that were false and highly offensive to the reasonable person. Plaintiffs respectfully direct the Court to their discussion *supra* regarding why none of the Defendants' statements qualify as constitutionally protected opinion and how these statements were highly offensive to the reasonable person.

**E.    PLAINTIFFS STATE A VALID CLAIM OF INVASION OF PRIVACY-PRIVATE DISCLOSURE OF PUBLIC FACTS (COUNT III)**

Consistent with Defendants' "sex sells" and strategy of deflecting their conduct to David Parnignoi, Defendants begin by mocking Plaintiffs inability to use Defendants' publicity of David Parnigoni's criminal conviction as a basis for Plaintiffs public disclosure of private facts claim. Defs. Motion at 22. Defendants then chastise Plaintiffs for seeking monetary damages for the harms that are actually form the basis of their claim in Count III, along with a another disdainful remark regarding Plaintiffs not complaining about "publicity given to Mr. Parnigoni's sex offender status" *Id.* As discussed above, David Parnigonis' criminal conviction, or Defendants decision to republicize it three years later, is not the basis of this *civil* lawsuit. Plaintiffs reiterate their plea that the Court reject Defendants' thinly veiled attempts to distract it from the actual issues and claims asserted. With respect to Defendants more germane arguments, Plaintiff responds as follows.

Defendants first argue that they are not liable for public disclosure of private facts because Rev. Vincent's letter did not explicitly state that Andrew was withdrawn in order to avert the disclosure regarding his father. Defendants' argument misses the mark, because it disregards the Plaintiffs' allegation that Defendant improperly publicized the fact that Andrew Parnigoni was withdrawn because of Defendants concerns regarding the potential threat his presence at the school posed to other children. *See* Am. Compl. at ¶ 70. The statement that "until recently [Andrew] attended the Nursery School," however, "the Church did not ask the Parnigonis to remove their son from the school," should not be viewed in a vacuum. Instead, the statement must be viewed in the

context of the other statements including the disclosure regarding his father's criminal conviction and an assertion by the Church that "steps have been taken to prevent Mr. Parnigoni from entering St. Columba's grounds or participating in St. Columba's Nursery School events." The Defendants make clear that Andrew's withdrawal is one of the "steps" taken to ensure that Mr. Parnigoni would have no reason to be on school grounds.

Defendants' sole argument against this logical derivation regarding Defendants' public disclosure of private facts is a single citation to a case regarding securities fraud for the proposition that the Court need not accept plaintiffs' inferences "if such inferences are unsupported by the facts set out in the complaint." Defs. Mem. at 23 (citing *Kowal v. MCI Comm. Corp.*, et al., 16 F.3d 1271, 1276 (D.C. Cir. 1994). Plaintiffs' inferences are more than reasonable, and they are derived from a plain reading of Defendants' defamatory letter. Defendants once again fail to make appropriate arguments under the rule of civil procedure in which they filed their motion—Rule 12(b)(6). Plaintiffs, not Defendants, get the benefit of all inferences that can be derived from the alleged facts. *Conley v Gibson*, 355 U.S. 41, 45-46, (1957).

Defendants' second assertion, that Andrew's withdrawal would have been readily apparent based on his absence from the classroom, is irrelevant because whether a fact is private depends on whether the reader or recipient of the private fact had prior knowledge of that fact. *See Harris by Harris v. Easton Pub. Co*, 483 A.2d 1377, 1384 (Pa. 1984). Moreover, the fact that Andrew Parnigoni's absence would be apparent neglects the other aspect of this claim, specifically, the reason why Andrew was removed from the School and the connection to the disclosure regarding his father.

Moreover, there is a distinct difference between the select few individuals who may have noticed Andrew's absence versus the public dissemination of this fact by way of a letter to every parent of the nursery school and the entire parish of the Church. Defendants do not even address

their disclosure of the private fact that his parents made the decision to withdraw him from the school. *See* Am. Compl. at ¶ 70. Finally, Defendants improperly raise a matter outside the pleadings to assert that Plaintiffs are being "disingenuous" in accusing Defendants of publicizing the decision to remove Andrew from the School. As discussed above, Defendants' inclusion of a document that is not included or even referenced in the Complaint is wholly improper. Moreover, their assertion of disingenuousness is baseless. Mr. Schamel's correspondence was necessitated solely by, and resulted from, Defendants' public disclosure of Plaintiffs' private facts.

Third, the Defendants' subjective determination why they believe the disclosure is not highly offensive is irrelevant. This question belongs exclusively within the purview of the jury. *See Vassiliades v. Garfinckel's, Brooks Bros.*, 492 A.2d 580, 588 (D.C. 1985).

Fourth, the Defendants contention that the "Church's handling of Andrew Parnigoni's enrollment at the school was of legitimate interest to the parish…" because parish has an interest in whether the Church's leadership is representing the community "in accordance with both values of secular...and religious importance …to the community" etc. etc." strains credibility. Defs. Mem. at 24.We know through other statements made by the Rector and Director Berry that their basis for making the disclosures, including the statements pertaining to Andrew, were due to Fiona's "poor choice" and "bad decision" in marrying David Parnigoni. The fact is that the parish had no interest whatsoever in knowing private facts about three-year-old Andrew Parnigoni withdrawal from the school or the basis for his withdrawal.

**F.    PLAINTIFFS STATE A VALID CLAIM FOR EMOTIONAL DISTRESS BECAUSE DEFENDANTS' CONDUCT WAS OUTRAGEOUS AND PLAINTIFFS' INJURIES WERE SEVERE (COUNT IV)**

Defendants once again attempt to avail themselves of the protections afforded by the First Amendment with respect to Plaintiffs' claim for intentional infliction of emotional distress (IIED). Defendants' continuous assertion that it is immune from liability falls like a house of cards.

Defendants' plea for First Amendment protection fails for the same reasons discussed supra; and in addition, it fails at this preliminary stage of the proceedings with respect to Plaintiffs IIED claim. This is because whether the First Amendment would apply as a defense to Plaintiffs' IIED claim is a question for the jury. *See Inland Mediation Bd. v. City of Pamona*, 158 F. Supp.2d 1120, 1158 n. 30 (C.D.Cal. 2001).[6]  Plaintiffs also reference here their discussion, *supra,* as to why Defendants cannot avail themselves of First Amendment protection with respect to the single sentence from the October 2007 letter that they assert as deserving of this protection. *See* Defs. Mem. at 16 (under the heading, "The October Letter's Statement That Parents Were Entitled to Know about Mr. Parnigoni's Conviction Also is Constitutionally Protected as an Opinion Based on Disclosed Facts").

Defendants attempt to frame Plaintiffs' IIED claim as governed by Virginia law because it "deals with feelings and, like the privacy counts, is hence governed by Virginia law." Defs. Mem. at 26.  However, Defendants fail to cite any support whatsoever for their position.  As discussed above, the District has a much greater interest in this case.  Defendants' continued reliance on the sole factor in favor of Virginia law, Plaintiffs' state of residence, is tenuous at best.

Under District of Columbia law, to establish a prima facie case of intentional infliction of emotional distress, a plaintiff must show:  (1) extreme and outrageous conduct on the part of the defendant which (2) either intentionally or recklessly (3) causes the plaintiff severe emotional distress. The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a

---

[6] The two cases Defendants' cite in support for the proposition that the First Amendment applies to an IIED claim are inapplicable here.  First, in *Provencio v. Paradigm Media, Inc.*, 44 S.W.3d 677 (Tex. App. 2001), the court's holding was in the context of a summary judgment motion.  In *Hustler Magazine v. Falwell*, 485 U.S. 46 (1988), a well-known political commentator, who was a public figure, sued Hustler for an ad in which the public figure was portrayed in an obscene situation.  There is no basis to apply, even generally, the holding in *Hustler* to the instant case involving private citizens suit against a Church and nursery school.

civilized community." *Larijani v. Georgetown University*, 791 A.2d 41, 43-33 (D.C. 2002) (citing *Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984).

A plaintiff states a claim for intentional infliction of emotional distress "if the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim 'Outrageous!'" *Id.* at 44 (citation omitted); *see also*, Howard University v. Best, 484 A.2d 958, 958 (D.C. 1984) ("It is for the trial court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. The case should be submitted to the jury if reasonable people could differ on whether the conduct is extreme and outrageous"). The question before the Court is whether an jury could reasonably find that the defendants' conduct, as described by the plaintiff, and with all reasonable inferences drawn in the plaintiff's favor, was sufficiently outrageous to satisfy this standard.

Defendants claim that dismissal of Count IV is warranted because Plaintiffs fail to allege facts to support either the "outrageousness" or "severity" elements and accuse Plaintiffs of reciting the elements in a "formulaic fashion, without more." Defendants' assertion is completely without merit as Plaintiffs more than sufficiently pled a valid claim of IIED. See Am. Compl. at ¶¶ 75-80.

With respect to the "outrageousness" element, Plaintiffs allege that the dissemination of the defamatory implications contained in the October 18, 2007 and November 9, 2007 to over 3,500 households in the D.C. area, including every parent of every student and every member of the Church's parish was extreme and outrageous. Am. Compl. at ¶ 76. Moreover, the Defendants' conduct was particularly outrageous in light of Mrs. Parnigoni's efforts to assuage their concerns including walking her son of school grounds, withdrawing him from the School, and offering to resign from her position." *Id.* at ¶ 77. While Defendants claim that their motivation for making the disclosure was purely for the sake of the children, Rev. Vincent and Director Berry both indicated

on separate occasions that disclosure was required due to Fiona's "poor choice in marrying Dave" *Id.* at ¶ 78.

The relevant question before this Court is whether reasonable people could differ on whether the conduct is extreme and outrageous. *Underwood v. National Credit Union Admin*, 665 A.2d 621, 640 (D.C. 1995) (emphasis added)( "[T]he evidence will be sufficient to support a claim of intentional infliction of emotional distress, and thus the jury should decide the case, *if reasonable people could differ* on whether the conduct is extreme and outrageous."). Plaintiffs survive this analysis. The public outcry that occurred after the Defendants' disclosure establishes that recipients of the defamatory disclosures could reasonably find Defendants' conduct to be outrageous. *See Am.* Compl. at ¶ 39 and 40. Even without the benefit of the letters from parents, Defendants' conduct is sufficiently "outrageous" to survive dismissal when viewed in the context of their motivation for making the disclosure, Plaintiffs' reasonable attempts to avert the unwanted attention that would result from the Church's disclosure, the defamatory nature of the statements contained in the letters, and the Church's unwarranted decision to publish the letter to not only all of the parents of the school, but the entire parish.

With respect to pleading severe emotional distress, at this juncture, Plaintiffs are only required to provide fair notice and the grounds upon which it rests." *See Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003). Defendants would have Plaintiffs introduce their psychiatric records as exhibits to the Amended Complaint in order satisfy their artificially stringent pleading requirements.[7] However, in the unlikely event that the Court deems Plaintiffs' factual

---

[7] Moreover, Defendants appear to argue that Plaintiffs should be required to repeat each and every fact relevant to each Count of the Complaint. Such a rigorous pleading requirement runs counter to the established notice pleading standard and would likely result in 100-page complaint. *See Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003) As is normal practice in pleadings, Plaintiffs assert at the beginning of each Count that they "reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set out in full."

assertions to be deficient, Plaintiffs respectfully request that they be permitted to amend their complaint appropriately.

Once again, the Defendants' cited cases are inapposite and wholly inapplicable based on the preliminary procedural posture of this case.[8] See Defs. Mem. at 27-28 (citing *Roe ex rel. Roe v. Heap.,* No. 03AP-586 2004 WL 1109849, at * 27 (Ohio Ct. App. May 11, 2004) (appellate decision affirming trial court's grant of *summary judgment); Miles v. Nat'l Enquirer, Inc.,* 38 F. Supp. 2d 1226, 1232 (D. Colo. 1999) (applying the actual malice standard to an IIED claim in the context of a *summary judgment motion*); *Lindemuth v. Jefferson Cty. Sch. Dist.,* 765 P.2d 1057, 1059 (Colo. Ct. App. 1988) (appellate decision affirming trial court's grant of *summary judgment*)).

## G.  PLAINTIFFS STATE A VALID CLAIM FOR PROMISSORY ESTOPPEL (COUNT V)

Ms. Parnigoni's claim for promissory estoppel is premised on the following facts: (1) on or around October 1, 2007, Ms. Parnigoni offered to resign her position in order to prevent and avoid the Defendant's subsequent acts of making the slanderous communications that gave rise to this civil action (see Am. Compl.. at ¶ 27); (2) on October 18, 2007, Director Berry informed Ms. Parnigoni that her contract would be renewed for the following year (*Id.* at  83); (3) that Director Berry was acting on behalf of the Defendant School when she made that promise; and (4) despite Director Berry's promise of continued employment, the Defendants did not renew Ms. Parnigoni's contract for the 2008-2009 school year. *Id.* at ¶ 84.

Thus, not only did the Defendant's actions stop Ms. Parnigoni from resigning her position on October 1, 2007, which would have given her time – prior to the defamatory pronouncements

---

[8] Plaintiffs especially take issue with the fact that Defendants do not disclose the procedural posture of the cases they cite to the Court.  Defendants' entire motion to dismiss pursuant to Rule 12(b)(6) is a thinly disguised summary judgment motion as the bulk of the cases cited by Defendants are

and publications – to procure employment for the following school year, but Ms. Parnigoni additionally relied on the promise of a renewed contract for the 2008-2009 school year, and forewent searching for replacement employment in the several months that followed after the promise was made and before the decision not to renew her contract was communicated to her.

The Defendant argues that "promissory estoppel is an equitable doctrine … [and] a party may not assert a promissory estoppel claim where there is an enforceable contract." Defs. Mem. at 29. This argument fails because <u>there was no enforceable contract for employment for the 2008-2009 school year</u>. Thus, even if the Defendant's legal theory is accurate (a point the Plaintiff does not concede here), it is entirely inapplicable here.

As the District Court ruled, in *Daisely v. Riggs Bank, N.A.,* 372 F. Supp. 2d 61 (D.D.C. 2005), "promissory estoppel is not a legal doctrine designed to give a party to a negotiated commercial bargain a second bite at the apple in the event it fails to prove breach of contract" (*Id.* at 71); and "reliance on a promise cannot be reasonable when it is completely at odds with the terms of a written agreement covering the same transaction." *Id.* at 71, Note 5. Neither of these factors is a concern in the present case, because as is clear from the pleadings and the Defendant's Motion to Dismiss, no contract had yet been reached for the 2008-2009 school year at the time Director Berry made the promise of future employment. While Ms. Parnigoni had an enforceable contract for the 2007-2008 school year, according to the Defendants, the school had not yet made its decision with respect to renewal of contracts for the 2008-2009 school year at the time the promise was made. *See* Def's Motion at 29. Because Ms. Parnigoni and Defendants had not yet entered into an enforceable contract for the 2008-2009 school year, the Defendant's argument fails.

---

rulings on summary judgment motions. Defendants' failure to disclose the procedural posture of these cases to the Court is disingenuous.

The Defendants additionally argue that it was not reasonable for Mrs. Parnigoni to "expect that the School would rest its decision to renew her contract on little more than one month's performance in the 2007-2008 school year." *See* Def's Motion at 29.  Defendants, however, do not provide any precedential support for the proposition that a teacher, who had been in continuous employment with the Defendant School for the previous six school years, could not reasonably rely on a promise of employment for the following school year.  Nor has the Defendant School provided any factual assertion as to when the decision to renew its teachers' contracts for the 2008-2009 school year actually occurred.  As such, the Defendants' challenge to this claim raises a genuine issue of material fact necessitating a trial – and is thus not capable of being decided on a motion to dismiss.

Lastly, the Defendant argues, in footnote 25, that the promissory estoppel claim applies only to Director Berry, because – according to the Defendant – Ms. Parnigoni "alleges a promise only by Ms. Berry and does not allege that any of the other Defendants were acting in concert with Ms. Berry or exerting control over her." *See* Def's P&A at 28-29, note 25.  This argument is in patent conflict with the facts alleged in the Amended Complaint, which reads, at Paragraph 84, "Defendant Berry, *acting on behalf of Ms. Parnigoni's employer, the School*, made a promise that Ms. Parnigoni's contract would continue for the following year." (emphasis added).  Since the facts alleged in the Amended Complaint must be assumed to be true, both Ms. Berry and the Defendant School are subject to the promissory estoppel claim.

Defendants have not demonstrated, in accordance with the standard for a motion to dismiss for failure to state a claim on which relief can be granted, that "no relief could be granted under any set of facts that could be proved consistent with the allegations," that Ms. Parnigoni reasonably relied on the Defendants' promise of future employment and elected not to pursue alternative employment for the 2008-2009 school year and that she suffered damages as a result of the

Defendants' breach of that promise.  *See Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229,

81 L.Ed.2d 59 (1984).

**H.    VIRGINIA LAW DOES NOT APPLY TO PLAINTIFFS' CONSORTIUM CLAIMS
        AND DISTRICT OF COLUMBIA LAW HAS LEFT OPEN THE QUESTION
        REGARDING PARENT-CHILD CONSORTIUM (COUNTS VI, VII & VIII)**

        Once again, Defendants attempt to avail themselves of Virginia law as a basis for dismissal

of Plaintiffs consortium claims (Counts VI, VII, and VIII).  However, as discussed above in detail,

the choice of law analysis overwhelmingly favors application of District of Columiba law.  Plaintiffs'

residence in Virginia is the only factor in this analysis weighing against an otherwise straightforward

application of District law.  It is well-settled that residency is "not dispositive in this analysis."

*Herbert v. District of Columbia*, 808 A.2d 776, 780 (D.C. 2002) (finding that District of Columbia law

applied even though plaintiff was a resident of the state of Maryland).  Given that Plaintiffs would

have less rights under Virginia law than they otherwise would under D.C. law, Defendants should

not be permitted to forum shop and flip-flop between D.C and Virginia law when it suits their

fancy.

        Defendants assert unequiviocally that the District does not recognize a claim for loss of

parent-child consortium.  However, the District left open the question of whether it would

recognize this claim.  *See District of Columbia v. Howell*, 607 A.2d 501, 506 (D.C. 1992) (recognition of

loss of parent-child consortium as a basis for damages must be addressed to the court *en banc*).

While the issue of damages is unsettled, the Court in *Howell* permitted the introduction of evidence

related to plaintiff's parent-child consortium claim.  *See id.*

**I.     PLAINTIFFS STATE A VALID CLAIM FOR INTENTIONAL INTERFERENCE
        WITH PROSPECTIVE BUSINESS ADVANTAGE (COUNT IX)**

        Under the law of the District of Columbia, intentional interference with prospective

economic advantage has four elements: (1) the existence of a valid business relationship or

expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3)

intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage. *Riggs v. Home Builders Inst.*, 203 F.Supp.2d 1, 23 (D.D.C. 2002).

Defendants believe that because their conduct was proper, there can be no liability whatsoever. Defendants' reasoning is of course flawed on its face. Plaintiffs respectfully direct the court to the Amended Complaint, wherein Plaintiffs aver that (1) Fiona Parnigoni runs a preschool camp called the Teddy Bear Camp in which students from the area, including students who attend St. Columba's Nursery School, attend during the summer months (Am. Compl. at ¶ 106); (2) Defendants were at all time aware that Mrs. Parnigoni was involved in running the Teddy Bear Camp and that some of their students were attendees and that some students were repeat attendees. (*Id.* at ¶ 107); (3) The dissemination of the defamatory letters induced or caused a breach or termination of students' enrollment in the Teddy Bear Camp. Defendants' conduct in disseminating the defamatory communications was purposefully and intentionally designed to interfere with these existing and expectant business relationships (*Id.* at ¶ 108); and (4) As a result of Defendants' conduct, Mrs. Parnigoni suffered damages in the form of loss of income and benefits, and extreme emotional pain and suffering. (*Id.* at ¶ 109).

Defendants' inject their self-serving opinion that because the disseminated information was truthful and "not defamatory and did not constitute an invasion of Plaintiffs' privacy," there can be no relief under this Count, is completely misguided. This is not a motion for summary judgment. There has not been any discovery in this case. Defendants make no real effort to test the sufficiency of the Amended Complaint, and Defendants fail to articulate a single legitimate reason as to why, given that the Plaintiffs assertions are to be taken as true and that all reasonable inferences are to be granted in their favor, Plaintiffs do not state a valid claim of intentional interference with prospective economic advantage.

**J.    PLAINTIFFS STATE A VALID CLAIM FOR NEGLIGENT MISREPRESENTATION  (COUNT X)**

Defendants deserve high marks for their creative argument that Plaintiffs somehow waived their right to assert a negligent misrepresentation/omission claim based on Mrs. Parnigoni's conversation with Director Berry wherein Berry sought additional facts and or clarification regarding what was previously disclosed to school three years earlier about Mr. Parnigoni's criminal case.

Interestingly, Defendants focus on the August 2007 conversation between Mrs. Parnigoni and Berry and not the earlier disclosure Mrs. Parnigoni made in 2004 to the former Director of the Nursery School.  In any event, Defendants creative argument does not pass the laugh test.  There is a patent difference between Director Berry inquiring as to the details of Mr. Parnigoni's criminal case in the event a parent were to inquire about it, versus the Church's decision to make a widespread publication to thousands of people.  Indeed, as Director Berry indicates in her email to the area directors listserve, the decision to make the widespread disclosure was not her own.  Am. Compl. at ¶ 34 ("This year her son was admitted to the school and I approached the board about the legal status of the child, mother/teacher, and husband. I also went to the Rector. In short order, the Rector and others upstairs had retained an attorney, changed the policy of the church to state that full disclosure would be made in all instance….").  Therefore, there is no basis from which Defendants can assert that Plaintiffs waived their misrepresentation claim based on the fact that Mrs. Parnigoni responded to inquiries from Director Berry or that any such waiver was even "knowing."[9]   In any event, the issue of waiver is a jury question and not one that is to be determined by the Court on a motion to dismiss pursuant to Rule 12(b)(6).

---

[9] Moreover, there is a distinct possibility that Director Berry obtained details regarding Mrs. Parnigoni's criminal conviction from Mrs. Parnigoni under false pretenses, *i.e.* that she intended to use the information for a widespread disclosure to the public.

Defendants' entire assertions regarding dismissal of this Count is premature, as the Court's role at this preliminary stage is to determine whether "plaintiff adequately asserted the essential elements of the negligent misrepresentation claim." *Burlington Ins. Co. v. Okie Dokie, Inc.*, 329 F.Supp.2d 45, 48 (D.D.C. 2004) (deciding in the context of a motion to dismiss that plaintiff states a valid claim for negligent misrepresentation).[10]  Therefore, whether the alleged omission—as Defendant argues—was an existing, or a future intention, is not a proper determination for a motion to dimiss for failure to state a claim.  Plaintiffs once again resist debating the likelihood of success of Plaintiffs' claims based on Defendants' subjective and self-serving version of the facts.

With respect to Defendants arguments regarding duty, the tort of negligent misrepresentation imposes a duty in favor of all those third parties who the defendant knows and should reasonably foresee will rely on the information in question.  *See Molecular Technology Corp. v. Valentine*, 925 F.2d 910, 916 (6th Cir. 1991).  The Defendants' recognition that they had a special duty to exercise care to the nursery school children logically extends to Andrew Parnigoni who was also a student at the School or to Fiona Parnigoni as their employee and due to her status as student's parent.

Finally, the Amended Complaint sufficiently asserts that Plaintiffs relied on Defendants' omission that it would make the defamatory disclosures when enrolling Andrew as a student in the school.

---

[10] The fact that Plaintiffs fail to cite a single case in support of their assertion should not go unnoticed either.

## V.        Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.


Respectfully Submitted,


_____/s/ _Sundeep Hora_____
Sundeep Hora (D.C. Bar. No. 472944)
Leslie D. Alderman III
ALDERMAN, DEVORSETZ & HORA PLLC
1025 Connecticut Ave., NW
Suite 615
Washington, D.C. 20036
Tel. 202.969.8220
Fax 202.969.8224
E-mail: shora@adhlawfirm.com

**COUNSEL FOR PLAINTIFFS**