## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

FIONA PARNIGONI, DAVID PARNIGONI,　　　)
AND ANDREW PARNIGONI,　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　Plaintiffs,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)　　1:08-cv-00613 (RBW)
　　　　　v.　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
ST. COLUMBA'S NURSERY SCHOOL,　　　　)
ST. COLUMBA'S EPISCOPAL CHURCH,　　　)
VESTRY OF ST. COLUMBA'S PARISH,　　　)
REV. JANET VINCENT,　　　　　　　　　　)
AND JULIA H. BERRY,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　Defendants.　　　　　　　　　)

---

## MEMORANDUM OPINION

The plaintiffs in this civil lawsuit assert claims against St. Columba's Nursery School; St. Columba's Episcopal Church; Vestry of St. Columba's Parish, the administrative committee of the church; Reverend Janet Vincent, Rector of the Church; and Julia H. Berry, Director of the School (collectively "the defendants"), Amended Complaint ("Am. Compl.") ¶¶ 4-8, for defamation (Count I), Am. Compl. ¶¶ 47-59; invasion of privacy–false light (Count II), Am. Compl. ¶¶ 61-67; invasion of privacy–public disclosure of private facts (Count III), Am. Compl. ¶¶ 68-74; intentional infliction of emotional distress (Count IV), Am. Compl. ¶¶ 75-80; promissory estoppel (Count V), Am. Compl. ¶¶ 81-86; loss of consortium (Counts VI-VIII), Am. Compl. ¶¶ 87-104; intentional interference with prospective economic advantage (Count IX), Am. Compl. ¶¶ 105-11; and negligent misrepresentation (Count X), Am. Compl. ¶¶ 112-17. Currently before this Court is the Defendants' Motion to Dismiss Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Defendants' Statement of Points and

Authorities in Support of Motion to Dismiss Amended Complaint Pursuant to Federal Rule of

Civil Procedure 12(b)(6) ("Defs.' Mem.").  The motion is opposed by the plaintiffs, Plaintiffs'

Opposition to Defendants' Motion to Dismiss Amended Complaint ("Pls.' Opp'n"), to which the

defendants filed their Reply in Support of Motion to Dismiss Amended Complaint Pursuant to

Rule of Civil Procedure 12(b)(6) ("Defs.' Reply").  Upon consideration of the submissions filed

by the parties, the Court concludes that the defendants' motion must be granted in part and

denied in part.

## I. Background

The plaintiffs in this civil lawsuit are Fiona Parnigoni, David Parnigoni, and Andrew

Parnigoni ("the plaintiffs"), who are residents of Arlington, Virginia.  Am. Compl. ¶ 1.  Plaintiff

Fiona Parnigoni is the wife of co-plaintiff David Parnigoni, and co-plaintiff Andrew Parnigoni is

their three-year-old son.  Id.  The dispute between the parties occurred during Fiona Parnigoni's

employment as a teacher from 2001 to 2008 at St. Columba's Nursery School (the "Nursery

School" or "School") located in the District of Columbia.  See generally Am. Compl.  Viewed in

the light most favorable to the plaintiffs, the facts underlying this action are the following.

In 2004, while she was employed by the School, id. at ¶ 15, Mrs. Parnigoni's fiancé at

that time, David Parnigoni, was charged with and ultimately convicted of indecently exposing

himself to a minor, id. ¶¶ 13, 15.  Mrs. Parnigoni had no involvement in that incident, id. ¶ 13,

but while the case was still pending resolution, Mrs. Parnigoni informed the Director of the

School of the situation regarding her fiancé, and the Director in turn informed the Board of

Governors of the Church (the "Board") and the Rector, Reverend James Donald, of David

Parnigoni's situation, id. ¶ 15.  The defendants took no action at that time and Mrs. Parnigoni

continued to work at the School without any further discussions about the matter.  Id. ¶¶ 16-17.

Sometime thereafter, David and Fiona Parnigoni married, and at no time did anyone associated with the School or Church Parish indicate that Mrs. Parnigoni's subsequent marriage to Mr. Parnigoni was or would be cause for concern or place her job in jeopardy.  Id. ¶ 17.

Three years after Mr. Parnigoni's conviction, in 2007, the Parnigonis decided to enroll their son at the School as a student, and they were notified of his acceptance in March 2007.  Id. ¶ 19.  Neither before nor at the time of the son's acceptance was there any indication that the defendants would publicly disclose information regarding Mr. Parnigoni's conviction as a sex offender as a result of the child's enrollment in the school.  Id.  However, in August of 2007, Julia Berry, who was named Director of the School in 2006, met with Mrs. Parnigoni and requested information from her regarding the details concerning Mr. Parnigoni's 2004 conviction.  Id. ¶ 18.   The Director stated that Mrs. Parnigoni was required to disclose the details of her husband's conviction so that the Director would be able to explain the circumstances to any parent who might inquire about the situation.  Id.  Mrs. Parnigoni provided the Director with the requested information and offered the Director the opportunity to speak with her husband's lawyers, id., however, the record is unclear as to whether the Director accepted or declined the offer.

On "the first day of the 2007-2008 term for teachers, the Director informed Mrs. Parnigoni that the Board was 'nervous' about [Mr. Parnigoni's] 2004 conviction."  Id. ¶ 20.  The Board's apprehension apparently stemmed from the fact that "Mr. Parnigoni might [now] have reason to be on the School property to pick [] up [his son]."  Id.  "Mrs. Parnigoni informed the Director that she [planned to] walk [her son] off school grounds a block away on the single day per week when her husband was required to pick [their son] up from school," which was  in accordance "with the unwritten agreement that was in place" between Mrs. Parnigoni and the

School "since Mr. Parnigoni's conviction." Id. ¶ 21. The Board was allegedly "relieved" to learn of the Parnigonis' arrangements to take their son off campus when Mr. Parnigoni needed to pick him up from school, id.; however, the Director still requested Mr. Parnigoni's "lawyer's contact information so that St. Columba's counsel could make a 'courtesy call,'" id. ¶ 22. The Church's attorney then contacted Mr. Parnigoni's lawyer and informed him that the Church was satisfied with the arrangement of walking Andrew away from the school to meet Mr. Parnigoni and assured the lawyer that "everything is fine" and that the Parnigonis "would not hear from the Church again on this issue." Id. Andrew Parnigoni's first day as a student at the School was September 17, 2007. Id. ¶ 23.

On October 1, 2007, the Director of the School told Mrs. Parnigoni that the Rector of the Church, Janet Vincent, wished to "meet with her." Id. ¶ 24. The "meeting was held two days later on October 3, 2007," id., and those in attendance included the Rector of the Church, the Director of the School, the Church's attorney, the Chairman of the Church's Board of Governors, Mrs. Parnigoni, and her attorney, id. ¶ 25. During the meeting, the Rector announced "her decision to make a full public disclosure" of Mr. Parnigoni's 2004 conviction "to all parents of students [attending] the Nursery School and the entire Parish." Id. It was also indicated that the Church planned to announce "the fact that Mrs. Parnigoni, a teacher at the school, was married to a convicted sex offender." Id.

As noted earlier, the Church had not mentioned previously any concerns regarding Mrs. Parnigoni's marriage to Mr. Parnigoni; therefore, Mr. and Mrs Parnigoni surmised that the new concern was related "to her son's enrollment in the [S]chool." Id. ¶ 26. Accordingly, Mrs. Parnigoni offered to withdraw Andrew from the School to avoid any "embarrassment to her and her family," and the Church's attorney allegedly informed Mrs. Parnigoni that removing her son

4

from the School would "certainly 'help'" the situation, and the attorney "encouraged" her to do so. Id. Mrs. Parnigoni therefore removed her son from the School in early October 2007, id. ¶ 27, and she also "offered to resign her position" as a teacher "in order to avert public disclosure" of her husband's conviction, but the School "rejected" her offer, id. ¶ 28.

On October 12, 2007, the Director of the School "met with Mrs. Parnigoni's co-teacher and two other colleagues" to discuss the impending disclosures about Mr. Parnigoni. Id. ¶ 29. "[T]he Director stated that while she was sorry that this had happened to Mrs. Parnigoni, she put the blame for the entire situation on Mrs. Parnigoni, and declared that if Mrs. Parnigoni had not married [her husband], she 'would not be in this position.'" Id. That same day, the Director emailed Mrs. Parnigoni asking her to remain at home on October 15, 2007, so that the Rector could inform the staff about the "'disclosure' without her being present." Id. ¶ 30. When the Rector spoke to the School staff during the meeting, she apparently "made it clear" that the sole reason for the disclosure was due to Mrs. Parnigoni's "'poor judgment in marrying David'" and denied that the disclosures were based on their son's "enrollment in the School." Id. ¶ 31. The Rector further stated that she would have made "the disclosure . . . even if [Mrs. Parnigoni] resigned." Id.

"On or about October 18, 2007, [the Rector] sent a letter (the "October 18[th] letter") to the parents of the students of the School and to all members of the Church's parish," which, inter alia, informed them of Mr. Parnigoni's registration "with the Virginia Sex Offenders and Crimes Against Minors Registry as a result of [his] July 3, 2004 conviction for indecent exposure to a minor." Id. ¶ 32. The letter identified David as Fiona's husband and indicated that "[u]ntil recently their son had attended the Nursery School." Id. The letter went on to state that it had been issued to "enable [parents] to make informed decisions as to whom [they should] entrust the

care and supervision of [their children]." <u>Id.</u>  It further stated that because the defendants lacked

the ability "to anticipate every possible future scenario [they] believe[d their] best course of

action [was] to give [the] parents the information they need[ed] to protect their children." <u>Id.</u>

Moreover, the letter stated that the "disclosures [were] necessary for the sake of our children"

because the parents were "entitled to information that may impact the safety of [their children]."

<u>Id.</u>  The Church sent the letter to "[o]ver 3,500 households in the D.C. metropolitan area,"

although the number of people who actually "read the letter" is unknown.  <u>Id.</u> ¶ 33.  "On the

same day that the [October 18th letter] was sent to the parents and the entire parish," the Director

sought suggestions and recommendations from other nursery school directors in "an email to the

DC Directors' Exchange list-serve, a group consisting of approximately 37 nursery school

directors in the Washington, D.C. area." <u>Id.</u> ¶ 34.  The email included all of the details regarding

the Parnigoni's situation and their relationship with the School without identifying them by

name.  <u>Id.</u>

On October 31, 2007, the Parnigonis "received a letter from a parent" expressing the

view that the School's "approach [was] totally unjustified," resulting in the Parnigoni "family's

name and reputation [being] tarnished, [and their] personal affairs publicized, and [their] son []

taken out of the school." <u>Id.</u> ¶ 39.  On that same day, the Parnigonis received a copy of another

letter sent to the Rector from a parent of one of the children attending the school that expressed

disappointment with the school's decision to embarrass Mrs. Parnigonis and her family.  <u>Id.</u> ¶ 40.

As had been announced in the October 18th letter, "on November 1, 2007[,] a meeting, open to

the public, was held to address any questions or concerns that the [October 18th letter] might

have raised." <u>Id.</u> ¶ 38.  Some who attended "the meeting indicated that they believed the

Rector's letter unfairly cast Mrs. Parnigoni as a threat to children." <u>Id.</u>

"On or about November 9, 2007, [the Director] sent another letter (the "November 9[th] letter") to the parents of students who attended the nursery school and[, it is believed by the plaintiffs], the entire parish as well.  Id. ¶ 41.  Among other things, the letter stated "that the world can be a less-than safe place for our children."  Id.  According to the plaintiffs, the letter "reinforced" the notion that "Mrs. Parnigoni was a potential threat to the School's children[,]" id., despite there having been no previous incidents suggesting "that Mrs. Parnigoni, because of her marriage to Mr. Parnigoni[,] or for any other reason, endangered or posed a threat to any student of the School or member of St. Columba's parish," id. ¶¶ 41, 42.

Although the Director informed Mrs. Parnigoni "that the Board would renew her contract for the next [school] year and that her teaching position with the school was safe and that she need not worry as the 'storm would soon pass'" at a meeting held shortly after the October 18th letter was sent, id. ¶ 37, Mrs. Parnigoni's contract was not renewed for the 2008-2009 school year despite her unblemished employment record, id. ¶¶ 42-43.  The plaintiffs assert that the Director told a parent that Mrs. Parnigoni's contract was not renewed "because of the disclosures contained in the [October 18th letter] and because current parents allegedly wanted to withdraw [their children] from Mrs. Parnigoni's class and prospective students did not want to be in her class [the following] year."  Id. ¶ 43.

In addition to teaching at the School, Mrs. Parnigoni had operated a summer camp since 2000 named the Teddy Bear Camp, for three- to six-year-old children "on the grounds of another [area] church."  Id. ¶ 44.  According to the plaintiffs, some of the students who attended the nursery School also attended Mrs. Parnigoni's Teddy Bear Camp during the summer and the defendants were allegedly "displeased that Mrs. Parnigoni ran [the] summer camp and that students from their School attended the camp."  Id. ¶ 45.  Accordingly, "[o]n or about February

7

28, 2008," [the Director] issued Mrs. Parnigoni a "letter of reprimand because Mrs. Parnigoni

sent parents a flyer about the Teddy Bear Camp," although she had done this in the past with the

Director's knowledge and had not previously been chastised for doing so.  Id.

   As a result of the actions allegedly taken by the defendants, the plaintiffs seek

compensatory and punitive damages, the costs of pursuing this action, and attorney's fees.  Id. at

26.  The defendants now seek dismissal of this action under Rule 12(b)(6) for failure to state any

claims upon which relief may be granted.  Defs.' Mem. at 1.

## II. Standard of Review

   A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests whether the

plaintiffs have properly stated a claim upon which relief may be granted.  Woodruff v. DiMario,

197 F.R.D. 191, 193 (D.D.C. 2000).  For a complaint to survive a Rule 12(b)(6) motion, it need

only provide "a short and plain statement of the claim showing that the pleader is entitled to

relief," Fed. R. Civ. P. 8(a)(2), which accomplishes the due objective of  "giv[ing] the defendant

fair notice of what the claim is and the grounds upon which it rests," Bell Atl. Corp. v. Twombly,

550 U.S. 544, 555 (2007) (citation and internal quotation marks omitted).  "Although detailed

factual allegations are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide

the grounds of entitlement to relief, a plaintiff must furnish more than labels and conclusions or a

formulaic recitation of the elements of a cause of action."  Hinson ex rel N.H. v. Merritt Educ.

Ctr., 521 F. Supp. 2d 22, 27 (D.D.C. 2007) (internal quotation marks and alteration in original

omitted) (quoting Twombly, 550 U.S. at 555).  Or, as the Supreme Court more recently stated,

"[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, ___ U.S. ___, 129

S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570).  Furthermore, a claim is facially

plausible "when the plaintiff[s] plead[] factual content that allows the court to draw a reasonable inference that the defendant[s] [are] liable for the misconduct alleged." Ashcroft, 129. S. Ct. at 1949 (quoting Twombly, 550 U.S. at 556). Moreover, under Rule 12(b)(6), the Court "must treat the complaint's factual allegations as true and must grant [the] plaintiff[s] the benefit of all reasonable inferences [that can be derived] from the facts alleged." Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (internal quotation marks and alteration in original omitted).  Finally, factual challenges are not permitted under Rule 12(b)(6); instead, the Court may only consider the factual allegations set forth in the complaint, any documents attached as exhibits thereto (or incorporated therein), and matters subject to judicial notice in weighing the merits of the motion. EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 (D.C. Cir. 1997).  The Court's focus is therefore restricted to the facts as alleged by the plaintiffs, which must be sufficient "to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

### III. Legal Analysis

The defendants challenge the sufficiency of each claim asserted in the plaintiffs complaint.  The Court will address each challenge separately after first assessing whether the claims are controlled by the law of the District of Columbia or Virginia.

**A.      Choice of Law**

All of the plaintiffs' claims arise from common law principles of tort liability, and are being pursued in this Court "based on the diversity of the citizenship of the parties pursuant to 28 U.S.C. § 1332(a)(1) (2006)."  Am. Compl. ¶ 9.  The plaintiffs are citizens of Virginia, defendants Vincent and Berry are citizens of Maryland, and the principle places of business for the remaining defendants appear to be in the District of Columbia.  Id. ¶¶ 1-8.  As an initial matter, the Court must assess which law of these three jurisdictions apply to the several claims asserted

by the plaintiffs.  "When deciding state-law claims under diversity or supplemental jurisdiction, federal courts apply the choice-of-law rules of the jurisdiction in which they sit."  Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 857 (D.C. Cir. 2006) (internal quotation marks omitted).  Employing the choice-of-law rules of the District of Columbia, "the [C]ourt must first determine if there is a conflict between the laws of the relevant jurisdictions."  Y.W.C.A. of the Nat'l Capital Area, Inc. v. Allstate Ins. Co. of Canada, 275 F.3d 1145, 1150 (D.C. Cir. 2002).  If a conflict exists, then courts in the District of Columbia must determine which jurisdiction has the most significant relationship to the claims being pursued by the plaintiffs.  The relevant factors to consider in conducting this analysis are: "(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship is centered."  District of Columbia v. Coleman, 667 A.2d 811, 816 (D.C. 1995) (citing Restatement (Second) of Conflict of Laws § 145(2) (1971)); Pearce v. E.F. Hutton Group Inc., 664 F. Supp. 1490, 1498 (D.D.C. 1987).  Furthermore, the District of Columbia courts apply a governmental interest analysis when examining claims under this jurisdiction's choice of law principles.  See Adolph Coors Co. v. Truck Ins. Exch., 960 A.2d 617, 620 (D.C. 2008) (applying a governmental interest analysis to case);  Linnell v. Sloan, 636 F.2d 65, 66-67 (4th Cir. 1980) (stating that the District of Columbia applies a governmental interest analysis when there is a conflict of laws).

The plaintiff has alleged claims for defamation (Count I), invasion of privacy–false light (Count II), invasion of privacy–public disclosure of private facts (Count III), intentional infliction of emotional distress (Count IV), promissory estoppel (Count V), loss of consortium (Counts VI-VIII), intentional interference with prospective economic advantage (Count IX), and

negligent misrepresentation (Count X).  The Court finds, and the parties have not disputed the contention, that it need not determine whether Virginia, Maryland, or District of Columbia law is controlling in regards to Counts I, IV, V, and IX, as the laws of those jurisdictions are not in conflict with respect to the prerequisites for the establishment of these claims.  There is, however, a conflict as to Counts II, III, VI, VII, VIII.  The parties make no argument as to which jurisdictions' law applies to Count X, however, for the same reasons that follow, the Court concludes that it is the law of the District of Columbia that governs this claim.

The defendants assert that the Court should dismiss Counts II and III (the two invasion of privacy claims) because "the[] claims are not recognized under Virginia law."  Defs.' Mem. at 18.  The defendants make the same argument with respect to the plaintiffs' loss of consortium claims, Counts VI-VIII.  Defs.' Mem. at 29-30.  The plaintiffs counter that as to Counts II and III, the District of Columbia has the most significant relationship to those claims because it is the place where the injury and the conduct that caused the injury occurred.  Pls.' Opp'n at 26.  The plaintiffs make the same assertion as to their loss of consortium claims.  Pls.' Opp'n at 38.

Concerning Counts II and III, the Court agrees with the plaintiffs that the District of Columbia has the greatest interest regarding these claims as all of the factors that must be considered—the place where the injury occurred, the place where the relationship is centered, the place where the conduct causing the injury occurred, and the place of business of the parties—weigh in favor of this conclusion. The Court reaches the same conclusion as to Count X. The injury to the plaintiffs occurred in the District of Columbia, as this is where the alleged invasion of the plaintiffs' privacy and the purported negligent misrepresentation occurred; this is where the alleged damage was inflicted, as this is where the information about the plaintiffs was disseminated, and this is where the dissemination of the information seems to have had its

greatest impact on the plaintiffs, i.e., this is where Mrs. Parnigoni was employed and operated her business, where the school from which Andrew had to be withdrawn is located, and the location where the relationship between the parties was centered.

In regards to Counts VI-VIII, the plaintiffs' consortium claims, a different result is demanded. Jurisdictions that employ the governmental interest choice of law principle typically rule that the law governing a loss of consortium action is the law where the marriage is domiciled, not where the injury occurred. See, e.g., Felch v. Air Fla., 562 F. Supp. 383, 386 (D.D.C. 1983). Thus, under this jurisdiction's choice of law analysis, the law governing the plaintiffs' loss of consortium claims is Virginia law, which is where Mr. and Mrs. Parnigoni and their son are domiciled. See Felch v. Air Fla., 562 F. Supp. at 386 (stating that the jurisdiction where the marital parties are domiciled has a greater interest than the place where the injury occurred).

**B.      The Plaintiffs' Defamation Claim**

Count I of the amended complaint asserts that Fiona and Andrew Parnigoni were defamed when the defendants disseminated the October 18, 2007 and November 9, 2007 letters. Am. Compl. ¶¶ 47-59. The defendants move to dismiss this claim on the ground that the two letters are not defamatory as a matter of law. Defs.' Mem. at 9. The defendants maintain that their challenged statements are true and that although the disclosures in the letters identifying Fiona and Andrew as David Parnigoni's wife and son may have been embarrassing, these revelations did not make them appear "'odious, infamous, or ridiculous.'" Id. at 10-11. The defendants further contend that it was clear that the disclosures were about David Parnigoni and not "'of and concerning'" Fiona and Andrew Parnigoni. Id. at 11. Accordingly, the defendants do not believe the letters contained anything that could demonstrate that they intended to convey

that Fiona and Andrew Parnigoni, as opposed to David Parnigoni, posed a risk to the students' safety.  Id. at 12-13.  Additionally, they argue that the letters, when considered in context, would not lead a reasonable person (in this case the parents of children attending the School or who are considering enrolling a child in the School) to believe that either Andrew or Fiona Parnigoni posed a threat to their children.  Id. at 13-14.  Instead, the defendants contend that the October 18, 2007 letter served merely as an advisory to parents concerning David Parnigoni's background and a warning that they should not assume that "he could be entrusted around their children simply because he is married to someone the Church did consider worthy of that trust." Id. at 14 (emphasis in original).  Moreover, the defendants assert that even if a defamatory inference could be derived from the Church's statement regarding the parents' right to know about Mr. Parnigoni's conviction, the statement is the Church's "opinion based on disclosed facts" and is therefore constitutionally protected.  Id. at 16-18.

The plaintiffs, on the other hand, insist that they have sufficiently pled a claim for defamation "by implication" because the issuance of a false statement is not a necessary component of a defamation by implication claim under District of Columbia law.  Pls.' Opp'n at 14.  They argue that the "defamatory inference" arose from the defendants' "juxtaposition of factual statements regarding Fiona Parnigoni's status as David Parnigoni's wife, with other non-factual statements regarding" the Church's reasoning for why disclosure was necessary.  Id. at 14-15.  The plaintiffs believe that a reasonable person could have construed the letters as conveying the impression that Mrs. Parnigoni was also believed to pose a threat to children.  Id. at 14-16.  The plaintiffs also advance a similar theory of liability on behalf of Andrew Parnigoni, questioning why the defendants had to reveal that Andrew was no longer a student in the School if, as the defendants claim, they did not intend to convey that Andrew posed no threat to the

13

other students.  Id. at 16.  The plaintiffs also disagree with the defendants' position that the October 18 letter was not capable of a defamatory meaning, id. at 17, and have presented letters from other parents to demonstrate that there were, in fact, members of the public who thought the letter was defamatory.[1]  Id. at 17-19.  Moreover, the plaintiffs point to what they characterize as the November 9, 2007 letter's "thinly veiled reference to pedophilia" as proof of the defendants' intent to convey a defamatory inference concerning Mrs. Parnigoni.  Id. at 17-19. The plaintiffs also believe that the circumstances under which the disclosures were made demonstrate that the defendants acted with defamatory intent.  Specifically, they note the defendants' refusal to forgo disclosing the information about Mr. Parnigoni despite their offer to (1) have Mr. Parnigoni pick Andrew up from the school several blocks away so Mr. Parnigoni would not have to be on school property as an adequate means of addressing the defendants' concerns, (2) withdraw Andrew from the School, and (3) Mrs. Parnigoni's offer to resign and instead reveal highly embarrassing information to over 3,500 households, which the Parnigonis assert collectively illustrates the defendants' desire to criticize Mrs. Parnigoni for her decision to marry Mr. Parnigoni.  Id. at 20-21; Am. Compl. ¶¶ 56-57.  They further contend that this intent is reflected by the decision not to renew Mrs. Parnigoni's contract.  Pls.' Opp'n at 21.

In order for the plaintiffs' defamation claim to survive the defendants' Rule 12(b)(6) motion, they must show "(1) that the defendant[s] made a false and defamatory statement concerning the plaintiff[s]; (2) that the defendant[s] published the statement without privilege to a third party; (3) that the defendant[s'] fault in publishing the statement amounted to at least

---

[1] As noted earlier, the plaintiffs state that they received a letter from a concerned parent who felt that the disclosures "tarnished" Mrs. Parnigoni and her family's "name and reputation."  Am. Compl. ¶ 39.  The plaintiffs have also included a letter from another parent who found the defendants' handling of the disclosure to be offensive and "damag[ing] to Mrs. Parnigoni [and] her family."  Id. ¶ 40.  The plaintiffs rely on these letters to demonstrate that others perceived the defendants' statements as defamatory.

negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff[s] special harm." Jankovic v. Int'l Crisis Group, 494 F.3d 1080, 1088 (D.C. Cir. 2007) (quoting Croixland Props. L.P. v. Corcoran, 174 F.3d 213, 215 (D.C. Cir. 1999)).  For the following reasons, the Court concludes that these requirements have been satisfied so far as Mrs. Parnigoni is concerned; however, the claim as to Andrew Parnigoni is found to be deficient.

     1.     <u>False and Defamatory Statement of and Concerning the Plaintiffs</u>

The first task for the Court is to determine whether the defendants made a false and defamatory statement concerning the plaintiffs.  A published statement is defamatory "if it tends to injure [a] plaintiff in his trade, profession, or community standing, or lower him in the estimation of the community."  Benz v. Washington Newspaper Publ'g Co., No. 05-1760 (EGS), 2006 WL 2844896, at *3 (D.D.C. Sept., 29, 2006).  And "[a] statement can be either facially defamatory or defamatory by implication, that is, a statement from which a reasonable person could draw a defamatory inference."  Raymen v. United Senior Ass'n, 409 F. Supp. 2d 15, 21 (D.D.C. 2006) (internal citation and quotation marks omitted).  In other words, defamation by implication evolves from what a statement reasonably implies.  White v. Fraternal Order of Police, 909 F.2d 512, 518 (D.C. Cir. 1990) (internal quotation marks and citations omitted). The statement, however, must be more than unpleasant or offensive.  Benz, 2006 WL 2844896, at *3 (quoting Klayman v. Segal, 783 A.2d 607, 613 (D.C. 2001)).  Rather, it must be "odious, infamous or ridiculous."  Benz, 2006 WL 2844896, at *3 (internal quotations and citations omitted).  Courts must therefore be careful not to imply defamatory meaning from statements that are not capable of such meaning.  Id.  "But if [a] communication, by the particular manner or language in which true facts are conveyed, supplies additional, affirmative evidence suggesting

that the defendant <u>intends</u> or <u>endorses</u> the defamatory inference, the communication will be deemed capable of bearing that meaning." <u>White</u>, 909 F2d at 520 (emphasis in original); <u>see also</u> <u>McBride v. Merrell Dow & Pharm., Inc.</u>, 717 F.2d 1460 (D.C. Cir. 1983) (finding that the juxtaposition of information led to a defamatory meaning); <u>see also</u> <u>White</u>, 909 F.2d at 523 (finding defamatory meaning in letters where the communication did not directly express the assertions but the meaning was derived by implication).  Finally, a plaintiff satisfies the "of and concerning element" of a defamation claim if a defendant's statements could reasonably "lead the [reader] to conclude that the [author] is referring to the plaintiff by description, even if the plaintiff is never named or is misnamed." <u>Jankovic</u>, 494 F.3d at 1088-89 (internal quotation marks and citations omitted).

Having thoroughly reviewed the letters and the circumstances surrounding their dissemination, this Court agrees that although the revelation that Fiona Parnigoni was David Parnigoni's wife was true, the information published by the defendants falls squarely within the standard discussed above, because it reasonably implied that Fiona Parnigoni posed a danger to children as a result of her decision to marry Mr. Parnigoni. And this is illustrated by the disclosures during the meeting held on October 12, 2007, which questioned Mrs. Parnigoni's decision to marry her husband, and thus conveyed the impression that Mrs. Parnigoni lacked sound judgment and implied that parents should have concerns about entrusting the care of their children to her.  This implication injured her professional reputation as a teacher and proprietor of a child care summer camp, as evidenced by the termination of Mrs. Parnigoni's teaching position prior to the 2008-2009 school year due to "the disclosures contained in the October 18, 2007 letter and because current parents allegedly wanted to withdraw [their children] from Mrs. Parnigoni's class and prospective students did not want to be in her class [the following] year".

16

Am. Compl. ¶ 43.  Furthermore, the implication can reasonably be construed as "ridiculous,"

Klayman, 783 A.2d at 613, as it was inconsistent with Mrs. Parnigoni's reputation and conduct

prior to the disclosures.  Therefore, accepting the plaintiffs' factual allegations as true, the Court

concludes that the information disseminated by the defendants was defamatory as a matter of law

in regards to Ms. Parnigoni.  See Raymen, 409 F. Supp. 2d at 21 (stating that a statement can be

defamatory by implication, if a reasonable person could draw a defamatory inference).   This

conclusion is confirmed by letters Mrs. Parnigoni and the Rector of the Church received from

concerned parents expressing their view that the disclosures "tarnished" Mrs. Parnigoni's image

and "damag[ed] [] Mrs. Parnigoni [and] her family."  Am. Compl. ¶¶ 39-40.  Thus, the plaintiffs

have demonstrated that  reasonable people could and did in fact interpret the letters as creating a

defamatory inference about Fiona Parnigoni, and this showing is sufficient to plead a claim of

defamation by implication.

However, unlike Mrs. Parnigoni, as to Andrew Parnigoni the plaintiffs have failed to

satisfy this first element necessary to prove a claim of defamation.  Andrew, a child himself,

was not responsible for caring for the other student at the school, and was no longer a student

when the disclosures by the defendants were made.  Moreover, neither the October 18th letter,

nor the November 9th letter, explicitly state or imply that Andrew was a threat to his fellow

students.  Thus, the plaintiffs have not pled facts sufficient to support Andrew's defamation

claim.

      2.     Publication to a Third Party Without the Plaintiffs' Consent

Accepting the facts in the complaint as true, it is evident that the defendants published

statements about the plaintiffs to third parties, including the parents of the children who attended

the School and all members of the Church, without the plaintiffs' consent.  Mrs. Parnigoni's

offer to withdraw Andrew from the school and resign from her position as a teacher to prevent the release of the information contained in the letters demonstrates her level of opposition to the disclosures.  Nonetheless, despite Mrs. Parnigoni's objection, the defendants released the information.  The circumstances clearly satisfy this element of a defamation claim.

      3.      <u>The Degree of Fault in Making the Publications</u>

A defamation claim also requires the Court to examine whether the defendants' conduct in publishing the defamatory letters amounted to negligence.  <u>Jankovic</u>, 494 F.3d at 1088.  In making this determination, courts consider the circumstances surrounding a defendant's publication of an allegedly defamatory statement.  <u>See</u> <u>Mandel v. Boston Phoenix, Inc.</u>, 456 F.3d 198, 209 (1st Cir. 2006) (according deference to the jury's factual determination that a reporter acted negligently in assessing a defamation claim by failing to read "pertinent documents available to her," failing to contact several individuals who might have "opposing views," "incorrectly characterizing [a] report [and] misrepresenting its findings and the identity of the party for whom it was prepared," and "guess[ing]" about the contents of a file).  The <u>Restatement (Second) of Torts</u> § 580B, cmt. h (1977) proposes several factors that courts should examine in assessing the fault element of a defamation claim.  One factor it proposes "is the nature of the interests that the defendant was seeking to promote by publishing the communication," <u>id.</u> ("[I]nforming the public as to a matter of public concern is an important interest in a democracy; spreading of mere gossip is of less importance[.]"), and several questions are proposed in making this assessment, <u>id.</u> ("How necessary was this communication to these recipients in order to protect the interest involved?  If there was no substantial interest to protect in publishing the communication to these recipients, then a reasonable person would be hesitant to publish the communication unless he had good reason to believe that it was

accurate."). Another factor suggested by the Restatement is the "extent of the damage to the plaintiff's reputation . . . that would be produced if the communication proves to be false." Id. The significance of this factor is impacted by whether the "communication was defamatory on its face" as compared to whether "its defamatory connotation [would] be known only by a few,"and also the extent to which the defendant disseminated the defamatory information. Id.

Here, the plaintiffs suggest that the defendants published the letters without regard to the adverse impact dissemination of the information would have on Mrs. Parnigoni as a teacher at the School and operator of the summer camp. Am. Compl. ¶¶ 52, 56, 106-09. Assuming for the sake of argument that the defendants acted solely for the purpose of protecting the children at the School and the summer camp, the defendants should have sent the letters only to the parents of the School's children and the summer camp. However, the defendants did not limit the scope of their dissemination to that audience, but also sent the letters to all members of the School's parish, which constituted more than 3,500 households. The dissemination was therefore much more extensive than necessary. And the fact that the defendants delayed the disclosure of the information for approximately three years after Mrs. Parnigoni advised them of her husband's conviction, coupled with the decision to make the disclosure only after she married Mr. Parnigoni, undermines the defendants' stated reason for making the disclosure and supports the plaintiffs' position that the disclosure was made to chastise Mrs. Parnigoni for exercising what the defendants consider to be her poor judgment in marrying Mr. Parnigoni.[2]   Moreover, during that three-year period before the dissemination the defendant does not allege that Mrs.

---

[2] According to the plaintiffs, "the Director stated that while she was sorry that this had happened to Mrs. Parnigoni, she put the blame for the entire situation on Mrs. Parnigoni, and declared that if Mrs. Parnigoni had not married [her husband], she 'would not be in this position.'" Am. Compl. ¶ 29. The plaintiffs also allege that the Rector stated that the "public disclosure" was being made "based solely on what she termed as Mrs. Parnigoni's 'poor judgment in marrying David.'" Id. ¶ 31.

Parnigoni's relationship with Mr. Parnigoni resulted in any incidents that could be construed as compromising the safety of the children at the School.  In addition, the defendants also ignored Mrs. Parnigoni's several attempts to avoid the release of this information, including removal of her child from the school and her offer to resign as an alternative to the disclosures.  The defendants' actions, coupled with their disapproval of Mrs. Parnigoni's marriage—as evidenced by the statement of the Director of the School and the Rector of the Church—support the plaintiffs' contentions that it was the defendants' desire to condemn Mrs. Parnigoni for her marital decision, thus rendering their publication of the information not only negligent, but malicious.  Therefore, in considering the magnitude of the injury to Mrs. Parnigoni's reputation, the defendants' deliberate choice not to accept alternative solutions to resolve the defendants' purported concern, and the lack of any evidence showing that Mrs. Parnigoni posed a danger to the children at the School, the Court concludes that a reasonable jury could find that the defendants' dissemination of the letters and the statements was at least negligent.

     4.    <u>Harm to the Plaintiffs as a Result of Publication</u>

Mrs. Parnigoni's employment as a teacher at the School was terminated prior to the beginning of the 2008-2009 school year and defendant Berry claimed that the October 18, 2007 disclosures and pressure from parents led to her termination.  Am. Compl. ¶ 43.  According to the plaintiffs, the emotional impact caused by the defendants' publication of the information about the plaintiffs to the Parish community and the statement made by the Director and the Rector regarding Mrs. Parnigoni's decision to marry her husband have significantly impaired the ability of the Parnigonis to interact with each other and to function as a healthy family.  Am. Compl ¶¶ 89, 95, and 101.  The resultant harm, the plaintiffs contend, has caused them to suffer mental anguish, distress, humiliation, and economic loss causing them harm.  <u>See generally</u> Am.

Compl.  These allegations sufficiently assert that Mrs. Parnigoni was harmed by the defendants'
actions.

     5.     <u>The Defendants' Constitutional Defense</u>

The defendants argue that even if their three disclosures are construed by the Court as
defamatory, the disclosures are nonetheless "constitutionally protected expression[s] of opinion
based on disclosed facts and cannot form the basis for a defamation claim."  Defs.' Mem. at 16.
Specifically, the defendants contend that their statements qualify as opinions that are protected
by the First Amendment.  <u>Id.</u> at 17-18.  This Court does not agree.

An opinion which "assert[s] probably false and defamatory facts" is not deserving of the
protections of the Constitution.  <u>Guilford Transp. Indus. v. Wilner</u>, 760 A.2d 580, 583 (D.C.
2000) (citing <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1 (1990).  For the reasons stated earlier,
<u>supra</u> at 15, the Court has already concluded, assuming the plaintiffs' allegations are true, as the
Court must at this stage of the proceedings, that the plaintiff can prove that the defendants'
actions created a false and defamatory implication that parents had reason to be concerned that
Mrs. Parnigoni presented a danger to children. The defendants' are therefore not entitled to the
First Amendment protections they seek to invoke.  Accordingly, the defendants' motion to
dismiss Mrs. Parnigoni's defamation claim on this ground must be denied.

**C.**    **The Plaintiffs' Invasion of Privacy Claims–False Light and Public Disclosure of
Private Facts Claim**

The defendants assert that the plaintiffs' claims for invasion of privacy-false light (Count
II) and public disclosure of private facts (Count III) simply "relabel" the plaintiffs' defamation
claim.  Defs.' Mem. at 18.  They challenge the plaintiffs' claim that the letters authored by
Reverend Vincent and Ms. Berry placed them in a false light or revealed private facts about

them.  Id.  The defendants also assert that these claims fail because they are not recognized under

Virginia law, and that even if District of Columbia law applies, they fail "because the facts

revealed in Rev. Vincent's letter were matters of public record."  Id.  The plaintiffs, on the other

hand, contend that the defendants' conduct invaded their privacy by placing them in a false light

and publicly revealed information about private family matters.  Am. Compl. ¶¶ 69-71.  They

also insist that they have pled each claim sufficiently and that District of Columbia law applies to

their invasion of privacy claims.  Pls.' Opp'n at 27-28.  As already concluded, the Court agrees

that District of Columbia law governs these claims.  Supra at 11.

      1.      Invasion of Privacy–False Light

      The defendants contend that the plaintiffs' invasion of privacy–false light claim fails

because their communications were constitutionally protected.  Defs.' Mem. at 21.  They also

argue that none of the statements were false nor could the statements be understood by a

reasonable person to imply that Andrew and Fiona Parnigoni presented threats to the safety of

other children.  Id.  Specifically, defendants maintain that the statements made by Reverend

Vincent about parents ensuring that their children not fall prey to sexual abusers were merely

general reminders and in no way were meant to imply that Andrew Parnigoni, a three year old, or

Fiona Parnigoni, a teacher employed by the school, were "threat[s] to [the] safety and well-

being" of children.  Id. (citation and internal quotation marks omitted).  The defendants also

assert that an invasion of privacy–false light claim is only actionable for statements that are false

and cannot be based on opinions that do not convey a false inference. Id. at 22.

      The plaintiffs, on the other hand, argue that they have pled the elements of a false light

claim with sufficient "specificity" in their Amended Complaint.  Pls.' Opp'n at 27.  They

contend that the two letters (1) constitute publicity; (2) contained statements that falsely

represented or imputed that Fiona and Andrew Parnigoni "were dangerous to children, a threat to their safety and well being, and that parents should take action to ensure that the children did not become victims of sexual abuse;" (3) included statements that "were directed to and concerned Fiona and Andrew Parnigoni;" and (4) "improperly atribut[ed] to [Fiona and Andrew Parnigoni] conduct and characteristics that were false [and] highly offensive to a reasonable person as demonstrated, in part, by the letter responses from the recipients of the letters at issue." Id. at 27-28.  The plaintiffs respond that rather than focusing on whether the elements of the claim have been adequately pled, the defendants have instead tried to argue the merits of their claim, which is improper in making a Rule 12(b)(6) challenge.  Id. at 28.  They also contend that the defendants "misunderstand or misconstrue the entire basis for [the plaintiffs'] false light claim" in arguing "that the 'expressed view that parents were entitled to know about David Parnigoni . . . [is] constitutionally protected opinion.'"  Id. (quoting Defs.' Mem. at 22).

For the plaintiffs' claim for invasion of privacy-false light to defeat a Rule 12(b)(6) motion, their complaint must allege that the defendants' actions created "(1) publicity (2) about a false statement, representation or imputation (3) understood to be of and concerning the plaintiff[s], and (4) which places the plaintiff[s] in a false light that would be offensive to a reasonable person."  Washburn v. Lavoie, 437 F.3d 84, 88 n.3 (D.C. Cir. 2005) (quoting Kitt v. Capital Concerts, Inc., 742 A.2d 856, 859 (D.C. 1999)) (internal citations and quotations omitted).  Because this tort is "so similar" to the tort of defamation, "[a] plaintiff may only recover on one of the two theories based on single publication, but is free to plead them in the alternative."  Weyrich v. New Republic, Inc., 235 F.3d 617, 628 (D.C. Cir. 2001) (quoting Moldea v. New York, 15 F.3d 1137, 1151 (D.C. Cir. 1994)).

23

The plaintiffs' assertion that the defendants distributed the letters to over 3,500 households satisfies the publicity prong of the tort. The defendants' release of information about Mr. Parnigoni's conviction as a sex offender and statements about whom parents should trust with the care of their children reasonably created the false impression that Mrs. Parnigoni was a threat to the students simply because of her association with Mr. Parnigoni. Therefore, the second and third components of the tort have been sufficiently pled. However, even if the Court had found that the statements against Mrs. Parnigoni were incapable of a defamatory meaning, the Court would still be required to consider whether the statements or their imputations place the plaintiffs in a "highly offensive" light. See Weyrich, 235 F.3d at 628. Because the statements in the letters, which implied that Mrs. Parnigoni posed a risk of harm to the children at the school, were highly offensive, the plaintiffs have satisfied the third element of the tort. See Benz v. Washington Publ'g Co., No. 05-1760 (EGS), 2006 WL 2844896, at *6 (D.D.C. Sept. 29, 2006) (finding that false statements that sexually linked the plaintiff to a known "porn king" would be highly offensive to a reasonable person). In fact, Mrs. Parnigoni and the defendants received letters expressing outrage at the defendants' actions and their implication that she presented a risk to the safety of the students at the School. Am. Compl. ¶¶ 40-41. Therefore, the allegations in the complaint concerning Ms. Parnigoni are more than adequate to defeat the defendants' Rule 12(b)(6) motion to dismiss.

However, the plaintiffs have not pled facts sufficient to support a claim of invasion of privacy–false light with respect to Andrew Parnigoni. The only statement the complaint asserts the defendants made in any of the communications about Andrew was that he no longer attended the School, which was obvious from his absence from the classroom. This in no way suggested anything negative about Andrew and therefore Andrew's invasion of privacy–false light claim

cannot survive the defendants' Rule 12(b)(6) motion.  The motion is therefore granted as to Andrew Parnigoni.

      2.    <u>Invasion of Privacy–Publication of Private Facts</u>

      The defendants opine that the plaintiffs appreciate that their invasion of privacy–publication of private facts claim can not be based on the information disclosed in Reverend Vincent's letter,[3] because although embarrassing, this information was already a matter of public knowledge, it having been disclosed already in a published judicial opinion in the Atlantic Reporter the week prior to the circulation of the Church's letter.  Defs.' Mem. at 22 (citing <u>Parnigoni v. District of Columbia</u>, 933 A.2d 823 (D.C. 2007).  Therefore, the defendants note that this count of the complaint is based solely "on the allegation that Reverend Vincent disclosed [the p]laintiffs' 'personal and private decision to withdraw their son from the School in an effort to avert the disclosure,' and [the] alleg[ation] that <u>this</u> disclosure (as opposed to the publicity given to Mr. Parnigoni's sex offender status) caused them 'nine million dollars[']' harm."  <u>Id.</u> at 22-23 (quoting Am. Compl.  ¶¶ 69, 73) (emphasis in original).  The defendants argue that this claim should be dismissed for other reasons.  First, while the October 18, 2007 letter stated that Andrew was no longer a student at the school, the defendants maintain that the letter does not suggest that the Parnigonis "withdrew [their son] to avert the disclosure" about Mr. Parnigoni, or for that matter, why he was withdrawn from the school.  <u>Id.</u> at 23.  Second, the defendants posit that Andrew's withdrawal from the School is not a private fact, because it would have been "readily apparent from his absence from the classroom[, and] there is no liability for giving further publicity to what the plaintiff himself leaves open to the public eye."

---

[3] Because this count of the Complaint is based solely on Reverend Vincent's letter that was sent to the parish membership, the defendants argue that this claim as to Ms. Berry must be dismissed.  Defs.' Mem. at 22 n.15.

Id. at 24 (internal citation and quotation marks omitted).   Third, the defendants assert that the disclosure concerning "Mrs. Parnigoni's offer to withdraw Andrew from the School . . . conveys that Mrs. Parnigoni tried to take steps that, in her mind, were accommodating and reasonable to protect her family," which was not "highly offensive" but rather "reflects positively upon her." Id.   Finally, the defendants argue that Andrew's withdrawal from  the school was of legitimate interest to the parish membership because it informed them that the Church's leadership had handled this "sensitive situation" in a "pruden[t] and competen[t]" manner and provided "reassurance that [the defendants] 'did not ask the Parnigonis to remove their son from the school . . . .'" Id.

The plaintiffs' response to the defendants' challenge to their publication of private facts claim is that their disclosure "improperly publicized the fact that Andrew Parnigoni was withdrawn because of [the defendants'] concerns regarding the potential threat his presence at the school posed to other children." Pls.' Opp'n at 29.  They also posit that the disclosure that Andrew had not been withdrawn from the School at the defendants' request cannot "be viewed in a vacuum," but must be considered in conjunction with the disclosures about "his father's criminal conviction" and the "assertion by the Church that 'steps [had] been taken to prevent Mr. Parnigoni from'" having any "reason to be on school grounds," one step being Andrew Parnigoni's withdrawal from the School. Id. at 29-30.  Responding to the defendants' second challenge to this claim, the plaintiffs contend that Andrew's "readily apparent . . . absence from the classroom . . . is irrelevant because whether a fact is private depends on whether the reader or recipient of the private fact had prior knowledge of the fact." Id. at 30.  They also contend that Andrew's apparent absence must be considered along with the disclosure about why he was no longer a student at the School and the fact that the disclosures were made to members of the

church who would have had no opportunity to observe that Andrew had been withdrawn from the School.  Id.  As to the defendants' third challenge to this count of the Complaint, the plaintiffs respond that "the [d]efendants' subjective determination why they believe the disclosure is not highly offensive is irrelevant" because "[t]his question belongs exclusively within the purview of the jury."  Id. at 31.  Finally, the plaintiffs argue that the defendants' position that their disclosures concerned a matter of "'legitimate interest to the parish,' . . . strains credibility" by overlooking the plaintiffs allegations that the disclosures were made for the purpose of condemning Mrs. Parnigoni for marrying Mr. Parnigoni.  Id. (citing Defs.' Mem. at 24).

        In the District of Columbia, the tort of invasion of privacy resulting from the disclosure to the public of private facts has five elements: "(1) publicity, (2) absent any waiver or privilege, (3) given to private facts (4) in which the public has no legitimate concern (5) and which would be highly offensive to a reasonable person of ordinary sensibilities."  Grunseth v. Marriott Corp., No. 95-7021, 1996 WL 104397, at *2 (D.C. Cir. Feb. 9, 1996) (quoting Wolf v. Regardie, 553 A.2d 1213, 1220 (D.C. 1989)).  As stated above, the defendants' distribution of the letters to  the School's parents and the other Church parishioners satisfies the publicity element.  However, the October 18, 2007 letter sent by the School did not state the private reasons that Andrew had been withdrawn from school—that his parents wanted to avert the disclosure of information regarding Mr. Parnigoni—it simply stated that Andrew no longer attended the school and that school officials had not asked the Parnigonis to withdraw their son.[4]  The fact that their son no longer attended the School was not a private fact, as that would have been evident to at least a segment of

---

[4] Specifically, the October 18th letter stated: "Until recently their son attended the Nursery School.  I want to assure you that steps have been taken to prevent Mr. Parnigoni from entering  St. Columba's Nursery School events."  Defs.' Mem., Ex. A.

the Church community from his persistent absence from the classroom. See Harrison v. Washington Post Co., 391 A.2d 781, 784 (D.C. 1978) (stating that "there is no protected privacy interest in preventing the further publicity of what [plaintiffs themselves] left open to the public eye," and therefore, "it is well settled law that an invasion of privacy action does not lie as to events which take place in public view.") (emphasis added).

Moreover, the defendants' disclosure that the son was no longer attending the School was of public concern, as the subject of the letter was providing information to at least some who had a right to know—parents who had children attending the School—that a sex offenders would not have a legitimate reason to be at or near the School.

> It is a defense to a claim of invasion of privacy that the matter publicized is of general public interest. . . . Moreover, this defense of privilege is not limited to dissemination of news about current events or public affairs, but also protects information concerning . . . all issues about which information is needed or appropriate so that individuals may cope with the exigencies of their period.

Vassiliades v. Garfinckel's, Brooks Bros., 492 A.2d 580, 589 (D.C. 1985) (citation and internal quotation marks omitted).  Moreover, the information that David was a convicted sex offender was already available in the public domain; thus, the fact of his conviction also was not a private matter.  See Harrison, 391 A.2d at 784 (stating that "there is no protected privacy interest in preventing the further publicity of what . . . [is] left open to the public eye.") (emphasis added). Therefore, because the plaintiffs fail to show how Andrew's withdrawal from the School or Mr. Parnigoni's conviction were private facts about which the public had no knowledge or legitimate concern, the Court must grant the defendants' motion to dismiss their invasion of privacy–public disclosure of private facts claim.[5]

---

[5] The Court notes that because this claim is being dismissed in its entirety, the separate issue of whether or not Ms. Berry should be dismissed individually is now moot.

**D.**     **The Plaintiffs' Intentional Infliction of Emotional Distress Claim**

The defendants believe that the plaintiffs' intentional infliction of emotional distress claim should be dismissed because they fail to allege the "rudiments" necessary to assert a claim for the tort rather than just "recit[ing] the elements in [a] formulaic fashion," as they contend the plaintiffs have done. Defs.' Mem. at 26. Specifically, the defendants believe that the plaintiffs' allegations do not meet the "outrageousness" or "severity" requirements of the claim because from their perspective the letters "lack all the earmarks of 'outrageous' conduct." Id. at 27. Moreover they assert that "courts [have] routinely [held] that revealing someone's status as a sex offender, even where the accusations are false or misleading, is legally insufficient to meet the 'outrage' requirement." Id. (internal citations and quotation marks omitted).

The plaintiffs argue that the element of "outrageousness" of an intentional infliction of emotional distress claim is a question for a jury. Pls.' Opp'n at 33. At the same time, they assert that the dissemination of the October 18 and November 9, 2007 letters to over 3,500 households amounts to outrageousness because Mrs. Parnigoni attempted in several respects  to allay the defendants' concerns, even proposing to tender her resignation, which were rejected by the Nursery School. Id. They further contend that outrageousness has been adequately pled through their assertion that the real motivation for disseminating the information about Mr. Parnigoni was to demonstrate Mrs. Parnigoni's "poor choice in marrying [Mr. Parnigoni]" and not "purely for the sake of the children" as the defendants allege. Id. at 33-34 (quoting the Am. Compl. ¶ 78). The plaintiffs insist that the Court should only concern itself with "whether reasonable people could differ on whether the conduct [alleged] is extreme and outrageous." Id. at 34.

For a plaintiff to survive a Rule 12(b)(6) motion to dismiss for failure to state a claim of intentional infliction of emotional distress under District of Columbia law, the plaintiff must

allege "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." Khan v. Parsons Global Servs. Ltd., 521 F.3d 421, 428 (D.C. Cir. 2008) (citing Darrow v. Dillingham & Murphy, LLP, 902 A.2d 135, 139 (D.C. 2006)).   The conduct alleged must be so outrageous that it goes "beyond all bounds of decency" and is "regarded as atrocious, and utterly intolerable in a civilized community." Lyles v. Micenko, 404 F. Supp. 2d 182, 187 (D.D.C. 2005) (quoting Homan v. Goyal, 711 A.2d 812, 818 (D.C. 1998) (internal citation and quotation marks omitted)); see Browning v. Clinton, 292 F.3d 235, 248 (D.C. Cir. 2002) (holding that the tort of intentional infliction of emotional distress is "reserved for truly outrageous behavior").   The alleged conduct must also constitute more than "mere insults, indignities, . . . annoyances, petty oppressions, or other trivialities." Lyles, 404 F. Supp. 2d at 187.

In this case, the plaintiffs allege that the "outrageousness" of the disclosures evolves from the defendants' rejection of Mrs. Parnigoni's efforts to stave off the revelations, the extensiveness of their dissemination and motive for making the disclosure.  The District of Columbia Circuit in Khan found that a plaintiff had sufficiently pled "'extreme and outrageous' conduct" by asserting an employer's "successful efforts to prevent [one of the plaintiffs] from privately paying [a] ransom [demand to her husband's kidnappers], despite threats of torture and mutilation," which "may have exposed [the wife] to the guilt of knowing that she could have prevented [her husband's] suffering and disfigurement if she had been able to convince [the employer] to provide the ransom details that they withheld from her" for the purpose of minimizing future corporate kidnappings. 521 F.3d at 423, 429.  In another case, the District of Columbia Court of Appeals found the defendant had acted outrageously when he gave the plaintiff's address and phone number to a person whom the defendant reasonably should have

expected would threaten the plaintiff's life in light of the fact that the person had already threatened the defendant's life.  Homan, 711 A.2d at 818-19.

However, in Williams v. Fed. Nat'l Mortgage Ass'n, No. 05-1483(JDB), 2006 WL 1774252, at *9 (D.D.C. June 26, 2006), the Court held that the complaint failed to state a claim for intentional infliction of emotional distress, where the plaintiff alleged that the defendants had "active[ly], conspiratorial[ly], malicious[ly], and secretive[ly] attempt[ed] to curtail or terminate [the plaintiff's] prospective and ongoing business relationships." 2006 WL 1774252, at *10.  The complaint also stated that the defendants intended through their actions to damage "[the plaintiff's] personal and business reputation," by having "refused to contract with her because of her race and engaged in a campaign to prevent others from doing business with her."  Id.  Despite these allegations, the court found that  the defendants' conduct failed to rise to the level required to satisfy a claim for intentional infliction of emotional distress.  Id.

Similar to the holding in Williams, this Court finds that a reasonable jury could not find that  the defendants' behavior here went beyond all possible bounds of decency, and certainly cannot be regarded as atrocious.  While Mrs. Parnigoni's attempts to prevent the disclosures in the letters were considerable, the plaintiffs' have failed to show that the defendants' behavior was extreme or outrageous aside from disseminating the information to over 3,500 households, which is seemingly broader than necessary, but certainly was not outrageous.  See Minch v. District of Columbia, 952 A.2d 929, 940-41 (D.C. 1998) (agreeing with trial court's grant of summary judgment for the defendant despite its release of an incorrect press release concerning the plaintiff's arrest and detention for a murder it was later determined he did not commit, even though the information contained in the press release was publicized in an article in the Washington Post; the District of Columbia Court of Appeals concluded that "publication of [the

plaintiff's] arrest as a suspect in [the murder case did] not, as a matter of law, make out a claim of intentional infliction of emotional distress because [the defendant's] actions—though mistaken—were not extreme and outrageous under the circumstances").

Here, the defendants assert that they believed that "Mr. Parnigoni's circumstances were relevant to parents" of children who attended their School, Defs.' Mem. at 18, "because [they] believed that [the] parents [were] 'entitled to information that may impact the safety of [their] children," id. at 16. The Court cannot conclude, as a matter of law, that the defendants' position was unfounded and that their decision to release the information despite Mrs. Parnigoni's ardent opposition, even when considered in conjunction with the defendants' decision to reveal the information due to their negative attitude concerning her marriage and their excessive distribution of the letters, rises to the level of "extreme" or "outrageous" conduct. This being a necessary element of a claim for intentional infliction of emotional distress, the plaintiffs have failed to meet their burden of proving the claim, and accordingly, the Court must grant the defendants' motion to dismiss this claim.[6]

## E.   Fiona Parnigoni's Promissory Estoppel Claim

Mrs. Parnigoni also seeks recovery under the doctrine of promissory estoppel. In challenging her promissory estoppel claim, the defendants argue that Mrs. Parnigoni's reliance on the School Director's statement that the controversy would soon pass and would not affect her employment as a basis for the claim fails because promissory estoppel is an equitable doctrine

---

[6] The Court having resolved the challenge to this claim on other grounds, it need not address the defendants' constitutional challenge as "[i]t is well-settled that courts should avoid unnecessarily deciding constitutional questions." See Nat'l Ass'n of Waterfront Employers v. Solis, 2009 WL 3436913, at *6, ___F. Supp. 2d___ (D.D.C. 2009); see also United Seniors Ass'n v. Shalala, 182 F.3d 965, 969-70 (D.C.Cir.1999) (because the case was resolved on other grounds, there was no need to reach the constitutional issues raised in the complaint).

that "may not [be] assert[ed] . . . where there is an enforceable contract."[7]  Defs.' Mem. at 28-29

(internal citations and quotation marks omitted).  And the defendants contend that Mrs. Parnigoni

had a contractual relationship with the School at the time the alleged oral promise was made,

which "govern[ed] her retention." Id. at 29.  They therefore assert that Mrs. Parnigoni's status as

a contractual employee precludes her from pursuing an equitable estoppel claim.  Defs.' Reply at

19.  Moreover, the defendants argue that Mrs. Parnigoni's "alleged reliance [on the purported oral

promise] was not reasonable as a matter of law and could not have been detrimental."  Defs.'

Mem. at 29.  They assert this position because the alleged oral promise was made at the beginning

of the school year while Mrs. Parnigoni was still under written contract and prior to the year when

it was decided that her contract would not be renewed.  Defs.' Reply at 20-21.  It is therefore the

defendants' position that the promissory estoppel claim must be viewed in the context of District

of Columbia law, which provides that all "employment relationships, absent an express agreement

to the contrary, are 'at will' and can be terminated by the employer without cause."  Defs.' Reply

at 20 (internal citations and quotation marks omitted).  Applying this standard, the defendants

posit that it was not reasonable as a matter of law for Mrs. Parnigoni to rely on a promise of

future employment when "(1) her current term was governed by a written contract, (2) extensions

of her employment term were, and had been in the past, handled by written agreement, and (3)

she would become an at-will employee until such a written agreement for the following year was

in place." Id.

---

[7] The defendants assert that while the plaintiffs make this claim against all the defendants, Ms. Berry was the only person alleged to have made any promise. Defs.' Mem. at 28-29 n.25.  Therefore, they argue, because the plaintiffs have not asserted that the other defendants were acting with Ms. Berry in this regard, the promissory estoppel claim against the other defendants should be dismissed.  Id.  Mrs. Parnigoni challenges the defendants' assertion and argues that because Ms. Berry was acting in accordance with the directions of the Board all the defendants are subject to this Count.  Pls.' Opp'n at 37.  The Court agrees with the plaintiffs.  Because the statements in the Amended Complaint must be accepted as true when assessing a Rule 12(b)(6) motion, defendant Berry, Vincent, and the School are all subject to the promissory estoppel claim.

On the other hand, Mrs. Parnigoni identifies several reasons why the promissory estoppel claim should be allowed to proceed.  She contends that the defendants' refusal to accept her resignation, coupled with the promise of a renewed contract for the 2008-2009, prevented her from securing a new position before the disclosures were made and prior to the commencement of the 2008-2009 school year.  Pls.' Opp'n at 35-36.  Furthermore, Mrs. Parnigoni counters the defendants' argument against the use of promissory estoppel asserting that the contractual relationship in place during the 2007-2008 school year between her and the School did not cover the 2008-2009 school year, and therefore, even if the defendants' legal analysis is correct, which they do not concede, it would not be applicable to this situation.  Id. at 36.  Thus, she contends, her promissory estoppel claim is proper.  Id.  Mrs. Parnigoni also claims that an issue of material fact exists regarding the reasonableness of her reliance on Ms. Berry's oral statement.  Id. at 37.

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim of promissory estoppel, the plaintiff must establish "(1) the existence of a promise, (2) that the promise reasonably induced reliance on it, and (3) that the promisee relied on the promise to his [or her] detriment."  Osseiran v. Int'l Fin. Corp., 498 F. Supp. 2d 139, 147 (D.D.C. 2007) (citing Daisley v. Riggs Bank, 372 F. Supp. 2d 61, 71 (D.D.C. 2005)); see also Granfield v. Catholic Univ. of America, 530 F.2d 1035, 1042 (D.C. Cir. 1976) (citing Restatement (Second) of Contracts, § 90 (1981), which provides that  "[a] promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.");  Willoughby v. Potomac Elec. Power Co., No. 94-1313, 1995 WL 761308, at *5 (D.D.C. Dec. 14, 1995).  And, "[p]romissory estoppel is recognized in the law of the District of

Columbia as a theory allowing recovery in contract <u>when there may have been a failure of proof of certain elements necessary to the formation of an express contract</u> . . . if a refusal to enforce a promise admittedly made would in the circumstances (usually reliance) result in injustice." <u>Fed. Ins. Co. v. Thomas W. Perry, Inc.</u>, 634 F. Supp. 349, 352-53 (D.D.C. 1986) (emphasis added). Furthermore, in <u>Osseiran</u>, the Court noted that District of Columbia law "presupposes" the absence of a written agreement when the doctrine of promissory estoppel is deemed applicable. 498 F. Supp. 2d at 147. The <u>Osseiran</u> Court also stated that while "reliance on an indefinite promise is unreasonable," "the promisor [s]hould expect the promisee to rely" on a promise which contains "definite terms." <u>Id.</u> "However, that promise need not contain language as specific and definite as that of an enforceable contract." <u>Id.</u>

The current dispute hinges on whether the contract in place during the 2007-2008 school year forecloses Mrs. Parnigoni's promissory estoppel claim. District of Columbia law is clear that promissory estoppel applies to arrangements only where no written agreements exist. <u>Osseiran</u>, 498 F. Supp. 2d at 147. In failing to allow a promissory estoppel claim where there is an express agreement, courts are primarily concerned about preventing plaintiffs to have "a second bite at the apple" in the event they are unable to maintain a breach of contract claim. <u>Daisley</u>, 372 F. Supp. 2d at 71. Here, Mrs. Parnigoni contracted with the School on an annual basis and her contract had been renewed each year by the School from 2001 through the 2007-2008 school year. However, because she had not yet entered into a written contract for the 2008-2009 school year when Ms. Berry purportedly made the oral promise of employment for that term, Mrs. Parnigoni can therefore avail herself to the relief provided by the promissory estoppel doctrine.

Moreover, Ms. Berry's purported promise was not too indefinite for Mrs. Parnigoni to have reasonably relied upon it, as her contract had been renewed annually on six prior occasions, she had an unblemished employment record, and the Director assured her that the controversy would not affect her employment.  See Ficken v. AMR Corp., 578 F. Supp. 2d 134, 145 (D.D.C. 2008) (holding that the defendant's promise to automatically convert the plaintiff's frequent flyer mileage if he agreed to take no action by a specific date was sufficiently definite for the plaintiff to have reasonably relied upon it; thus, the plaintiff's claim survived the motion to dismiss); see also Osseiran, 498 F. Supp. 2d at 148 (finding promises referring to sale of specific stock and signing of a specific draft agreement were sufficiently definite for the plaintiff to reasonably rely upon them). Furthermore, Mrs. Parnigoni did not seek alternative employment for the following school year, relying to her detriment on the promise of employment Ms. Barry allegedly made to her for the following year.  The Court therefore concludes that Mrs. Parnigoni has adequately pled the elements of a promissory estoppel claim and the defendants' Rule 12(b)(6) motion to dismiss this claim must be denied.

**F.      The Plaintiffs' Loss of Consortium Claims**

Each of the plaintiffs' claims assert a loss of consortium claim against the defendants; plaintiff David Parnigoni for loss of consortium with his wife, Am. Compl. ¶¶ 87-92; plaintiff Andrew Parnigoni for loss of consortium with his mother, id. ¶¶ 93-97; and plaintiffs David and Fiona Parnigoni for loss of consortium with their son, id. ¶¶ 99-104.  The defendants argue that the loss of consortium claims should be dismissed because the plaintiffs' state of residence (Virginia) does not recognize the tort for loss of consortium.  Defs.' Mem. at 30.  Likewise, the defendants maintain their disagreement with the plaintiffs' positions that District of Columbia law

governs these claims and that the District of Columbia courts have remained open to the question of whether the tort of loss of parent-child consortium is recognized in this jurisdiction. Defs.' Reply at 22.

The plaintiffs characterize the defendants' assertion that Virginia law should apply to their loss of consortium claims as forum shopping, and opine that District of Columbia law should apply. Pls.' Opp'n at 38. Although the plaintiffs' acknowledge that their state of residence is a factor in determining the choice of law question, they maintain that their residency is "not dispositive" and that the defendants should not be permitted to "forum shop" and choose Virginia as the jurisdiction whose laws govern their loss of consortium claims because the tort is not recognized there. Id. (internal citations and quotation marks omitted).

Jurisdictions like the District of Columbia that employ the governmental interest choice of law doctrine have typically concluded that the law governing a loss of consortium action is the law where the marriage is domiciled not where the injury occurred. Felch v. Air Fla., 562 F. Supp. 383, 386 (D.D.C. 1983). This is because the marital domicile is thought to have the greatest interest in claims related to marital union. See Linnell v. Sloan, 636 F.2d 65, 66-67 (4th Cir. 1980). Therefore, Virginia law governs the loss of consortium claims, as Mr. and Mrs. Parnigoni's marriage is domiciled in that state.

The state of Virginia does not recognize a tort claim for loss of consortium, see Va. Code Ann. § 55-36; see also Bolen v. Bolen, 409 F. Supp. 1374 (W.D. Va. 1976) (stating that Virginia Code § 55-36 bars a husband from bringing an action for loss of consortium), and this proscription equally applies to the claim of a parent asserting loss of consortium with a child. See Cocoli v. Children's World Learning Ctrs., Inc., 41 Va. Cir. 589, 594 (Cir. Ct. 1994). Therefore,

the plaintiffs have failed to state a claim upon which they are entitled to relief as to all of their

consortium claims and the defendants' motion to dismiss these claims must be granted.

**G.      Fiona Parnigoni's Intentional Interference with Prospective Economic Advantage Claim**

This claim is based on Mrs. Parnigoni's operation of a preschool summer camp attended

by students who also attended the defendant School and other preschool students who reside in

the District of Columbia area, Am. Compl. ¶ 106, and her allegations that the "[d]efendants'

conduct in disseminating the defamatory communications was purposefully and intentionally

designed to interfere with [the operation of her summer camp]," id. ¶ 108.  The defendants argue

that the claim should be dismissed because the conduct alleged by Mrs. Parnigoni was not

wrongful as a matter of law,  Defs.' Mem. at 30, and because the interference complained of must

be improper, which the defendants contend has not been alleged, id. at 31.  Specifically, the

defendants contend that the issuance of their letters was not improper because they "were not

defamatory and did not constitute an invasion of [Mrs. Parnigoni's] privacy," id. at 31, and that

the disclosure about Mr. Parnigoni was truthful, id.; Defs.' Reply at 23.

Mrs. Parnigoni counters the defendants' challenge to this claim, noting the allegations

pled in paragraphs 106-09 of the plaintiffs' Amended Complaint, which she asserts satisfy the

four elements of the claims.  Pls.' Opp'n at 39.  And because she believes the challenge as

presented "make[s] no real effort to test the sufficiency of the Amended Complaint," Mrs.

Parnigoni opines that given that all of the allegations in the complaint must be accepted as true,

she has adequately pled her intentional interference with prospective economic advantage claim.

Id.

For this claim to survive the defendants' Rule 12(b)(6) motion to dismiss, the complaint

38

must allege "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage." Bennett Enters., Inc. v. Domino's Pizza, Inc., 45 F.3d 493, 499 (D.C. Cir. 1995); see also Riggs v. Home Builders Inst., 203 F. Supp. 2d 1, 23 (D.D.C. 2002) (internal citations omitted).  The Court will assess whether the plaintiffs have met these pleading requirements.

      1.      Existence of a Valid Business Relationship or Expectancy

A legally recognizable business expectancy may include "the opportunity of obtaining customers," Carr v. Brown, 395 A.2d 79, 84 (D.C. 1978), that is "commercially reasonable to anticipate," Whelan v. Abell, 953 F.2d 663, 673 (D.C. Cir. 1992) (citation and internal quotation marks omitted); see also Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., 592 F. Supp. 2d 86, 98 (D.D.C. 2009).   Here, Fiona Parnigoni alleges that she had a legitimate expectation of being able to solicit campers for her Teddy Bear Camp from amongst her current Nursery School students because she had done so successfully in the past.  Pls.' Opp'n at 39.

Mrs. Parnigoni had a reasonable expectation of recruiting students from the School to attend her summer camp because the defendants had permitted her to solicit campers from the School in prior years.  Am. Compl. ¶¶ 45, 107.  Thus, there existed a "background of business experience on the basis of which it is possible to estimate with some fair amount of success both the value of what has been lost and the likelihood that the plaintiff would have received it if the defendant had not interfered."  Carr, 395 A.2d at 84.  And because Mrs. Parnigoni had successfully solicited campers for her Teddy Bear Camp from the Nursery School with the defendants' knowledge in previous years, she could make a reasonable estimate of how many children from the School would participate in the Teddy Bear Camp in future years.

The conclusion reached by the District of Columbia Circuit in <u>Browning v. Clinton</u>, 292 F.3d 235 (D.C. Cir. 2002), supports Mrs. Parnigoni's position as to this element of the claim. There, the court found that the plaintiff had demonstrated a valid business expectancy where the plaintiff's complaint alleged not only that she had a reasonable expectation of selling her novel to a publisher, but also that she had been encouraged to continue working on the book by a book company editor. In addition, her book had received favorable press coverage in two magazine articles, one describing her book as having the potential to replace the media coverage a popular book had been receiving. <u>Id.</u> at 242-43. In this case, Mrs. Parnigoni had an even stronger business expectancy than the plaintiff in <u>Browning</u> because she reasonably expected that some of her campers would be children from the School based on her success in recruiting her students in the past. Pls.' Opp'n at 39. Thus, Mrs. Parnigoni has adequately pled the first requirement of this claim.

2.    <u>The Interferer's Knowledge of the Relationship or Expectancy</u>

A plaintiff must show that the interferer was aware of the business expectancy. <u>Veolia</u>, 592 F. Supp. 2d at 98 (internal citations omitted). In <u>Veolia</u>, this Court found that a putative interferer's knowledge of a plaintiff's relationship or expectancy may be demonstrated by the putative interferer's conduct. <u>Id.</u> Mrs. Parnigoni has alleged that the defendants knew of the relationship she had with the children who attended both their school and also her camp, in addition to her expectancy that her students would attend her camp in the future because Ms. Berry (the School's Director) knew she had circulated flyers advertising her summer camp to parents of students who attended the School prior to the disclosure about her husband. Am. Compl. ¶¶ 45, 107. Accordingly, Mrs. Parnigoni has alleged that the defendants knew of her business expectancy of successfully soliciting campers from the ranks of her students for her

Teddy Bear Camp.  Mrs. Parnigoni has therefore asserted facts sufficient to show that the

defendants knew of Mrs. Parnigoni's business expectancy.

      3.      <u>Intentional Interference Inducing or Causing a Breach or Termination of the
Relationship or Expectancy</u>

      The third element of this tort requires "a strong showing of intent to disrupt ongoing

business relationships" on the part of the alleged interferer.  <u>Bennett</u>, 45 F.3d at 499 (internal

quotation marks omitted).  This element includes "conduct that prevents the plaintiff from

acquiring or continuing the prospective relationship in addition to conduct that induces or

otherwise causes a third person not to enter into or continue the prospective relation." <u>Browning</u>,

292 F.3d at 244 (D.C. Cir. 2002) (citation, internal quotation marks, and alterations in original

omitted).  Finally, the actor's "interference must be improper."  <u>Veolia</u>, 592 F. Supp. 2d at 99

(quoting <u>Furash & Co. v. McClave</u>, 130 F. Supp. 2d 48, 56 (D.D.C. 2001).

      Here, Mrs. Parnigoni alleges that the defendants improperly published defamatory

information about her that substantially interfered with her ability to attract children to her Teddy

Bear Camp, Am. Compl. ¶ 108, knowing that she had successfully recruited campers from the

School in previous years, <u>id.</u> ¶¶ 44, 107.  The Court agrees.  By communicating the information in

the letters about Mr. Parnigoni's conviction in a manner that called into question Mrs. Parnigoni's

character and distributing the letters beyond the circle of individuals who would need to know

about Mr. Parnigoni's past, the defendants substantially interfered with Mrs. Parnigoni's ability to

recruit campers from the School's student body.  As was the case in <u>Browning</u>, where the plaintiff

claimed that the defendants' threats prevented her from forming any business relationships when

she embarked upon doing so, 292 F.3d at 243-44, Mrs. Parnigoni asserted that the defendants'

defamatory conduct prevented her from successfully soliciting students despite expending

reasonable efforts to attract children to her camp as she had done in past years through the distribution of flyers advertising the camp.  Additionally, Mrs. Parnigoni contends that the outright prohibition of the distribution of her flyers by the defendants demonstrates their intentional interference with her attempt to recruit students to her summer camp.  As illustrated by Kimmel v. Gallaudet Univ., 639 F. Supp. 2d 34, 45 (D.D.C. 2009), even Mrs. Parnigoni's bare allegations that the defendants' communications with parents and nursery school directors caused her to lose her prospective business relationships are sufficient to establish the intent prong of this tort.  See id. (finding that the plaintiff's allegation that the defendants  "spread[] false and defamatory lies" about her to the Washington Post and that "at least three potential sources of prospective employment [] disappeared" as a result of the defendant's actions was sufficient to demonstrate the defendant's intentional interference with the plaintiff's expectancy of continuing her teaching career) (internal brackets omitted); see also Williams v. Fed. Nat'l Mortgage Ass'n, No. 05-1483 (JDB), 2006 WL 1774252, at *9 (D.D.C. June 26, 2006) (finding that the plaintiff's allegation that the defendants communicated "defamatory information" about her to other companies associated with the plaintiff was sufficient to support this third element).  Therefore, Mrs. Parnigoni has pled facts sufficient to satisfy the third element required to prove an intentional interference with the plaintiff's prospective economic advantage claim.

4.      Resultant Damage

Generally, "resultant damages reasonably flow from the intentional interference of a business relationship or expectancy." Veolia, 592 F. Supp. 2d, at 100.  Here, Mrs. Parnigoni contends that the defendants prevented her from distributing flyers about the Teddy Bear Camp to the parents of the children attending the School, even though there had been a history of children who attended the School also attending her summer day camp.  See Am. Compl. at ¶106.  And,

Mrs. Parnigoni's alleges that her inability to distribute her flyers advertising the summer camp decreased her opportunity to enroll students,  resulting in the loss of income.  Pls.' Opp'n at 39. Furthermore, she asserts that "[t]he dissemination of the defamatory letters induced or caused a breach or termination of students' enrollment in the Teddy Bear Camp."  Id.

In Gross v. Akin, Gump, Strauss, Hauer, and Feld, LLP, the court denied a former employee's motion to dismiss concluding that a reasonable jury could find that the employee tortiously interfered with the law firm's prospective client relationship where the employee sent harmful emails to a prospective client which resulted in the client failing to sign a retainer with the firm.  599 F. Supp. 2d 23, 32 (D.D.C. 2009).  In this case, Mrs. Parnigoni makes similar allegations, asserting that the defendants' communications with the parents of students that attended the School, other nursery school directors in the area, and the defendants' restrictions on Mrs. Parnigoni's ability to distribute her flyers for the purpose of attracting children to the camp harmed her efforts to secure camp participants.  Thus, construing  the facts of this case in a light most favorable to Mrs. Parnigoni, she has sufficiently alleged that she suffered damages as a result of the defendants' intentional interference with her future business expectancy.

Having adequately pled all elements of a claim for intentional interference with prospective economic advantage, the defendants' Rule 12(b)(6) motion to dismiss this claim must be denied.

**H.     The Plaintiffs' Negligent Misrepresentation Claim**

The plaintiffs' negligent misrepresentation claim is based on the defendants' admission of Andrew as a student at the School without advising Mr. and Mrs. Parnigoni that if Andrew enrolled in the School the disclosure about Mr. Parnigoni's conviction would be made.  Am. Compl. ¶ 113.  The defendants seek the dismissal of this claim arguing that it has not been properly pled because the Complaint does not allege: (1) that the defendants made a false

43

statement or omission of fact; (2) that the defendants made a statement in violation of a duty to

exercise reasonable care; and (3) that the plaintiffs relied to their detriment on false information.

Defs.' Mem. at 31-32.  In support of these arguments, the defendants state that the claim is

deficient "because the alleged omission—'that the disclosures [regarding David Parnigoni] would

be made'—was not one of then existing 'fact' but of future intention," thus, the defendants claim

that there was no misrepresentation because the School had no intention to make any disclosure

regarding Mr. Parnigoni's criminal conviction at the time it requested the information from Mrs.

Parnigoni in August of 2007.  Id. at 33.  Therefore, they argue that they had no duty to tell the

Parnigonis that a disclosure could or would be made as it was an unforeseeable future event at that

time.  Id.  Moreover, the defendants argue that educational institutions have no "legal fiduciary

duty to its employees or the parents of prospective students," and in any event, the determination

of a fiduciary duty is a question of law for the Court to decide, not a jury.  Defs.' Reply at 24.

     The plaintiffs address the defendants' lack of duty position by arguing that "the tort of

negligent misrepresentation imposes a duty in favor of all those third parties who the defendant

knows and should reasonably foresee will rely on the information in question."  Pls.' Opp'n at 41.

And, the plaintiffs further contend that Andrew Parnigoni, as one of the school's students, and

Fiona Parnigoni, as one of its employees, falls within the scope of that obligation.  Id.

     For the plaintiffs' claim of negligent misrepresentation to survive a Rule 12(b)(6) motion to

dismiss, they must successfully plead that "(1) the defendants made a false statement or omission

of a fact; (2) the statement was a violation of a duty to exercise reasonable care; (3) the false

statement or omission involved a material issue; (4) the plaintiffs reasonably relied to their

detriment on the false information; and (5) the defendants' challenged conduct proximately caused

injury to the plaintiffs."  Burman v. Phoenix Worldwide Indus., 384 F. Supp. 2d 316, 336 n.17

(D.D.C. 2005) (citing Burlington Ins. Co v. Okie Dokie Inc., 329 F. Supp. 2d 45, 48 (D.D.C.

2004)).  Here, the defendants challenge only the sufficiency of the plaintiffs' allegations as to the

first, second, and fourth element of the claim.  However, a sufficiently pled negligent

misrepresentation claim requires satisfaction of all five elements, see Bell v. Rotwein, 535 F.

Supp. 2d 137, 144-45 (D.D.C. 2008) (finding plaintiff's claim deficient because he failed to allege

an injury caused by the defendant's actions); In re U.S. Office Products Co. Securities Litigation,

251 F. Supp. 2d 58, 74 (D.D.C. 2003) ("[N]egligent misrepresentation claims must adequately

allege all of the required elements").  Therefore, because the plaintiffs fail to adequately plead two

of the elements necessary to establish a claim of negligent representation, the defendant's motion

to dismiss this claim is granted.[8]

Where misrepresentations are made about future acts, they cannot serve as the basis for a

negligent misrepresentation claim.  See Isaac v. Mnemonic Sys. Inc., No. CIV. A. 97-0988 (JHG),

1998 WL 151286, at *7 (D.D.C. Mar. 25, 1998) ("As a general rule, the misrepresentation

underlying a . . . negligent misrepresentation claim must be a misrepresentation as to past or

present fact.").[9]  In 2004, when Mrs. Parnigoni disclosed to the School the information concerning

her husband's conviction, the School made no further inquiry about the situation.  In fact, the

School did not solicit any additional information from her with respect to Mr. Parnigoni's

---

[8] In addition to the arguments listed above, the defendants' also advance a waiver argument regarding the plaintiffs' negligent misrepresentation claim.  Specifically, the defendants' argue that the plaintiffs waived their negligent misrepresentation claim when the Director of the School informed Mrs. Parnigoni in August 2007, before Andrew was actually enrolled in the School, "that she intended to tell any parent who inquired about Mr. Parnigoni's conviction."  Defs.' Mem. at 32.  And they contend that, as a matter of law, their waiver position is not compromised by their decision, "after further consultation (including consultation with counsel)," to make the disclosure in a letter and not in one-on-one conversations between the Director a parent.  Id.  However, because the Court has resolved this claim on other grounds, it need not address the defendants' waiver argument.

[9] "However, exceptions to this rule are numerous and include situations where a relationship of trust and confidence exists between the parties."  See Isaac v. Mnemonic Sys. Inc., No. CIV. A. 97-0988 (JHG), 1998 WL 151286, at *7 (D.D.C. Mar. 25, 1998).

conviction until 2007 after Ms. Berry had become the Director of the School.  Am. Compl. ¶ 18.

Earlier in 2007, the Parnigonis applied to enroll their son in the School without being told that

their son's admission to the School would result in the disclosure of Mr. Parnigoni's conviction.

Id. ¶ 19.  However, because the Parnigonis enrolled their son in the School, the new leaders

reevaluated Mr. Parnigoni's arrest and his subsequent conviction.  Id. ¶ 19.  Importantly, as the

defendants observe, the plaintiffs do not allege that at that point—"presumably March, 2007, when

Andrew was admitted, or August 2007, when he enrolled"—the defendants had plans to "issue a

letter about Mr. Parnigoni['s]" conviction to the parents and the church's parishioners.  Defs.'

Mem. at 33.  Rather, the decision to disclose the information was made only after Andrew's

admission and the defendants then consulted with their legal counsel.  Defs.' Mem. at 5.  Support

for this conclusion is found in the October 18th letter, which stated: "[o]ver the past several

months three situations, or renewed concern about situations, have led us to review our Standards,

Policies and Procedures with legal counsel . . . [and after] consulting with attorneys" they made the

decision to inform the parishioners and School.  Id.  Therefore, the alleged omission about which

the plaintiffs complain was not pre-existing or present at the time of Andrew's admission.  In fact,

nothing in the plaintiffs' Amended Complaint suggests that when the School received the

application to admit Andrew, the School's admission's committee had any information as to

whether or not the School would disclose Mr. Parnigoni's conviction.  Furthermore, the Court

notes that despite the plaintiffs' assertion that the defendants failed to disclose to them that

information regarding Mr. Parnigoni's conviction would be disclosed if Andrew was enrolled in

the School, the new Director of the School (Ms. Berry) told Mrs. Parnigoni "around th[e] time"

she enrolled her son in the School that Mrs. Parnigoni "was required to disclose the details of her

husband's conviction so that the Director could explain it to any parent who might ask a question

regarding it" and Mrs. Parnigoni provided the information requested.  Am. Compl. ¶¶ 18-19.

Subsequently, at a meeting between Ms. Parnigoni and the leadership of the Church, the School

and their attorney, Ms. Parnigoni was informed that information about Mr. Parnigoni's conviction

would be made public.  Id. ¶¶ 24-25.  Therefore, the plaintiffs have not sufficiently alleged that

there was a false representation or omission of a material fact on the part of the defendants when

the Parnigonis applied for Andrew's admission nor when Andrew enrolled in the School.  See Day

v. Avery, 548 F.2d 1018, 1025-26 (D.C. Cir. 1976) (stating that the misrepresentation being

asserted generally must be a conscious misrepresentation of fact as to a past or present act;

misrepresentations concerning a future act will not ordinarily qualify); Isaac, 1998 WL 151286, at

*7; accord Lampman v. Dewolff Boberg & Associates, Inc., No. 07-2072, 2009 WL 757368, at *5

(4th Cir. Mar. 23, 2009).  Thus, for this reason alone the defendants' motion to dismiss the

plaintiffs' negligent misrepresentation claim must be granted.[10]

     However, even if the Court could find that the plaintiffs satisfied the first element of this

claim—that the defendants made a false statement or omission of a fact—the plaintiffs' claim for

negligent misrepresentation would still be unsuccessful as they cannot show that they reasonably

relied on the omission.

     In Redmond v. State Farm Ins. Co., 728 A.2d 1202, 1208 (D.C. 1999), the plaintiff brought

an action alleging, inter alia, negligent misrepresentation. There, Mr. Redmond purchased an

apartment building for which he acquired insurance coverage from State Farm. Id. at 1203.  Prior

---

[10] Furthermore, this result is warranted even in light of the plaintiffs' argument that they fall into an exception because as an employee and prospective student, the defendants had a duty to disclose that upon Andrew's enrollment, information pertaining to Mr. Parnigoni's conviction would be released, Pls.' Opp'n at 41.  Although there may be support for the plaintiffs' argument (see Isaac, 1998 WL 151286, at *7 (stating that "a relationship of trust and confidence exist[ing] between the parties" constitutes an exception to the general rule that the misrepresentation must be in regards to pre-existing or present act)), the plaintiffs would still be unable to satisfy the fourth element—reasonable reliance—necessary to satisfy their claims for negligent misrepresentation. See infra.

to purchasing the insurance, Mr. Redmond met with a State Farm agent. Id.  During the discussions between the two, neither Mr. Redmond nor the agent addressed whether the policy included coverage against lead paint claims despite the plaintiff's knowledge that insurance policies contain provisions excluding certain risks. Id. at 1204.  Several years later, two of Mr. Redmond's tenants sued him for having negligently exposed their children to lead paint, and State Farm refused to defend or indemnify him based on its policy's exclusion clause. Id.  Mr. Redmond in turn sued State Farm arguing that he had a reasonable expectation that the policy covered his tenants' claims because the agent described it as an "all risk" policy, and the exclusion was never discussed. Id. at 1203.  The trial court found that even though the defendant's agent failed to disclose to Mr. Redmond the policy's lead paint exclusion, id. at 1207, "[t]here [was] [] no evidence whatsoever that [States Farms agent's] error of omission was intended to or, indeed, did lull [Mr.] Redmond into thinking he had lead paint coverage." Id. at 1208.  On appeal, the District of Columbia Court of Appeals agreed, holding that State Farm had no obligation to defend or indemnify Mr. Redmond because he had not shown that the agent "led him to believe that he had lead paint coverage and therefore induced him not to read the policy." Id.

Similarly, in this case the plaintiffs do not have a basis for claiming that the defendants led them to believe that information pertaining to Mr. Parnigoni's conviction would not be disclosed if they enrolled their son as a student at the School.  Indeed, nothing to that effect was even said or suggested to them before they submitted their application for their son's admission, or at any time before he was actually enrolled. Nor were they in any way made to believe that if their son was admitted into the school that there would be no disclosure of Mr. Parnigoni's conviction. Thus, the plaintiffs have also failed to adequately plead the fourth element of their negligent misrepresentation claim.

## IV. Conclusion

The plaintiffs have pled facts sufficient to support their claims of defamation and invasion of privacy–false light as to Mrs. Parnigoni and to support their claims for promissory estoppel and intentional interference with prospective economic advantage; therefore, the Court must DENY the defendants' Rule 12 (b)(6) motion to dismiss these claims for failure to state claims upon which relief may be granted.  The plaintiffs, however, have failed to plead facts sufficient to support their claims of  defamation and invasion of privacy–false light as to Andrew Parnigoni and they have also failed to adequately plead their claims of invasion of privacy–public disclosure of private facts, intentional infliction of emotional distress, loss of consortium, and negligent misrepresentation. Therefore, the Court must GRANT the defendants' Rule 12(b)(6) motion to dismiss these claims for failure to state claims upon which relief may be granted.

**SO ORDERED** this 29 day of January, 2010.[11]

REGGIE B. WALTON
United States District Judge

_____

[11] This Memorandum Opinion accompanies the Order issued on March 27, 2009.